Randy J. Tanner
BOONE KARLBERG P.C.
201 West Main, Suite 300
P. O. Box 9199
Missoula, MT  59807-9199
Phone:  (406) 543-6646
Fax:      (406) 549-6804
rtanner@boonekarlberg.com

Travis Annatoyn (*pro hac vice* pending)
Democracy Forward Foundation
1333 H. St. NW, Washington, D.C. 20005
Phone:  (202) 601-2483
Fax:      (202) 448-9090
tannatoyn@democracyforward.org

**FILED**

AUG 0 7 2018

Clerk, U.S. District Court
District Of Montana
Missoula

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS,<br><br>Plaintiff,<br><br>vs.<br><br>RYAN ZINKE, in his official capacity as Secretary of the Interior, VINCENT DEVITO, in his official capacity as Counselor for Energy Policy to the Secretary of the Interior, DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, and BRIAN STEED, in his official capacity as Deputy Director of Policy and Programs for the Bureau of Land Management,<br><br>Defendants. | Cause No. CV-18-139-M-DWM<br><br><br><br>COMPLAINT |

## INTRODUCTION

1.      This case challenges the Department of the Interior's "Royalty Policy Committee," ("RPC" or "Committee"), a body ostensibly designed to debate and recommend federal policies concerning the leasing and regulation of public resources under both public and private land – an area covering 700 million acres – and in offshore waters.  As this broad mandate suggests, the RPC directly implicates the interests of American taxpayers (who receive royalties in exchange for the use of their resources), landowners, ranchers, conservationists, outdoor enthusiasts, and advocates of renewable energy.

2.      Rather than pursue its task with the full and transparent participation of these voices, the Committee operates in secret and works to advance the goals of only one interest: the extractive industries that profit from the development of public gas, oil, and coal.

3.      In the absence of competing viewpoints and meaningful public participation, the Committee has already rushed out recommendations to lower leasing royalties across the United States, to expand the amounts of public land available for leasing, and to eliminate environmental and other permitting reviews that safeguard against wasteful or damaging resource extraction.  These and similar decisions threaten an environmentally-destructive wave of inefficient resource

leasing and extraction, long-term public health effects from air and water pollution, and lost revenues to the American taxpayer, states, and localities.

4.      The RPC's brand of hasty, one-sided, and preordained decisionmaking is not sanctioned by Congress, which passed the Federal Advisory Committee Act ("FACA") as a "sunshine law" to ensure that advisory committees are subject to public disclosures and participation.  In a direct affront to congressional intent, Defendants' decision to disregard FACA threatens public confidence in the integrity of the federal government and its management of public lands and minerals.

5.      For instance, FACA requires that advisory committees like the RPC rely on balanced membership and be protected against undue influence by special interests.  The Committee's membership, however, is conclusively stacked with representatives of extractive industries, to the exclusion of conservation, recreational, community, and taxpayer advocacy groups.

6.      This membership ensures that the RPC will advance purely private interests, and will not consider policies that could increase royalties to the United States Treasury and downstream disbursement to states; that would reflect the fair market value of the United States' energy resources; or that would fairly take into account and balance competing interests in conservation, recreation, ranching, and renewable energy.

7.    Indeed, several corporations represented on the Committee currently hold and regularly bid on Bureau of Land Management ("BLM") leases, and thus stand to directly benefit from the Committee's proposals, all in violation of FACA and its implementing regulations.

8.    FACA also requires that the RPC operate in the open and with public input.  The Committee's lopsided membership has disregarded these requirements. The Committee has not provided lawful notice of its meetings; has not properly disclosed the materials on which it relies for analysis and recommendations; has impermissibly outsourced many of its functions to secretive subcommittees and working groups; and has illegally truncated the public's attempt to provide comment.  This decisionmaking process belies any meaningful attempt to consider the significant range of public opinion on the management of federal lands and minerals.

9.    Plaintiff is a Montana-based membership organization representing ranchers, landowners, and other interested parties in states where federal resources are leased.  Plaintiff and its membership therefore have a direct stake in Defendants' adherence to the decisionmaking processes required by FACA, and in the injurious federal policies advanced by the RPC.

10.    Like all other public interest groups who sought a voice in RPC proceedings, Plaintiff's recommendations have been ignored in favor of special

4

interests close to Secretary Zinke and Vincent DeVito, the Committee's Chair and the former treasurer to the Secretary's Political Action Committee.[1]  Together Chairman DeVito and Secretary Zinke have raised hundreds of thousands of dollars from the extractive industries that, acting through the RPC, now drive the nation's public lands and minerals policies.  A single company represented on the Council – Cloud Peak Energy – donated $10,000 to Secretary's Zinke's congressional campaign in 2016 alone.[2]

11.     Plaintiff and other members of the public have brought the RPC's shortcomings to the Committee's attention, to no avail.  To the contrary, the RPC has recently doubled down on its single-minded focus by adding even more leasing advocates to its ranks.  Accordingly, Plaintiff brings this action for declaratory and injunctive relief.

## PARTIES

12.     Defendant RYAN ZINKE is the Secretary of the Interior, and has ultimate authority over the RPC's formation, composition, administration, and termination.  He is sued in his official capacity.

---

[1] *See* Ben Lefebvre, *FEC Increases Scrutiny of Zinke's Former PAC*, Politico, Apr. 2, 2018, https://www.politico.com/story/2018/04/02/fec-scrutiny-of-ryan-zinkes-seal-pac-495228.
[2] *Rep. Ryan K Zinke – Montana District 01*, Open Secrets, https://www.opensecrets.org/ members-of-congress/contributors?cid=N00035616&cycle=2016 (last visited Aug. 7, 2018).

13.    Defendant UNITED STATES DEPARTMENT OF THE INTERIOR ("DOI") or ("Department") is an agency within the executive branch of the federal government responsible for administration of the nation's public lands, including the administration of mineral and energy leasing and related environmental regulations.

14.    Defendant VINCENT DEVITO is Counselor for Energy Policy to the Secretary of the Interior and is the Committee's Chairperson.  He is sued in his official capacity.

15.    Defendant BUREAU OF LAND MANAGEMENT is an agency within the Department of the Interior responsible for managing nearly 250 million acres of public lands and 700 million acres of subsurface mineral estates that lie beneath public lands, or that were severed from public lands when the surface estate was transferred.

16.    Defendant BRIAN STEED is the Deputy Director of Policy and Programs at BLM, and, pursuant to DOI delegations, currently exercises the authority of that agency's Director.  He is an ex-officio member of the RPC and is sued in his official capacity.

17.    Plaintiff WESTERN ORGANIZATION OF RESOURCE COUNCILS, headquartered in Billings, Montana, is a regional network of grassroots community organizations including 15,190 members – hundreds of

whom reside in western Montana – and 39 local chapters across seven states. WORC's mission is to build sustainable environmental and economic communities that balance economic growth with public health and stewardship of land, water, and air resources.

18.    WORC's members farm and ranch on lands overlying and neighboring federal, state, and privately-owned coal, oil, and gas deposits, and experience numerous adverse impacts from coal mining and oil and gas exploration and development, including damage to water and other resources, deterioration of air quality and associated health effects, and destruction of recreational areas. WORC and its member groups, which together form a federation, have a longstanding interest in mining, drilling, leasing, and royalty policy as it pertains to coal, oil, and gas deposits, and for over 35 years have actively engaged in advocacy in this area.

19.    WORC brings this action on its own behalf. An important component of WORC's mission is educating and informing its members about the ways in which their interests are affected by federal policy on public lands and minerals. Thus, WORC routinely updates its membership concerning proposed rulemaking, legislation, and other policy developments. For example, WORC has updated its members through action alerts, blog postings, newsletter articles, and monthly

7

mailings concerning the 2011-2015 royalty valuation rulemaking process, various legislation introduced in Congress, and the RPC.

20.    WORC's capacity to provide updates to its membership is compromised when the government relies on opaque and procedurally-flawed advisory committees to shape executive rulemaking.  Absent the disclosures required by FACA (particularly the statute's requirements for open meetings and records), WORC is unable to adequately inform its members about the Committee's deliberations and proposals, such that WORC and its membership cannot meaningfully participate in Committee processes and other agency actions.

21.    Plaintiff is also injured by the Committee's inadequate chartering and formation, including the Committee's unbalanced membership and inadequate provisions concerning the influence of special interests.  These flaws deprive Plaintiff of a voice – much less a vote – on Committee deliberations.

22.    Specifically, RPC's imbalanced charter and membership have created a Committee that claims broad authority to advise Defendants on a range of issues related to public minerals and leasing, but that lacks the safeguards necessary for a balanced exchange of views and the careful formation of policy—safeguards that are essential to Defendants' obligations under the dozens of statutes governing the American public's resources.  Indeed, the shortcomings in the Committee's formation have already led to one-sided policy recommendations.  Under FACA,

therefore, the fundamental flaws in the Committee's founding documents injure Plaintiff by depriving WORC of the fair and open policy-making apparatus required by law.

23.    Plaintiff also brings this action on behalf of its members.  Beyond the inherent procedural flaws attendant to the Committee and its operation, Plaintiff and its members are injured by the Committee's influence on Defendants' policymaking.  Like many Americans, Plaintiff's membership is harmed when the federal government leases public resources at fire sale prices or absent necessary environmental review, practices that increase public liability, slash public revenue, and degrade the environment.  Many of the policies *already* put in motion by the Committee – such as lower royalty rates and partial environmental reviews – encourage precisely these consequences.

24.    For example, extraction activities disturb nearby environs with machinery that emits noise, water, and air pollution, and – in the case of longwall mining, a technique used in coal extraction – that can literally split open the earth.

25.    Thus, an expansion or deregulation of leasing of public minerals will increase the likelihood that split estate landowners (*i.e.*, landowners who own private land above federal minerals) will suffer damages to farm and ranch land; that residents living near coal, oil and gas production will experience air pollution, reductions in water quality and/or quantity, and threats to their health; that ranchers

will lose grazing permits and tourism-related income; and that westerners who hunt, fish and recreate on public lands will suffer reduced access and/or reductions in wildlife. Plaintiff's membership includes many such landowners, ranchers, and recreationists.

26.    The above injuries are caused by Defendants' unlawful formation and operation of the Committee. Defendants are responsible for the Committee's formation, its membership, its safeguards against special interests, and its operations, including its provision for meetings that are open and that facilitate public participation.

27.    A favorable decision from this Court will redress Plaintiff's injuries by vacating the inherently defective and injurious Committee or by requiring that the Committee operate in a fashion comporting with FACA and allowing Plaintiff and its membership to follow and participate in Committee meetings.

## JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically FACA, 5 U.S.C. § App. II, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

29.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(B) and 28 U.S.C. § 1391(e)(1)(C), because WORC is headquartered in this District,

and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here. Specifically, Montana contains significant public lands and minerals subject to the leasing and leasing-related regulations that the RPC now oversees: in 2017, for instance, the Department of the Interior disbursed over $24 million in leasing-related royalties to the state of Montana,[3] and there are 341 oil and gas leases covering approximately 641,500 acres under the Flathead National Forest alone.[4]

30.     Venue is also proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(A) because Defendant Ryan Zinke performs official duties in this district and therefore resides here. On information and belief, Secretary Zinke has traveled to Montana at least ten times since his appointment. For example, Secretary Zinke has made official remarks at the Western Governors' Association in Whitefish, Montana, and has engaged in official Department business at Glacier National Park and in Browning, Montana.

---

[3] DOI, *Natural Resources Revenue Data, Federal Disbursements*, https://revenuedata.doi.gov/explore/#federal-disbursements (last visited on Aug. 7, 2018).
[4] U.S. Dep't of Agric., *Volume 2 – Final Environmental Impact Statement for the Forest Plan, Flathead National Forest* at 137 (Dec. 2017), https://www.fs.usda.gov/Internet/FSE_ DOCUMENTS/fseprd566363.pdf.

## LEGAL BACKGROUND

### A. The Federal Advisory Committee Act

31.     A "sunshine law," FACA demands transparency and public participation when the executive branch establishes or uses non-federal bodies for the purpose of seeking advice and generating policy. Prior to FACA, special interests had used these committees – and the associated veneer of governmental legitimacy – to drive federal decisionmaking outside the light of public scrutiny, participation, and debate.

32.     Under FACA, therefore, a federal agency may only form an advisory committee once it has "determined as a matter of formal record, after consultation with the [General Service Administration ("GSA")], with timely notice published in the Federal Register, [that the committee is] in the public interest in connection with the performance of duties imposed on that agency by law." 5 U.S.C. App. II § 9(a)(2). Likewise, the agency forming the advisory committee must render and explain a "[d]etermination of need in the public interest," including a finding that the committee is "essential to the conduct of agency business and . . . the information to be obtained is not already available through another advisory committee or source within the Federal Government." 41 C.F.R. § 102-3.30(a).

33.     When passing FACA, Congress explained that "[o]ne of the great dangers in the unregulated use of advisory committees is that special interest

groups may use their membership on such bodies to promote their private concerns," citing in particular an Industrial Waste Committee where "only representatives of industry were present[,]" and "[n]o representatives of conservation, environment, clean water, consumer, or other public interest groups were present." H.R. Rep. No. 92-1017, at 6 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 3491, 3496.

34. To ensure that special interests do not control the advice rendered by advisory committees, FACA requires "the membership of [an] advisory committee to be fairly balanced in terms of points of view represented and the functions to be performed by the advisory committee." 5 U.S.C App. II § 5(b)(2), (c).

35. Likewise, the advisory committee's charter must contain appropriate provisions to "assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment[.]" 5 U.S.C. App. II § 5(b)(3), (c).

36. Department regulations applicable to the RPC expand on this requirement, mandating that "[p]ersons or employees of organizations who hold leases, licenses, permits, contracts or claims which involve lands or resources administered by the [BLM] normally shall not serve on advisory committees." 43 C.F.R. § 1784.2-2(a). To effectuate this requirement, "[m]embers of advisory

committees shall be required to disclose their direct or indirect interest in leases, licenses, permits, contracts, or claims and related litigation which involve lands or resources administered by the [BLM]," including holdings of spouses and children. *Id.* § 1784.2-2(c).

37.     Once established, an advisory committee must include and facilitate public comment and participation.  Thus, an advisory committee must provide "timely notice" of its meetings to the public, 5 U.S.C. App. II § 10(a)(2), and must allow interested persons to "attend, appear before, or file statements with [the] committee, subject to such reasonable rules or regulations as the Administrator [of GSA] may prescribe," *id.* § 10(a)(3).

38.     The Administrator of the GSA has implemented these statutory obligations by requiring advisory committees to publish notice of their meetings "at least 15 calendar days prior" to the meetings, unless documented and "exceptional circumstances" require otherwise.  41 C.F.R. § 102-3.150.  All meetings must be held "in a manner or place reasonably accessible to the public" and allow "[a]ny member of the public [to] speak to or otherwise address the advisory committee if the agency's guidelines so permit." *Id.* § 102-3.150(a), (d). DOI regulations explicitly extend this requirement to any subdivisions of an advisory committee, such as subcommittee or working groups, 43 C.F.R. § 1784.4-

14

3(c), and require 30 days' notice of these meetings and of full Committee

meetings.  43 C.F.R. § 1784.4-2(a).

39.    Beyond FACA's requirement for public notice and participation, an

advisory committee must also make available "the records, reports, transcripts,

minutes, appendixes, working papers, drafts, studies, agenda, [and] other

documents . . . made available to or prepared for" the committee.  5 U.S.C. App. II

§ 10(b).  Pursuant to the Department's Manual, these obligations extend to the

RPC's subcommittees and working groups.  DOI, Department Manual, 308 DM

2.11, *available at* https://www.doi.gov/elips/browse.

40.    These materials must be released well *before* the relevant meeting, so

that the public can "follow the substance of the [committee's] discussions." *Food

Chem. News v. Dep't of Health & Human Servs.*, 980 F.2d 1468, 1472 (D.C. Cir.

1992).

**B. The Administrative Procedure Act**

41.    The APA allows a person "suffering legal wrong because of agency

action, or adversely aggrieved by agency action" to seek judicial review of that

action.  5 U.S.C. §§ 702-704.  Under the APA, a reviewing court may "compel

agency action unlawfully withheld or reasonably delayed," *id.* § 706(1), and "hold

unlawful and set aside agency action, findings, and conclusions" that are

"arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with

law," *id.* § 706(2).  Because FACA does not provide its own standard or scope of review, or a cause of action, this case is properly brought under the standards set forth in the APA.  *See* 5 U.S.C. § 701(a).

## FACTUAL ALLEGATIONS

### A. The Importance Of Federal Leasing Regimes To Public Health And Finances

42.     The leasing and extraction of public minerals is governed by several statutes and regulations.  The regulatory scheme governing a particular lease and its permitting depends on the resource extracted (*e.g.*, coal, natural gas, or oil) and the location of the extraction (onshore or offshore), among other factors.[5]  BLM has primary jurisdiction over onshore mineral estates, while the Bureau of Ocean Energy Management and the Bureau of Safety and Environmental Enforcement regulate offshore drilling.  The Office of Natural Resources Revenue manages monetary transactions for onshore and offshore extraction.

43.     Generally, private lessees that extract public minerals must pay royalties – calculated as a percentage of the underlying resource's value – to the United States.  In addition, industries operating on federal lands pay bonus bids, rents, and other fees.

---

[5] *See generally* Jayni F. Hein, *Federal Lands and Fossil Fuels: Maximizing Social Welfare in Federal Energy Leasing,* 42 Harv. Envtl. L. Rev. 1, 10-12 (2018).

44.     Collectively, these revenues flow to the United States Treasury and to tribal treasuries.  In 2017, the United States collected nearly $7 billion in revenue from the disposition of the American public's oil, gas, and coal.[6]

45.     The United States Treasury, in turn, disburses royalty proceeds to states and to federal programs such as land reclamation, the Land and Water Conservation Fund, and historic preservation efforts.[7]

46.     States depend on federal royalty revenues to replenish their general funds, and to pay for public schools and infrastructure.  In Colorado, nearly half of the $92 million received in royalties from state land extraction is allocated to supply the State Public School Fund.[8]  In Montana, 75% of federal royalty revenues flow to the state general fund.[9]  And New Mexico receives nearly $500 million in annual royalty revenue, which is then used to help fund state schools and hospitals.[10]

---

[6] DOI, *Natural Resources Revenue Data, Revenue from Extraction on Federal Land*, https://revenuedata.doi.gov/explore/#revenue (last visited on Aug. 7, 2018).
[7] DOI, *Natural Resources Revenue Data, Federal Disbursements*, https://revenuedata.doi.gov/explore/#federal-disbursements (last visited on Aug. 7, 2018).
[8] *See* Colo. Fiscal Inst., *CFI Brief: Federal Coal Program Reform Could Provide Much Needed Resources to Local Budgets* (Aug. 17, 2015), http://coloradofiscal.org/wp-content/uploads/2015/08/2015-8-17_Coal-Royalties-FINAL.pdf; DOI, *Natural Resources Revenue Data, Colorado, State Disbursements,* https://revenuedata.doi.gov/explore/CO/ (last visited Aug. 7, 2018).
[9] Mont. Dep't of Revenue, *Biennial Report: July 1, 2014 – June 30, 2016* at 129 (2016), https://mtrevenue.gov/wp-content/uploads/2017/07/2016-Biennial-Report-Complete.pdf.
[10] N.M. Legislative Fin. Comm., *Oil and Natural Gas Revenue* (May 2018), https://www.nmlegis.gov/Entity/LFC/Documents/Finance_Facts/finance%20facts%20oil%20and%20gas%20revenue.pdf.

47.     When the government sets royalty rates too low – or when it uses inaccurate valuation methods – it encourages inefficient overleasing by private entities and lowers overall revenue to federal, state, and tribal treasuries.

48.     Currently, the United States does not demand fair market value for its public resources.  A 2017 report by the Government Accountability Office determined that federal royalty rates have been set below levels that would maximally benefit the public fisc, and that higher rates would lower production but produce increased revenues for federal, state, and tribal treasuries.[11]  Other commenters have observed that current royalty rates do not merely shortchange Americans with respect to the fair market value of their resources, but further fail to account for long-term liabilities from leasing in the form of persistent environmental damage.  And the federal government forgoes tens of millions each year in lost royalty revenue from the wasteful venting and flaring of methane and other byproducts of natural gas extraction.[12]

---

[11] *See, e.g.*, U.S. Gov't Accountability Office, GAO-17-540, Oil, Gas, and Coal Royalties: Raising Federal Rates Could Decrease Production on Federal Lands but Increase Federal Revenue (2017).

[12] Taxpayers for Common Sense, *Gas Giveaways: Methane Losses Are a Bad Deal for Taxpayers* at 4 (Apr. 2018), https://www.taxpayer.net/wp-content/uploads/2018/04/TCS-Report-Gas-Giveaways_-April-2018.pdf.

**B. Secretary Zinke Illegally Charters And Staffs The RPC To Undervalue Leases Of Public Resources**

49.    To recommend leasing-related policy to federal decisionmakers, the first Royalty Policy Committee was chartered in 2004.  The charter was renewed in 2006, 2008, 2010, and in 2012, before lapsing in 2014.

50.    On March 29, 2017, Secretary Zinke chartered the Committee's most recent iteration, and the Department of the Interior publicly announced the Committee on April 3, 2017.  *See* Royalty Policy Committee Establishment, 82 Fed. Reg. 16222 (Apr. 3, 2017).  The very next day, DOI announced the repeal of a landmark rule, less than a year old, that had made important strides towards valuing public resources of oil, gas, and coal in a fashion protective of the American taxpayer and residents of western states.  *See* Repeal of Consolidated Federal Oil & Gas and Federal & Indian Coal Valuation Reform, 82 Fed. Reg. 16323 (Apr. 4, 2017).  *See generally Becerra v. United States Dep't of Interior,* 276 F. Supp. 3d 953, 955-57 (N.D. Cal. 2017).

51.    The Committee's stated purpose is to generate specific policy proposals and transmit those proposals to Secretary Zinke for further action.  In practice, the RPC was designed from the outset to replace the repealed valuation rules with a set of policies extremely favorable to the extractive industries, and irreparably harmful to American taxpayers, public lands, and persons residing nearby federal mineral estates.

52.     Unlike prior iterations of the RPC, which focused largely on technical issues of royalty rates and valuation, the new RPC purports to embrace a much broader agenda of regulatory reform, including significant changes to federal permitting regimes such as that set forth in the National Environmental Policy Act ("NEPA"), the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). At the Committee's first meeting, Chairman DeVito advertised the RPC as a vehicle to achieve "energy dominance," a goal that would require the Committee to "address a range of issues from leasing, permitting, royalty policy, product valuation regulations, revenue transparency, and other general policy improvements."[13] Thus, the latest iteration of the RPC implicates non-extractive interests (e.g., environmental and taxpayer interests) much more so than previous Committees.

53.     Under FACA, creation of the RPC required significant preliminary findings. In their haste to charter the RPC's sweeping new mandate, Defendants ignored these requirements.

54.     Specifically, Secretary Zinke was obligated to "determine[] as a matter of formal record, after consultation with the [GSA], with timely notice published in the Federal Register, that the committee is in the public interest in

---

[13] DOI, *Royalty Policy Committee Inaugural Meeting, Summary of Proceedings* at 3, 6-7 (Oct. 2017), https://www.doi.gov/sites/doi.gov/files/uploads/rpc_-_oct_2017_committee_mtg_-_mtg_summary_v2.pdf.

connection with the performance of duties imposed on that agency by law."

5 U.S.C. App. II § 9(a)(2). Likewise, the GSA's implementing regulations

required Secretary Zinke to render a "[d]etermination of need in the public

interest," including a finding that the committee is "essential to the conduct of

agency business and . . . the information to be obtained is not already available

through another advisory committee or source within the Federal Government."

41 C.F.R. § 102–3.30(a).

56.	Defendants were required to make these findings as applied to what

Chairman DeVito has called the RPC's new, "broad" mandate.[14]

56.	Beyond a lengthy string citation to several statutes, the Secretary's

only effort to comply with these requirements reads, in its entirety: "[i]t has been

determined that the Committee is in the public interest in connection with the

responsibilities of the Department of the Interior."[15] No further analysis supports

this conclusion.

57.	FACA also requires "the membership of [an] advisory committee to

be fairly balanced in terms of points of view represented and the functions to be

performed by the advisory committee." 5 U.S.C App. II 5 § (b)(2), (c). This

---

[14] *Id.* at 7.

[15] DOI, *Royalty Policy Committee Charter* ¶ 2 (*date signed* Mar. 29, 2017, *date filed* Apr. 21, 2017), *available at* https://www.doi.gov/sites/doi.gov/files/uploads/2017_charter_royalty_policy_committee.pdf ("RPC Charter").

balance must be "both geographic *and interest-specific*," 43 C.F.R. § 1784.2-1(a)

(emphasis added), and should include "representatives of the public interest" and

"a variety of economic and social groups." DOI, Department Manual, 308 DM

8.3(A)(2), *available at* https://www.doi.gov/elips/browse.

58.     The Committee's charter calls for a membership comprised of:

- Seven federal, ex-officio, and nonvoting representatives of various DOI sub-agencies;

- Up to six members representing "the Governors of States" receiving more than $10 million in royalty revenues from federal leasing;

- Up to six members representing various mineral and/or energy stakeholders;

- Up to four members representing academic and public interest groups, and;

- Up to four members representing Indian Tribes subject to certain federal statutes.[16]

59.     In addition to the regular members of the Committee, there are many

alternate members, including six alternate members representing industry, six

alternate members representing states, and two alternates representing academic

and public interest groups.

60.     Unlike many other advisory committees, the RPC was not permitted

to elect its chair from among its membership. Instead, Secretary Zinke used the

---

[16] *Id.* ¶ 12.

RPC's charter to install Vincent DeVito as the Committee's permanent chair.[17] Before his appointment to a newly-created political position at DOI – "Counselor to the Secretary for Energy Policy" – Chairman DeVito served as an attorney for extractive industries and as treasurer for the "Supporting Electing American Leaders PAC," Secretary Zinke's political action committee.[18]

61.    And unlike at least one prior version of the RPC, the Committee eschewed a "Membership Balance Plan" that would have established guidelines for a fairly balanced membership.[19]  Instead, Chairman DeVito committed the RPC to a strictly "business mindset."[20]

62.    Operating without a Membership Balance Plan and pursuant to Chairman DeVito's "business mindset," the RPC solicited nominations for Committee membership.  Various public interest and conservation groups submitted nominations but were denied.  Instead, Defendants stacked the Committee with advocates for extractive industries.

63.    Of the 12 regular and alternate Committee members representing "various mineral and/or energy" stakeholders, all but one represent experience with extractive industries.

---

[17] *Id.*

[18] *See* Lefebvre, *supra* note 1.

[19] *See, e.g.,* DOI, *Federal Advisory Committee (FAC) Membership Balance Plan* (Mar. 16, 2012), *available at* https://www.facadatabase.gov/download.aspx?fn=Charters/21405_Membership%20Balance%20Plan_(2012-04-20-07-51-34).pdf.

[20] DOI, *supra* note 13 at 3.

64.     Of the six alternate and regular Committee members representing "academia and public interest," at least three work or consult for extractive industries.  None of the six members purport to represent those portions of the public interested in conservation or in royalty prices that are fair to taxpayers or local, non-tribal stakeholders.  Indeed, one of the six "public interest representatives" – Daniel Rusz – appears to lack any experience in academic or public interest work, and was initially slated to participate on the RPC as one of the "industry" representatives due to his experience in the coal mining industry.

65.     When Defendants determined that this membership was not sufficiently lopsided, they suddenly and without explanation added two "non-voting subject matter experts to represent the public interest" to the Committee.[21] These positions, which are not contemplated by the RPC's Charter, were filled by David Kreutzer of the Heritage Foundation and Paul Blair of Americans for Tax Reform.  Both individuals have aggressively advocated for policies supported by extractive industries.[22]

66.     The Committee has staffed these members in a largely opaque decisionmaking structure, delegating policy formulation to subcommittees and

---

[21] DOI, *Planning, Analysis, & Competitiveness Subcommittee* at 1 (Mar. 30, 2018), https://www.doi.gov/sites/doi.gov/files/uploads/pac_meeting_summary_3.30.18_js_1_0.pdf.
[22] *See, e.g.*, Kevin Dayaratna, David Kretuzer, & Nicolas Loris, The Heritage Found., *Time to Unlock America's Vast Oil and Gas Resources* (Sept. 1, 2016), https://www.heritage.org/environment/report/time-unlock-americas-vast-oil-and-gas-resources.

working groups whose complete membership was only released after months of inquiry by public interest organizations.[23]  Underscoring the pro-forma nature of the Committee, Chairman DeVito and Committee members then delegated significant subcommittee and working group responsibility to *alternate* members, even though the alternate members' appointment letters provided that their primary responsibility was to attend full Committee meetings in the event that primary members were unavailable.

67.    At the Committee's February meeting, for example, "alternate" member Kathleen Sgamma of Western Energy Alliance (a lobbying group for extractive industries) presented the recommendations for onshore oil and gas development.  These recommendations, most of which have been endorsed by the Committee, chiefly included the reduction or elimination of environmental reviews for leases.[24]

68.    The RPC's staffing and structure mean that it is not "fairly balanced" under FACA.  Because they share a common interest in driving down public compensation for mineral rights, the powerful "industry" and so-called "public interest" blocks on the Committee are able to steer the RPC towards extraction-

---

[23] *See* Taxpayers for Common Sense, *Document Release: Agency Lists Subcommittee and Working Group Members*, July 9, 2018, https://www.taxpayer.net/energy-natural-resources/document-release-agency-lists-subcommittee-and-working-group-members/.
[24] *See* DOI, *Royalty Policy Committee February 28, 2018 Meeting, Summary of Proceedings* at 10-11 (*prepared* Mar. 2018), https://www.doi.gov/sites/doi.gov/files/uploads/rpc_-_feb_2018_committee_mtg_with_memo.pdf.

friendly outcomes even without assistance from Chairman DeVito and his allies within the Committee's influential "alternate" membership. No members of the Committee represent interests such as Plaintiff's.

69.     In addition to its "fairly balanced" requirement, FACA requires that advisory committees "contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment[.]"  5 U.S.C. App. II § 5(b)(3), (c).

70.     With certain exceptions, therefore, members of Department of Interior advisory committees providing recommendations on the leasing of public resources may not hold "leases, licenses, permits, contracts or claims which involve lands or resources administered by [BLM]," or work for employers with those holdings.  43 C.F.R. § 1784.2-2(a).

71.     Additionally, members must "disclose their direct or indirect interest in leases, licenses, permits, contracts, or claims and related litigation which involve lands or resources administered by [BLM]," including holdings of a spouse or dependent child.  *Id.* § 1784.2-2(c).

72.     The RPC and its membership have ignored these requirements.  No member has publicly disclosed their interests in BLM-administered lands, and, on

information and belief, at least seven Committee members (including alternate members) are employed by companies holding BLM leases.  Collectively, these employers – including behemoths like Chevron, Shell, and Conoco Phillips – lease millions of acres of land from BLM.   One such Committee Member is employed by Cloud Peak energy, which almost exclusively mines federal coal.

### C. In Secret, The RPC Outsources Its Decisionmaking To Corporate Interests

73.     One of FACA's primary goals is to ensure openness and transparency in advisory committee deliberations.

74.     Accordingly, an advisory committee must provide "timely notice" of its meetings to the public, 5 U.S.C. App. II § 10(a)(2), and must allow interested persons to "attend, appear before, or file statements" with the committee, *id.* § 10(a)(3).  By regulation, the RPC must give thirty days' notice of all Committee, subcommittee, and working group meetings, 43 C.F.R § 1784.4-2, and must open all meetings – including subcommittee and working group meetings – to the media and public, *id.* § 1784.4-3(a).  "The scheduling of meetings and the preparation of agendas shall be done in a manner that will encourage and facilitate public attendance and participation." *Id.* § 1784.4-3(c).

75.     The Committee has publicly met on at least three occasions – on October 4, 2017, February 28, 2018, and June 5-6, 2018 – and a fourth meeting is scheduled for September 2018.  Further meetings are anticipated into at least 2019.

76.     The RPC has operated to exclude public participation.  In violation of its obligation to provide 30-days' notice of Committee meetings, it announced its February and June meetings only 14 and 19 days earlier, respectively.  *See* Public Meeting, 83 Fed. Reg. 6613 (Feb. 14, 2018); Public Meeting, 83 Fed. Reg. 22989 (May 17, 2018).

77.     The RPC has provided no public notice of its subcommittee or working group meetings, even though these subsidiary groups have generated nearly all of the RPC's policy recommendations.

78.     The RPC's subcommittee and working group meetings – many of which are spearheaded by representatives of the oil and gas lobbies – have not been opened to the media and public.

79.     At least one other advisory committee chartered by Secretary Zinke met in secret and with DOI officials *before* what was advertised as its first meeting.[25]  The RPC has not disclosed whether it has convened similar meetings.

80.     Otherwise, the RPC has opened its full Committee meetings to the public.  But it has not facilitated public participation during these meetings.  At the Committee's February 2018 meeting, the RPC permitted interested members of the public to speak for only two minutes per person, for a total of thirty minutes.  The

---

[25] Chris D'Angelo, *Documents Raise More Ethics Issues for Ex-NRA Lobbyist Working for Ryan Zinke*, HuffPost, July 18, 2018, https://www.huffingtonpost.com/entry/ben-cassidy-nra-interior-wildlife-council-trophyhunting_us_5b4d1136e4b0fd5c73be0bb5.

vast majority of the speakers – some of whom had unsuccessfully sought Committee membership – decried the RPC's lack of balance and transparency, or spoke against specific policy proposals.[26]

81.     Belying any meaningful opportunity for public participation, the Committee immediately thereafter held votes on and adopted many policy proposals to which the public had objected, providing no meaningful opportunity for the Committee to evaluate the public's concerns.[27]

82.     For example, members of the public used their truncated speaking opportunities to offer concerns regarding the RPC's proposals to lower offshore royalty rates and to value coal royalties according to a company's internal transactions, as opposed to a true arm's length transaction.  Without providing additional time for the Committee to discuss these comments, Chairman DeVito rushed through a Committee vote purporting to approve both proposals.

83.     Chairman DeVito's pro forma ratification of subcommittee and working group proposals constitute adoption "by the parent advisory committee without further deliberations by the parent advisory committee."  41 C.F.R. § 102-3.145.  Accordingly, GSA regulations – in addition to the DOI regulations

---

[26] *See* DOI, *supra* note 24 at 13-22.
[27] *Id.*

cited above – mandate that all such subcommittee and working group meetings comply with FACA's provisions for openness and transparency.  *Id.*

84.    Beyond FACA's requirement for public notice and participation, an advisory committee must also make available all "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, [and] other documents . . . made available to or prepared for" the Committee.  5 U.S.C. App. II § 10(b).  These obligations extend to the RPC's subcommittees and working groups.  DOI, Department Manual, 308 DM 2.11, *available at* https://www.doi.gov/elips/browse.

85.    These materials must be released well *before* the relevant meeting, such that the public can "follow the substance of the discussions."  *Food Chem. News v. Dep't of Health & Human Servs.*, 980 F.2d 1468, 1472 (D.C. Cir. 1992).

86.    The RPC has violated these rules because it has not provided any documents prepared for or used by the Committee's working groups and subcommittees prior to those bodies' meetings.   Moreover, the RPC provided summary materials relevant to the Committee's February meeting only two days before that meeting, precluding the public from fully following the substance of the Committee's technical discussions.

87.    The RPC maintains a website on which it purports to post materials in compliance with FACA.  But although the RPC's meetings are recorded, the

Committee's website does not contain recordings or transcripts of the RPC's meetings.

### D. The RPC Illegally Adopts Policy Recommendations Depriving The Public Of Fair Market Value For Its Resources

88.    The outcome of the RPC's lopsided and secretive decisionmaking process is just as Secretary Zinke and Chairman DeVito intended: the Committee has issued dozens of recommendations that benefit only extractive industries, at the expense of American public.

89.    For example, the Committee has proposed widening a loophole that permits coal companies to undervalue their royalty payments when the coal company sells coal to a subsidiary.  Currently, coal companies are permitted to estimate the fair market value of these sales by looking to the arm's-length transactions of similarly-situated companies.  30 C.F.R. § 1206.257(c)(2)(i).  This regulation is itself subject to manipulation and deceptive accounting, and likely costs American taxpayers tens of millions of dollars per year in lost revenues.  The Committee, however, has recommended that DOI exacerbate the undervaluation associated with this practice by amending its regulations so that coal companies can essentially name their own price when selling coal internally.[28]

---

[28] *See* DOI, *supra* note 24 at 3.

90.    The Committee has also issued several recommendations for scaling

back or altering requirements for environmental review of leases under NEPA,

which calls for federal agencies to evaluate the environmental consequences of

proposed actions.  42 U.S.C.A. § 4332(C).  The RPC's NEPA-related

recommendations include directing DOI staff to misapply Section 390 of the

Energy Policy Act of 2005, which provides exemptions from NEPA review for

certain leasing-related activity.  Pub. L. No. 109–58, §309, 119 Stat. 594, 747

(2005).

91.    The RPC has successfully recommended that DOI widen the

congressionally-mandated NEPA exemptions without seeking further

congressional action or undertaking notice and comment rulemaking.

92.    The Committee has also recommended arbitrarily truncating NEPA

review where certain federal leases overlap with private landholdings; where

recent (but not necessarily related) NEPA analysis exists; and where the Secretary

determines that certain effects of leasing are categorically "speculative."

Furthermore, the Committee has recommended rolling back dozens of DOI

policies related to the conservation of public lands and cultural artifacts.

93.    The Committee has further recommended revising what are known as

"Onshore Orders 3, 4, and 5," which establish standards for site security, oil

measurement, and gas measurement, and which and ensure that the federal

government receives accurate royalty payments.  43 C.F.R. §§ 3173-75.

Incredibly, the Committee issued this recommendation even though the current

orders flowed from the recommendations of a prior iteration of the RPC, and, as

documented in prior BLM rulemaking, pose scant burdens on extractive industries.

94.    When the Committee took public comment on these and related

policies at its June 2018 meeting, an overwhelming majority of speakers –

including interfaith leaders and tribal representatives – decried the RPC's

procedures and policies.[29]

95.    These concerns fell on deaf ears.  When a Committee member

responded to the public's concerns by expressing hesitation concerning the scope

and breadth of the Committee's NEPA proposals at the Committee's June, 2018

meeting, Chairman DeVito proclaimed "I'm not going to go down that road," cut

off debate on the issue, and later ratified the related proposals through a rushed

voting process.[30]  By the time the Committee had adjourned that day, the BLM had

transformed the controversial policy into a formal guidance document.[31]

---

[29] *See* DOI, *Royalty Policy Committee June 6, 2018 Meeting, Summary of Proceedings* at 21-35
(June 2018),
https://www.doi.gov/sites/doi.gov/files/uploads/signed_june_rpc_meeting_summary_with_mem
o.pdf.
[30] Pamela King, *BLM adopts NEPA change recommended by industry group*, E&E News, (June
7, 2018).
[31] Bureau of Land Management, *NEPA Efficiencies For Oil And Gas Development* (June 6,
2018), https://www.blm.gov/policy/ib-2018-061.

96.     Because the Committee has spent its resources fulfilling the wish list

of Secretary Zinke's and Chairman DeVito's preferred special interests, the RPC

has not even attempted to pursue policies that would benefit the public interest and

American taxpayer.  Thus, the Committee has declined to pursue policies that

would compensate the public for the hundreds of millions of dollars in revenue

wasted through natural gas flaring, venting, and leaks; insufficient bonding for

lessees;[32] artificially low royalty rates; non-competitive bidding associated with

area-wide leases or anti-competitive speculation;[33] lack of compensation for

negative externalities such as air and water pollution; the lack of comprehensive

lessee data; overly-generous royalty deductions related to transportation

allowances; or lost revenue from idle leases.[34]

97.     The failure to consider any policies in the public interest – and the

related recommendation of policies that encourage indiscriminate, uncompensated

resource extraction – pose immediate threats to the American taxpayer and to

Plaintiff's membership, who will suffer the most acute environmental and

economic injuries associated with overleasing.

---

[32] Government Accountability Office, *Coal Mine Reclamation* (March 2018)
https://www.gao.gov/products/GAO-18-305.
[33] Hein, *supra* note 4 at 13-14.
[34] *See* Congressional Budget Office, *Options for Increasing Federal Income from Crude Oil and Natural Gas on Federal Lands* (Apr. 19, 2016), https://www.cbo.gov/publication/51421 (documenting that increasing the minimum bid to $10 per acre for competitive and noncompetitive leases would boost net federal and state income by an estimated $50 million over 10 years).

## CLAIMS FOR RELIEF

### Count One
### Unlawful Creation Of A Federal Advisory Committee,
### 5 U.S.C. § 706, 5 U.S.C. App. II § 9

98.     Plaintiff repeats and incorporates by reference each of the forgoing

allegations as if fully set forth herein.

99.     FACA and its implementing regulations require certain findings and

procedures before an agency may create an advisory committee.  The RPC does

not comply with these requirements.  In particular, Defendants have not adequately

explained why the RPC is "is in the public interest in connection with the

performance of duties imposed on that agency by law," 5 U.S.C. App. II § 9(a)(2),

why the RPC is "essential to the conduct of agency business," 41 C.F.R.

§ 102-3.30(a), or why "the information to be obtained [through the committee] is

not already available through another advisory committee or source within the

Federal Government," *id.*

100.    Accordingly, Defendants' creation of the RPC is arbitrary, capricious,

an abuse of discretion, not in accordance with law, and in excess of its statutory

authority.  5 U.S.C. § 706(2).

## Count Two
### Failure to Disclose Advisory Committee Materials And To Provide For Public Participation, 5 U.S.C. § 706, 5 U.S.C. App. II § 10

101.   Plaintiff repeats and incorporates by reference each of the forgoing allegations as if fully set forth herein.

102.   FACA and its implementing regulations require that Defendants be transparent and open when conducting advisory committee business, but the RPC has unlawfully operated outside of the public eye.  In particular, Defendants have failed to:

(a) make available to the public the "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, [and] other documents . . . made available to or prepared for" the RPC's subcommittees and working groups, 5 U.S.C. App. II § 10(b);

(b) make available Committee materials in advance of RPC meetings, *id.*;

(c) allow public participation at Committee, subcommittee, and working group meetings, 43 C.F.R. § 1784.4-3(c), and;

(d) provide adequate notice of Committee, subcommittee, and working group meetings, *id.* § 1784.4-2(a).  *See also* 41 C.F.R. § 102-3.145.

103.   Defendants' closed meetings are arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of its statutory authority, and/or constitute agency action unlawfully withheld.  5 U.S.C. §§ 706(1), (2).

36

**Count Three**
**Unfairly Balanced Advisory Committee,**
**5 U.S.C. § 706, 5 U.S.C. App. II § 5**

104.   Plaintiff repeats and incorporates by reference each of the forgoing allegations as if fully set forth herein.

105.   FACA requires that an advisory committee be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. App. II § 5(b)(2).  The RPC's stated function is to provide advice and recommendations on "the fair market value of and on the collection of revenues derived from, the development of energy and mineral resources on Federal and Indian lands," RPC Charter ¶ 3, but the Committee includes no representation from non-Tribal communities affected by such development, such as landowners, environmentalists, outdoor recreationalists, or taxpayers.

106.   Defendants' actions in appointing RPC membership are arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of its statutory authority.  5 U.S.C. § 706(2).

**Count Four**
**Failure To Comply With Conflict Of Interest Requirements,**
**5 U.S.C. § 706(2), 5 U.S.C. App. II § 5**

107.   Plaintiff repeats and incorporates by reference each of the forgoing allegations as if fully set forth herein.

108.   All advisory committees must include "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest." 5 U.S.C. App. II § 5(b)(3).  The RPC lacks such provisions because significant portions of its membership directly benefit from the leasing and leasing-related policies they are now evaluating.  In particular, the RPC is unlawfully comprised of members who are directly involved with BLM leasing or who are employed by organizations with such involvement, 43 C.F.R. § 1784.2-2(a).  Likewise, the RPC has failed to disclose its members' BLM-related holdings.  *Id.* § 1784.2-2(c).

109.   Defendants' failure to ensure that the RPC will not be inappropriately influenced by special interests is arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of its statutory authority, and/or constitutes agency action unlawfully withheld.  5 U.S.C. §§ 706(1), (2).

## Prayer for Relief

WHEREFORE, Plaintiff prays that this Court:

1.   declare that Defendants' creation and administration of the RPC violates the APA, FACA, and implementing regulations, and that the Committee is therefore unlawful;

38

2.      vacate the RPC's charter and all Secretarial orders attendant to the

RPC's creation, including the appointments of individual committee members and

alternate members;

3.      enjoin the RPC, its subcommittees, and its working groups from

meeting, advising the Secretary, and otherwise conducting Committee,

subcommittee, or working group business;

4.      order the RPC, its subcommittees, and its working groups to

immediately release all materials prepared for the Committee, its subcommittees,

or its working groups, and to provide a *Vaughn* index for such materials and those

withheld from production for any reason;

5.      order the RPC to announce its meetings, and those of its

subcommittees and working groups, at least 30-days prior to those meetings, and to

provide for public participation at those meetings;

6.      order the RPC to prepare a formal plan for public participation at its

meetings, and those of its subcommittees and working groups, including measures

guaranteeing that each interested member of the public is afforded ample time to

address the Committee, subcommittees, and working groups;

7.      order the RPC, and its subcommittees and working groups, to release

materials prepared for future meetings at least two weeks prior to those meetings;

8.      enjoin the Secretary from relying on any recommendations or advice

from the RPC, as chartered on March 29, 2017, in future agency actions;

9.      award Plaintiff its costs, attorneys' fees, and other disbursements for

this action; and

10.     grant any other relief this Court deems appropriate.

DATED this 7th day of August 2018.

Randy J. Tanner
BOONE KARLBERG P.C.
*Attorney for Plaintiff*

40