## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

MICHAEL H. BAER
Trial Attorney (New York Bar No. 5384300)
U.S. Department of Justice,
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Telephone:   (202) 305-8573
Facsimile:   (202) 616-8470
E-mail:      Michael.H.Baer@usdoj.gov

*Counsel for Defendants*

| | |
|---|---|
| **WESTERN ORGANIZATION OF RESOURCES COUNCILS,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**RYAN ZINKE, *et al.*,**<br><br>**Defendants.** | **CV 18-139-M-DWM**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................3

I.      The Federal Advisory Committee Act ...........................................................3

II.     The Royalty Policy Committee .......................................................................5

III.    The Instant Action .........................................................................................7

LEGAL STANDARD............................................................................................8

ARGUMENT .........................................................................................................9

I.      Plaintiff Lacks Standing for Each of Its Claims..............................................9

        A.      Plaintiff Does Not Have Associational Standing. ...............................10

        B.      Plaintiff Does Not Have Organizational Standing. .............................20

II.     Counts Three and Four Are Non-Justiciable. ...............................................25

        A.      Ninth Circuit Precedent Forecloses Plaintiff's § 5(b)(2) Claim. ........26

        B.      Plaintiff's § 5(b)(3) Claim Also Is Not Justiciable. ...........................28

III.    Counts One and Two Should Be Dismissed for Failure to State a
        Claim...........................................................................................................31

        A.      Defendants Complied with the Provisions that Govern the
                Establishment of the RPC. .................................................................31

        B.      The RPC Has Adhered to the Applicable Rules Governing Its
                Meetings and Records. ......................................................................33

CONCLUSION....................................................................................................38

i

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...............................................................................9

*Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Calif. Dep't of Transp.*,
  713 F.3d 1187 (9th Cir. 2013) ...........................................................13

*Auer v. Robbins*,
  519 U.S. 452 (1997) .............................................................................36

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...............................................................................9

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .............................................................................14

*Coalition for ICANN Transparency Inc. v. VeriSign, Inc.*,
  452 F. Supp. 2d 924 (N.D. Cal. 2006) .................................................11

*Colo. Envtl. Coal. v. Wenker*,
  353 F.3d 1221 (10th Cir. 2004) ..................................................... 30, 31

*Ctr. for Food Safety v. Vilsack*,
  636 F.3d 1166 (9th Cir. 2011) .............................................................17

*Ctr. for Law & Educ. v. Dep't of Educ.*,
  396 F.3d 1152 (D.C. Cir. 2005) ..................................................... 23, 24

*Ctr. for Policy Analysis on Trade & Health (CPATH) v. Office of U.S. Trade Representative*,
  540 F.3d 940 (9th Cir. 2008) .................................................... 26, 27, 28

*Cummock v. Gore*,
  180 F.3d 282 (D.C. Cir. 1999) ...............................................................4

*Doe v. Shalala*,
  862 F. Supp. 1421 (D. Md. 1994) ........................................................27

*Doe v. Vill. of Mamaroneck*,
  462 F. Supp. 2d 520 (S.D.N.Y. 2006) ...................................................24

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*,
  48 F. Supp. 3d 1 (D.D.C. 2014)................................................... 24, 29

*Fair Hous. of Marin v. Combs*,
  285 F.3d 899 (9th Cir. 2002) ..............................................................23

*Food Chem. News v. Dep't of Health & Human Servs.*,
  980 F.2d 1468 (D.C. Cir. 1992)................................................... 37, 38

*Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*,
  887 F.3d 906 (9th Cir. 2018) ..................................................... 10, 18, 20

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ............................................................................16

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ............................................................................25

*In re Gilead Sci. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ...............................................................9

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) ..............................................................................8

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
  624 F.3d 1083 (9th Cir. 2010) ................................................ 20, 23, 24

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ............................................................................25

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .........................................................................9, 22

*Nat'l Mining Ass'n v. Zinke*,
  877 F.3d 845 (9th Cir. 2017) ...............................................................37

*Nat'l Council of La Raza v. Cegavske*,
  800 F.3d 1032 (9th Cir. 2015) ...............................................................13

*Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*,
  No. 2:11-CV-578-FTM-29, 2012 WL 3589804 (M.D. Fla. Apr. 12, 2012) ........27

*Physicians Committee for Responsible Medicine v. Vilsack*,
  No. 16-CV-00069-LB, 2016 WL 5930585 (N.D. Cal. Oct. 12, 2016) ...............28

*Prisology, Inc. v. Fed. Bureau of Prisons*,
  852 F.3d 1114 (D.C. Cir. 2017).............................................................22

*Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*,
  886 F.2d 419 (D.C. Cir. 1989)......................................................... 26, 29

*Pub. Citizen v. U.S. Dep't of Justice*,
  491 U.S. 440 (1989) .................................................................. 2, 21, 22

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*,
  810 F.3d 827 (D.C. Cir. 2016)...............................................................19

*Safe Air for Everyone v. Meyer*,
  373 F.3d 1035 (9th Cir. 2004) ...........................................................9, 10

*San Luis & Delta-Mendota Water Auth. v. Haugrud*,
  848 F.3d 1216 (9th Cir. 2017)...................................................... 15, 19, 20

*Serv. Women's Action Network v. Mattis*,
  320 F. Supp. 3d 1082 (N.D. Cal. 2018)..................................................23

*Smith v. Pac. Properties & Dev. Corp.*,
  358 F.3d 1097 (9th Cir. 2004) ....................................................... 10, 20

*Spencer Enters., Inc. v. United States*,
  345 F.3d 683 (9th Cir. 2003) ...............................................................25

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016)............................................................. 9, 10, 14

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) .................................................................. *passim*

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
  137 S. Ct. 1645 (2017).................................................................10

*W. Watersheds Project v. Kraayenbrink*,
  632 F.3d 472 (9th Cir. 2011) .......................................................11

*WildEarth Guardians v. U.S. Dep't of Agric.*,
  795 F.3d 1148 (9th Cir. 2015) ......................................................16

*Wilderness Soc., Inc. v. Rey*,
  622 F.3d 1251 (9th Cir. 2010) ..................................... 16, 17, 20, 21

**STATUTES**

5 U.S.C. App. II § 5 ....................................................... *passim*

5 U.S.C. App. II § 7 .......................................................................4

5 U.S.C. App. II § 9 ........................................... 5, 31, 32, 33

5 U.S.C. App. II § 10 .....................................................................5

5 U.S.C. App. II § 2 .......................................................................4

5 U.S.C. § 552 ...............................................................................5

5 U.S.C. § 701 .............................................................................25

5 U.S.C. § 706 ...............................................................................8

19 U.S.C. § 2155 .........................................................................26

**RULES**

Fed. R. Civ. P. 12 ......................................................................8, 9

Fed. R. Civ. P. 25 .........................................................................8

**REGULATIONS**

41 C.F.R. § 102-3.30 ............................................................................... 32, 33

41 C.F.R. § 102-3.35 .............................................................................. 4, 5, 36

41 C.F.R. § 102-3.145 .............................................................................. 36, 37

43 C.F.R. § 1784.0-1 ....................................................................................35

43 C.F.R. § 1784.0-5 ....................................................................................35

43 C.F.R. § 1784.2-2 ....................................................................................30

43 C.F.R. § 1784.4-1 ....................................................................................35

43 C.F.R. § 1784.4-2 ....................................................................................34

43 C.F.R. § 1784.4-3 ....................................................................................34

43 C.F.R. § 1784.6-1 ....................................................................................30

69 Fed. Reg. 19876 (Apr. 14, 2004) .......................................................6, 31

82 Fed. Reg. 16222 (Apr. 3, 2017) ........................................... 6, 31, 34, 35

82 Fed. Reg. 41646 (Sept. 1, 2017) ...........................................................7

83 Fed. Reg. 6613 (Feb. 14, 2018) ............................................................7

83 Fed. Reg. 22989 (May 17, 2018) ..........................................................7

83 Fed. Reg. 40081 (Aug. 13, 2018) ..........................................................7

83 Fed. Reg. 44302 (Aug. 30, 2018) .........................................................35

**OTHER AUTHORITIES**

DOI, Department Manual, 112 DM 34.1, *available at*
https://www.doi.gov/elips/browse (last visited Nov. 2, 2018).........................7, 35

U.S. Gov't Accountability Office, GA0-17-540, Oil, Gas, and Coal Royalties:
Raising Federal Rates Could Decrease Production on Federal Lands but Increase
Federal Revenue (2017) ........................................................................................19

## INTRODUCTION

Article III does not permit plaintiffs to convert policy disagreements with federal agencies into lawsuits brought in federal court absent a concrete and particularized injury. But that is precisely what the plaintiff in this case, the Western Organization of Resource Councils ("WORC"), seeks to do in challenging the Department of the Interior's ("Interior") Royalty Policy Committee ("RPC" or "the Committee").

The Secretary of the Interior ("the Secretary") established the RPC to provide advice on issues related to the leasing of energy and mineral resources on federal and Indian lands. Although the RPC initially was established in 2004, and renewed as recently as 2012, the Committee's charter lapsed in 2014. When the Committee was reconstituted in 2017 (its current iteration), the Secretary assigned it the same general mandate as its predecessor. For Plaintiff, however, that mandate took on a new valence with a new administration, and it has filed suit to challenge Defendants' compliance with the Federal Advisory Commission Act ("FACA") in establishing and operating the RPC.

Plaintiff's complaint should not move past the motion-to-dismiss stage for multiple, independent reasons. At the outset, this Court lacks jurisdiction over each of Plaintiff's claims because Plaintiff has failed to allege that its members, or the organization itself, has suffered an injury in fact. Three of the four counts in

1

Plaintiff's complaint raise procedural violations of FACA—claims that the RPC was improperly established, is unfairly balanced, and is insufficiently insulated from the influence of special interests.  But in order to have standing to bring these claims, WORC or its members must identify a concrete interest that is threatened by Defendants' challenged actions.  Plaintiff has fallen far short of this burden.  Instead of specific allegations about particular members or interests, the complaint contains broad-brush criticisms of the RPC and conclusory allegations of harm to groups like ranchers, westerners, and recreationists.  Moreover, Plaintiff never explains how targeting the RPC—an entity that can at most make recommendations—is reasonably likely to protect WORC or its members from imminent harm.

Plaintiff also lacks standing to bring the remaining count in the complaint (Count Two), which alleges violations of the rules that govern public access to Committee meetings and records.  Because Plaintiff never alleges that it "has specifically requested, and been refused," the information and access it seeks, it is in the same position as any member of the public with respect to the RPC's records and meetings.  *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989).  That generalized injury is not sufficient for standing.

Two of Plaintiff's claims fail for an additional threshold reason: they would require this Court to apply provisions of FACA that offer no meaningful standards against which to judge Defendants' actions.  Courts consistently have held that those

provisions, which require advisory committees to be "fairly balanced" and protected against "inappropriate[] influence[]," are non-justiciable.  *See* 5 U.S.C. App. II §§ 5(b)(2), (3).  There is no basis for deviating from those holdings here.

Finally, Plaintiff has not alleged plausible challenges to the establishment of the RPC or to the manner in which the RPC has handled access to meetings and Committee records.  The RPC consistently has complied with FACA and the applicable regulations that govern public access to and participation in the Committee's work.  Plaintiff's arguments to the contrary rest on invented procedural hoops—like a purported obligation to make more extensive written findings than FACA or its implementing regulations require—and a misapplication of regulations from the Bureau of Land Management, which is a component that neither administers nor regulates the RPC.

Plaintiff has failed to demonstrate the concrete interest required for this Court to exercise jurisdiction, and each of the four counts in the complaint suffers from an additional, fatal flaw that either deprives this Court of jurisdiction or denies Plaintiff a viable cause of action.  The complaint, accordingly, should be dismissed.

## BACKGROUND

### I.    The Federal Advisory Committee Act

Congress enacted FACA to reduce the growing cost of unnecessary blue ribbon commissions, advisory panels, and honorary boards set up by the government

to advise the President and federal agencies. The statute seeks to eliminate committees that have outgrown their usefulness and impose uniform procedures on those that are indispensable. *See* 5 U.S.C. App. II § 2(b). FACA defines an "advisory committee" as "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof" that is "established" by statute, or "established or utilized" by the President or by one or more federal agencies, "in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government." *Id.* § 3(2). The General Services Administration ("GSA"), the federal agency "charge[d] . . . with prescribing regulatory guidelines and management controls applicable to advisory committees," *Cummock v. Gore*, 180 F.3d 282, 285 (D.C. Cir. 1999), has clarified that "the requirements of the Act . . . do not apply to subcommittees of advisory committees that report to a parent advisory committee and not directly to a Federal officer or agency[.]" 41 C.F.R. § 102-3.35(a). Agencies are not precluded, however, from applying provisions of FACA to such subcommittees. *Id.*

FACA imposes an array of procedural requirements on the creation and operation of advisory committees. An "advisory committee" cannot meet or take any action until a charter is filed with the head of the agency to which it reports and with the House and Senate committees having legislative jurisdiction over the

4

agency.  5 U.S.C. App. II § 9(c).  Every "advisory committee" must give advance notice in the Federal Register of any meetings, *id.* § 10(a)(2), generally hold all meetings open to the public, *id.* §§ 10(a)(1) & (d), keep detailed minutes of each meeting and copies of all reports received, issued, or approved by the advisory committee, *id.* § 10(c), and make its records available to the public for inspection and copying at a single location in accordance with the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, 5 U.S.C. App. II § 10(b).  Of particular relevance here, advisory committees must be "fairly balanced in terms of the points of view represented and the functions to be performed," *id.* § 5(b)(2), and the constituting agency must put in place "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment," *id.* § 5(b)(3).

## II.    The Royalty Policy Committee

The RPC was first established in 2004, with a mandate to "review and comment on revenue management and other mineral-related policies" stemming from federal and Indian mineral leases.  Establishment Notice, 69 Fed. Reg. 19876 (Apr. 14, 2004).  After lapsing in 2014, the Secretary established the current iteration

of the Committee in 2017,[1] with a similar mandate to "advise on current and emerging issues related to the determination of fair market value, and the collection of revenue from energy and mineral resources on Federal and Indian lands," as well as "on the potential impacts of proposed policies and regulations related to revenue collection from such development, including whether a need exists for regulatory reform." Royalty Policy Committee Establishment; Request for Nominations, 82 Fed. Reg. 16222 (Apr. 3, 2017).

Seven senior Interior officials serve as nonvoting, ex-officio members of the Committee. DOI, *Royalty Policy Committee Charter* ("RPC Charter") ¶ 12, Apr. 21, 2017 (attached as Exhibit 1).[2] The Committee also includes a) up to six representatives of governors of states that receive at least $10,000,000 annually in royalty revenues from federal leases, b) up to four representatives of Indian Tribes that are subject to laws relating to mineral development, c) up to six representatives of various mineral and/or energy stakeholders, and d) up to four members representing academic and public interest groups, as well as alternates. *Id.*

---

[1] Unless otherwise noted, references to the RPC in this brief are to the Committee that was established in 2017.

[2] The RPC Charter is incorporated by reference into the complaint. *See, e.g.*, Compl. 56 & n.15. On October 2, 2018, an amended charter was filed reflecting that the Counselor to the Secretary for Energy Policy is no longer the Chairperson of the Committee. *See* RPC Charter ¶ 12, *as amended* Oct 2, 2018.

The Committee is administered by the Office of Natural Resources Revenue ("ONRR"), RPC Charter ¶ 6, which is the component within Interior responsible for "collection and disbursement of royalty payments" from "leasing and production of natural resources and energy from Federal and Indian lands[,] onshore and on the Outer Continental Shelf."  DOI, Department Manual, 112 DM 34.1, *available at* https://www.doi.gov/elips/browse (last visited Nov. 2, 2018).

The RPC has held four meetings to date, each of which has been noticed in the federal register.  *See* 82 Fed. Reg. 41646; 83 Fed. Reg. 6613; 83 Fed. Reg. 22989; 83 Fed. Reg. 40081.  Materials from those (and any future) meetings, summaries of those meetings, summaries of subcommittee meetings, and information on Committee and subcommittee members, are available at the Committee's website: https://www.doi.gov/rpc.

## III.    The Instant Action

Plaintiff, a Montana-based organization that seeks to "build sustainable environmental and economic communities," filed this suit on August 8, 2017. Compl. ¶ 17, Doc. 1.  Plaintiff named Ryan Zinke, the Secretary of the Interior; the Department of the Interior; Vincent DeVito, Counselor for Energy Policy to the Secretary of the Interior (and the Committee's Chairperson) [3]; the Bureau of Land

---

[3] Vincent DeVito no longer works at Interior and is thus no longer the Chairperson of the RPC.  Scott Angelle, the Director of the Bureau of Safety and Environmental

7

Management ("BLM"); and Brian Steed, the Deputy Director of Policy and Programs at BLM, as defendants.  The complaint alleges four violations of FACA, all brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  *See* Compl. ¶¶ 98-109.  Count One alleges that Defendants failed to make certain required findings in establishing the RPC; Count Two alleges that Defendants have not provided the required level of public access to meetings, materials, and records; Count Three alleges that the RPC is unfairly balanced; and Count Four alleges that Defendants have not taken sufficient steps to prevent the Committee from being inappropriately influenced.  *Id.*

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges a federal court's jurisdiction over the subject matter of the complaint.  The party invoking the court's jurisdiction bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  A Rule 12(b)(1) motion will be granted when, looking at the entirety of the complaint, its allegations fail to establish jurisdiction.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

---

Enforcement, now serves as the Committee's Chairperson.  Because Mr. DeVito was sued in his official capacity, Mr. Angelle should be automatically substituted as a defendant, pursuant to Federal Rule of Civil Procedure 25(d).

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, a plaintiff's complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). In reviewing a Rule 12(b)(6) motion, a court accepts as true all well-pleaded facts in the complaint, but is not required to accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sci. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## ARGUMENT

### I. Plaintiff Lacks Standing for Each of Its Claims.

Plaintiff has not met its burden of establishing Article III standing with respect to any of the four claims it raises, whether Plaintiff asserts standing on behalf of its members or on behalf of itself. Plaintiff must establish all three elements of the "irreducible constitutional minimum of standing[.]" *Lujan*, 504 U.S. at 560-61. Specifically, Plaintiff must show that is has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016). Plaintiff must

establish these elements "for each claim [it] seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1647 (2017) (citation omitted).  And at the pleading stage, Plaintiff must "clearly allege facts demonstrating each element." *Spokeo*, 136 S. Ct. at 1547 (alteration omitted) (citation omitted).

Plaintiff brings this action "on its own behalf" and "on behalf of its members." Compl. ¶¶ 19, 23.  Accordingly, it must either establish standing "as a representative of its members" (associational standing) or "in its own right" (organizational standing). *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1101 (9th Cir. 2004).  Under either approach, however, the allegations contained in the complaint "are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1039.

## A.    Plaintiff Does Not Have Associational Standing.

To establish associational standing, an organizational plaintiff like WORC "must demonstrate that at least one of its members would otherwise have standing to sue in [the member's] own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 917-18 (9th Cir. 2018) (alterations in original) (citation omitted).  Plaintiff has not made this showing for

two independent reasons.  First, it has failed to identify—either by name or by circumstances—any specific members at *all*, much less members who have been harmed by Defendants' actions.  Second, even if Plaintiff had identified specific members, the allegations in the complaint fall far short of what Article III requires for jurisdiction.

### 1. *Plaintiff Fails to Identify Any Member Who Has Allegedly Suffered Harm.*

Plaintiff falters at the first hurdle of the associational standing inquiry: nowhere in its 40-page complaint does Plaintiff include "specific allegations that at least one identified member ha[s] suffered or [will] suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).  That shortcoming is "fatal to [plaintiff's] attempt to plead associational standing."  *Coalition for ICANN Transparency Inc. v. VeriSign, Inc.*, 452 F. Supp. 2d 924, 934 (N.D. Cal. 2006); *see also W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 483 (9th Cir. 2011). The task of demonstrating that at least one member will be harmed cannot be "dispensed with in light of statistical probabilities"; rather, an organizational plaintiff must either identify some individuals who are "harmed by the challenged [action]" or show that "*all* the members of the organization are affected by the challenged activity."  *Summers*, 555 U.S. at 498-99.

Plaintiff has done neither.  Instead, it has relied on broad characterizations of the groups it claims may be affected by policies the RPC may recommend—groups that plainly are more expansive than its own membership.  *See* Compl. ¶ 25 (alleging an increased likelihood of harms to "split estate landowners," "residents living near coal, oil and gas production[,]" and "westerners who hunt, fish and recreate on public lands").  But of course, Plaintiff does not allege that *all* such landowners, residents, and westerners are harmed by policies under consideration by the RPC or are members of WORC, and the complaint is silent as to which, if any, of Plaintiff's members actually are harmed.  Moreover, Plaintiff places its members in the same boat as the "many Americans" who (Plaintiff claims) are affected by government leasing rates, further obscuring any "concrete and particularized injury" to one or more of its members.  *Id.* ¶ 23; *Summers*, 555 U.S. at 494.

Plaintiff's lack of specificity matters because, without identifying individual members who are harmed, Defendants cannot fully engage with—and this Court cannot properly assess—Plaintiff's grounds for standing.  For instance, it is clear that recreationists, like the "westerners" described in Plaintiff's complaint, Compl. ¶ 25, do not have standing to challenge regulations affecting public lands when they do not "identify any particular site" they intend to visit, or when they have not described how the challenged regulations "will impede a specific and concrete

12

plan" to visit.  *Summers*, 555 U.S. at 495.  Here, the complaint fails to identify a

particular site; it fails to identify any concrete plan to visit a particular site; and it

fails to identify regulations that would affect particular sites and plans (much less

how such regulations are fairly traceable to the RPC, which has no authority to

promulgate regulations).  The same kinds of questions linger for the other broad

categories of Americans Plaintiff relies on for standing—for example, which

particular resources do individual split estate landowners live on top of and which

regulations under consideration affect those  resources?[4]  Plaintiff's claim to

standing under these circumstances is "tantamount to eliminating the requirement

of concrete, particularize injury in fact."  *Id.* at 496.

       2.  *Plaintiff Has Not Demonstrated that Any Member,  if Identified,
          Would Have Standing.*

---

[4] Accordingly, this is not one of the cases that the Ninth Circuit has hypothesized
might exist, "where the defendant need not know the identity of a particular member
to understand and respond to an organization's claim of injury[.]"  *Nat'l Council of
La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015).  In any event, the court's
dicta in *National Council of La Raza* was limited to the suggestion that an
organization might not need "to identify *by name* the member or members injured[.]"
*Id.* (emphasis added); *see also Associated Gen. Contractors of Am., San Diego
Chapter, Inc. v. Calif. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013)
(holding that an organizational plaintiff must make "specific allegations establishing
that at least one *identified member* had suffered or would suffer harm" (emphasis in
original) (citation omitted)).  Here, Plaintiff's failure to *name* individual members is
only a symptom of the broader failure to identify, with specificity, the circumstances
giving rise to any particular member's standing.

Plaintiff's failure to specify any member of WORC who has been harmed (or would be harmed) by Defendants' actions is dispositive of its attempt to establish standing on behalf of its members.   But even if Plaintiff were to recast its allegations to apply to a particular member, Plaintiff's theory of associational standing would still falter because the allegations fail to satisfy the requirements of Article III.

Plaintiff has not established that any member has suffered an "injury in fact," which requires "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560).   More specifically, a "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way[,]" and a "concrete" injury is one that "actually exist[s]," *i.e.*, it must be "real, and not abstract."   *Id.* (citations omitted).   And for an injury to be "actual or imminent," it "must be *certainly impending* . . . [a]llegations of *possible* future injury are not sufficient."   *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted).

Plaintiff suggests two bases for injuries to its members: first, "inherent procedural flaws attendant to the Committee and its operation," and second, "the

Committee's influence on Defendants' policymaking." Compl. ¶ 23.[5] But these are not distinct theories of standing. Rather, they collapse into one another because the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers*, 555 U.S. at 496. As the Ninth Circuit has made clear, "[t]o establish a procedural injury in fact, [a plaintiff] must allege . . . that (1) the [agency] violated certain procedural rules; (2) these rules protect [a plaintiff's] concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests." *San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216, 1232 (9th Cir. 2017), *as corrected* (Mar. 23, 2017) (citation omitted). In other words, no member of WORC has standing to challenge the RPC's compliance with the procedural requirements of FACA absent a concrete interest that is threatened by Defendants' actions.

Plaintiff alleges no such injury. As an initial matter, Plaintiff fails to identify a *concrete* interest of its members implicated by the RPC. Instead, Plaintiff lists a series of feared consequences—such as "degrad[ing] the environment," causing "damage to farm and ranch lands," and "experience[ing] air pollution"—that it

---

[5] Plaintiff does not appear to allege an informational injury to its members. *Compare* Compl. ¶ 23, *with id.* ¶ 20 (highlighting only WORC's inability to access information from the Committee). In any event, a claim of informational injury on the part of WORC's members would fail for the same reason that WORC's does. *See infra* at 20-22.

never links to particular members, locations, and policies.  Compl. ¶¶ 23, 25. Article III does not permit Plaintiff to rely on these generalities.  Rather, for these kinds of interest "to be 'concrete,' there must be a geographic nexus between the individual asserting the claim and the location suffering an environmental impact." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015) (citation omitted); *cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000) ("The relevant showing for Article III standing is not injury to the environment but injury to the plaintiff.").  For example, in *Wilderness Society, Inc. v. Rey*, 622 F.3d 1256 (9th Cir. 2010), the Ninth Circuit spelled out what would be required for a member of one of the plaintiff organizations to have a concrete interest in challenging an agency's appeal procedures for land and resource management projects.  The court held that "it would be sufficient to show that [the member] had repeatedly visited an area affected by a project, that he had concrete plans to do so again, and that his recreational or aesthetic interests would be harmed if the project went forward without his having the opportunity to appeal." *Id.* at 1256.  The gap between that level of specificity and the allegations in Plaintiff's complaint is striking—there is no analogue in this case to a particular member, to a particular project, or to a particular interest that would be harmed.

16

Moreover, even if Plaintiff were to identify a member with a concrete interest, it has not shown a reasonable probability that "the challenged [agency] action will *threaten* [that member's] concrete interests." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 (9th Cir. 2011) (emphasis added). The only alleged threat to Plaintiff's members mentioned in the complaint is the conclusory assertion that the RPC's "failure to consider" policies that WORC supports and the RPC's "recommendation of policies" that WORC opposes together "pose immediate threats to . . . Plaintiff's membership" because of alleged "environmental and economic injuries associated with overleasing." Compl. ¶ 97. This threadbare allegation does not identify a specific threat to a concrete interest, and it therefore does not suffice for standing. *See Wilderness Society*, 622 F.3d at 1257 (holding that a plaintiff organization's member lacked standing because he failed to pair a sufficiently specific interest with an allegation that a particular project would affect that interest). And in any event, Plaintiff acknowledges earlier in the complaint that these policies are not, in fact, "immediate threats"; at most they are policies that "increase the likelihood" of harm. Compl. ¶ 25. Plaintiff therefore has not shown that its members are threatened with any "*imminent* and concrete harm[.]" *Summers*, 555 U.S. at 495 (emphasis added).

Moreover, Plaintiff's allegations—which focus on what the RPC *considers* and *recommends*—illustrate a more significant flaw in Plaintiff's approach to

17

injury in fact: only the Department of the Interior itself, not the RPC, is responsible for any policies that could harm WORC's members.   To be sure, Plaintiff has named Interior and Interior officials as Defendants, but this case challenges only their actions in establishing and operating the RPC, not Interior's ultimate policy decisions.   *See* Compl. ¶¶ 100, 103, 106, 109.   That distinction matters because, in the typical procedural injury case, the plaintiff points to a particular agency decision that threatens it and argues that there is "a reasonable probability that the [agency's] decision could be influenced" by correcting an alleged procedural deficiency attendant to that decision.   *Friends of Santa Clara River*, 887 F.3d at 920 (citation omitted).

Here, however, there are two layers of uncertainty.   First, correcting any alleged deficiencies in the creation and operation of the RPC might lead the Committee to make different recommendations, but that possibility is speculative. Second, there is the separate question of whether Interior would choose to pursue different policies in a world where the RPC issued different recommendations.   But the complaint undermines the viability of that scenario.   In Plaintiff's view, royalty policy was already causing many of the harms Plaintiff allege its members suffer. *See, e.g.* Compl. ¶ 23 (alleging membership "is harmed when the federal government leases public resources at fire sale prices").   Specifically, Plaintiff points to a June 2017 report from the Government Accountability Office, which

preceded the establishment of the RPC, as evidence of precisely the kind of undervaluing of federal resources it challenges here. *Id.* ¶ 48 (citing U.S. Gov't Accountability Office, GA0-17-540, Oil, Gas, and Coal Royalties: Raising Federal Rates Could Decrease Production on Federal Lands but Increase Federal Revenue (2017)). Similarly, Plaintiff's characterization of the Committee as nefariously "designed from the outset to replace [repealed Interior] rules with a set of policies extremely favorable to the extractive industries" further undercuts its standing allegations. *Id.* ¶ 51. If Plaintiff claims that Interior was dead-set on implementing a particular slate of policies, then it is not reasonably probable that changing the procedures governing the RPC would change Interior's decisions down the road. *See R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, 810 F.3d 827, 830 (D.C. Cir. 2016) (allegedly improper appointment of members to an advisory committee "by no means rendered the risk of eventual adverse [agency] action substantially probable or imminent" and therefore did not support standing).

Where an asserted procedural injury rests on "an attenuated chain of conjecture" as extensive as the one at issue here, that procedural injury does not constitute an injury in fact.[6] *San Luis*, 848 F.3d at 1233 (citation omitted). Plaintiff, accordingly, lacks standing on behalf of its members.

---

[6] Although "the causation and redressability requirements [for standing] are relaxed" when "a plaintiff asserts a violation of a procedural right," the requirements are "not

### B.     Plaintiff Does Not Have Organizational Standing.

Plaintiff's second asserted basis for standing—as an organization in its own right—fares no better than its first.  To establish organizational standing, Plaintiff must satisfy the same test used to assess "standing in the context of an individual plaintiff[.]"  *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).  But as with its members, Plaintiff has not alleged the existence of a "concrete and particularized injury giving [WORC] a personal stake in the outcome of the controversy."  *Smith*, 358 F.3d at 1105 (citation omitted).

WORC principally rests its theory of standing on informational injury.  *See Wilderness Soc.*, 622 F. 3d at 1258.  Specifically, WORC alleges that Defendants' failure to comply with FACA's disclosure requirements, "particularly the statute's requirements for open meetings and records," has deprived it of information on the Committee's "deliberations and proposals[.]"  Compl. ¶ 20.  As an initial matter though, this injury could only support standing for Count Two of the complaint—

_____

toothless in procedural injury cases."  *Friends of Santa Clara River*, 887 F.3d at 918 (citation omitted).  Here, the degree of speculation required to establish that a specific WORC member has been injured is also reason to hold that any such injury is not fairly traceable to Defendants.  *See San Luis*, 848 F.3d at 1233 (holding that "[n]ot only [was] the alleged threat" to plaintiff's "interests not reasonabl[y] probable, it [was] also not fairly traceable to [defendant's] actions" (citation omitted)).

the one count that alleges a lack of access to information or meetings, rather than procedural violations of FACA.  *See id.* ¶¶ 101-03; *see also Wilderness Soc.*, 622 F.3d at 1260 (declining "to recognize an informational injury as a result of a procedural deprivation").

Count Two of the complaint identifies four categories of information or participation that Defendants allegedly have failed to provide: 1) records for the RPC's subcommittees and working groups; 2) Committee materials sufficiently in advance of RPC meetings; 3) participation at subcommittee and working group meetings; and 4) adequate notice of meetings.  Compl. ¶ 102.  Plaintiff lacks standing to bring these claims because it has failed to allege that it "has specifically requested, and been refused," the information and access it seeks.  *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989).

In *Public Citizen*, the Court held that an organization had standing to raise a FACA challenge when an American Bar Association committee "refused [the organization's] request for" information.  491 U.S. at 447, 449.  In reaching that conclusion, the Court looked carefully at a similar statute, FOIA, and noted FOIA plaintiffs with standing have shown that "they *sought and were denied* specific agency records."  *Id.* (emphasis added).  For both FACA and FOIA, then, the Court repeatedly emphasized the need to both ask for, and be denied, information in order to have standing to sue.  *See id.* at 449-50 ("The fact that other citizens or groups

21

of citizens might make the same complaint *after unsuccessfully demanding disclosure* under FACA does not lessen appellants' asserted injury, any more than the fact that numerous citizens might *request the same information* under the Freedom of Information Act entails that those who *have been denied access* do not possess a sufficient basis to sue." (emphasis added)).

This requirement ensures that plaintiffs do not "rais[e] only a generally available grievance about government" that is common to all citizens. *Lujan*, 504 U.S. at 573.  The D.C. Circuit recently reached that conclusion in a FOIA case, holding that a "requester has suffered a particularized injury" only when "he has requested and been denied information Congress gave him a right to receive." *Prisology, Inc. v. Fed. Bureau of Prisons*, 852 F.3d 1114, 1117 (D.C. Cir. 2017). *Prisology* addresses the precise question at issue here—whether an alleged failure to publish information, without a request by the plaintiff, is sufficient to "differentiate [the plaintiff] from the public at large." *Id.* at 1116.  The answer to that question is no; an alleged agency failure to make information public, without more, implicates "a harm common to everyone, a harm of the sort *Lujan* described as not stating an Article III case or controversy." *Id.* at 1116-17.  WORC has not alleged that it requested, and was denied, RPC records or access to RPC meetings. Accordingly, it is in the same position as every member of the public, and it lacks standing to assert an informational injury.

Finally, to the extent WORC claims that it has suffered an injury in fact that is *not* an informational injury, WORC has not adequately alleged such an injury in its complaint.[7] An organization in WORC's shoes must allege that it has "suffered 'both a diversion of its resources and a frustration of its mission.'" *Lake Forest*, 624 F.3d at 1088 (quoting *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)). But an organization's "mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved'" so as to confer standing. *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 n.4 (D.C. Cir. 2005) (citation omitted).

Here, although the complaint includes some discussion of WORC's broad mission, which includes "build[ing] sustainable environmental and economic communities," Compl. ¶ 17, the complaint lacks any allegation that Plaintiff has had to *divert* (or even otherwise spend) any of its resources to address any action that Defendants have taken with respect to the RPC. The closest Plaintiff comes is

---

[7] The conclusory allegation that Plaintiff lacks "a voice – much less a vote – on Committee deliberations" is peculiar because Plaintiff never claims that it (or one of its members) has been injured by being denied a *seat* on the Committee. Compl. ¶ 21. Nor could it, given that any such injury would rest on speculation about who would be chosen. But if Plaintiff is not claiming such an injury, then its allegation in paragraph 21 raises only "a setback to the organization['s] abstract social interest[.]" *Serv. Women's Action Network v. Mattis*, 320 F. Supp. 3d 1082, 1100 (N.D. Cal. 2018).

a description of WORC's efforts to update members through "action alerts, blog postings, newsletter articles, and monthly mailings[.]"   Compl. ¶ 19.   But if anything, this allegation reinforces the absence of an organizational injury here, given that WORC has apparently engaged in the same kind of communication with its members for "the 2011-2015 royalty valuation rulemaking process, various legislation introduced in Congress, *and* the RPC." *Id.* (emphasis added).   WORC cannot have suffered an injury by continuing to engage in the same advocacy and information dissemination it engaged in prior to the establishment of this iteration of the RPC. *See, e.g.*, *Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1, 23–24 (D.D.C. 2014) (organization's "expenditure of funds to promote its legislative agenda through research, education, outreach . . . , and litigation is a normal and critical part of its mission and operations"); *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 542 (S.D.N.Y. 2006) (organization lacked standing where its "entire reason for being is to pursue the sort of advocacy . . . that it has pursued in this case").   Put differently, because WORC has not even attempted to "show that it would have suffered some other injury if it had not diverted resources to counteract[]" Defendants' role in establishing and operating the RPC, it does not have standing to sue on its own behalf. *Lake Forest*, 624 F.3d at 1088.

## II.     Counts Three and Four Are Non-Justiciable.

Although the APA "embod[ies] a basic presumption of judicial review,"

*Lincoln v. Vigil*, 508 U.S. 182, 190 (1993), review is unavailable where "statutes

preclude judicial review" or "agency action is committed to agency discretion by

law." 5 U.S.C. § 701(a)(1)-(2). And as relevant here, an action is committed to

agency discretion when "the statute is drawn so that a court would have no

meaningful standard against which to judge the agency's exercise of discretion."

*Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Where that is so, the court lacks

jurisdiction. *See, e.g.*, *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 691

(9th Cir. 2003) (characterizing 706(a)(2) as "the APA's jurisdictional bar").

Under the framework established in *Heckler*, Counts Three and Four each

raise challenges to the composition of the RPC that are non-justiciable.  Count

Three alleges that the Committee is not "*fairly balanced* in terms of the points of

view represented and the functions to be performed by the advisory committee."

Compl. ¶ 105 (emphasis added) (quoting 5 U.S.C. App. II § 5(b)(2))  And Count

Four claims that the RPC lacks "appropriate provisions to assure that the advice

and recommendations of the advisory committee will not be *inappropriately*

*influenced* by the appointing authority or any *special interest*."  Compl. ¶ 108

(emphasis added) (quoting 5 U.S.C. App. II § 5(b)(3)).  Because FACA provides

no meaningful standards for assessing whether Defendants have complied with these provisions, the Court lacks jurisdiction over these two claims.

## A.    Ninth Circuit Precedent Forecloses Plaintiff's § 5(b)(2) Claim.

The Ninth Circuit has already held that FACA provides "no meaningful standard to apply" to § 5(b)(2)'s "'fairly balanced' membership requirement[.]" *Ctr. for Policy Analysis on Trade & Health (CPATH) v. Office of U.S. Trade Representative*, 540 F.3d 940, 942 (9th Cir. 2008), *as amended* (Oct. 8, 2008).  In *CPATH*, the Ninth Circuit examined the composition of Industry Trade Advisory Committees ("ITACs"), which were required under the Trade Act to "be representative of all industry, labor, agricultural, or service interests (including small business interests) in the sector or functional areas concerned." *Id.* (quoting 19 U.S.C. § 2155(c)(2)).  But the court concluded that neither FACA nor the Trade Act supplied a standard against which the court could judge whether viewpoints represented on advisory committees were "fairly balanced[.]" *Id.* at 945.

FACA, the court explained, fails to "articulate what perspectives must be considered when determining if the advisory committee is fairly balanced[.]" *CPATH*, 540 F.3d at 945.  In other words, whether the committee was fairly balanced was a "hopelessly manipulable" "political question that [was] best left to the other branches of government." *Id.* (citing *Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*, 886 F.2d 419, 426 (D.C. Cir. 1989)

26

(Silberman, J., concurring)); *see also, e.g.*, *Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*, No. 2:11-CV-578-FTM-29, 2012 WL 3589804, at *8 (M.D. Fla. Apr. 12, 2012) (concluding that "there is no indication from the provisions of . . . FACA[] that there is a meaningful standard to apply when considering whether the Secretary complied with the 'fairly balanced' requirement"); *Doe v. Shalala*, 862 F. Supp. 1421, 1430 (D. Md. 1994) ("The balance of judicial opinion holds that, by reason of the lack of judicial standards to address alleged 'imbalances' of membership on such committees, Courts will not decide the issue; it is non-justiciable.")

The holding from *CPATH* forecloses Plaintiff's § 5(b)(2) claim because FACA does not provide this Court with standards to determine whether the RPC is "fairly balanced." In fact, Plaintiff's critique of the RPC—that certain groups lack representation—mirrors the argument the Ninth Circuit rejected in *CPATH*. *Compare CPATH*, 540 F.3d at 943 (recounting plaintiff's argument that "ITACs do not currently have any members representing the public health community and that, as a result, the points of view represented on the ITACs are not fairly balanced"), *with* Compl. ¶ 105. Moreover, to the extent Plaintiff will argue that another source of authority provides a meaningful standard, the BLM regulation

27

and Interior Department Manual cited in the complaint do not suffice.[8]  *See* Compl.

¶ 57.  The guidance Plaintiff quotes—that advisory committee balance must be "both geographic and interest-specific," and that committees should include "representatives of the public interest and a variety of economic and social groups," *id.* (citations and emphasis omitted)—does no more to offer manageable standards than the Trade Act did in *CPATH*, which required that the committees "insofar as is practicable, be representative of all industry, labor, agricultural, or service interests (including small business interests) in the sector or functional areas concerned[.]"  *CPATH*, 540 F.3d at 945.  Accordingly, Plaintiff's § 5(b)(2) claim must be dismissed.

### B.    Plaintiff's § 5(b)(3) Claim Also Is Not Justiciable.

The reasoning that led the Ninth Circuit to hold that FACA does not supply meaningful standards to evaluate "fairly balanced" claims under § 5(b)(2) compels the same result for "inappropriately influenced" claims under § 5(b)(3).  That is precisely the conclusion the court reached in *Physicians Committee for Responsible Medicine v. Vilsack*, No. 16-CV-00069-LB, 2016 WL 5930585, at *1 (N.D. Cal. Oct. 12, 2016), where the plaintiff argued that the agencies responsible for

---

[8] And in any event, as explained *infra* at 33-37, those sources of authority have no bearing on this case.

28

overseeing an advisory committee on national dietary guidelines failed to comply with § 5(b)(3).

In dismissing the case "for lack of subject-matter jurisdiction," the court in *Physicians Committee* emphasized that it had "seen no definition of 'special interest,'" and had "seen no law describing when a participant may be held to have 'inappropriately influenced' an advisory committee." *Id.* at *3. The same concerns are apparent here. Plaintiff, for instance, never proffers a definition of "special interest" or suggests where a court might look to find one, despite characterizing the RPC as having "spent its resources fulfilling the wish list of [Defendants'] preferred special interests." Compl. ¶ 97; *see also Microbiological Criteria*, 886 F.2d at 430 (Silberman, J., concurring) ("'Special interest' may do as a political perjorative . . . , but I do not see how, at least in the context of this statute, we have any way to determine what it means for purposes of judicial review."). Plaintiff's complaint is equally sparse on the question of how to decide when a special interest exerts "inappropriate[] influence[]." 5 U.S.C. App. II § 5(b)(3). There is no standard for this Court to determine the point at which an "interest" represented on the RPC crosses the line from "appropriately" influencing the Committee to "inappropriately" doing so. *See Microbiological Criteria*, 886 F.2d at 431 (Silberman, J., concurring) ("[W]hat legally discernible principles could be employed to determine when a particular special interest is overly represented[?]").

29

Finally, to the extent Plaintiff will argue that BLM regulations contained in 43 C.F.R. § 1784.2-2 salvage the justiciability of § 5(b)(3) here, *see* Compl. ¶ 108, that argument is unavailing.   First, those regulations apply only to advisory committees within the regulatory purview of the BLM, which the RPC is not.  *See infra* at 33-36.  Second, although the regulations address disclosure, they do not mention "special interests" or purport to gauge the "appropriate" level of influence a special interest can exert.  43 C.F.R. § 1784.2-2.  They are thus silent on the questions a court must answer in attempting to apply § 5(b)(3).  In fact, the Tenth Circuit has held that "§ 5(b)(3) does not provide a meaningful standard of review for a court to apply" in the specific context of a BLM advisory committee, reasoning that any such standard is particularly elusive where, as here, the committee requires the involvement of groups with an interest in the advice the committee will be giving.  *Colo. Envtl. Coal. v. Wenker*, 353 F.3d 1221, 1231 (10th Cir. 2004) (per curiam).[9]   The Court, accordingly, should dismiss Plaintiff's § 5(b)(3) claim as non-justiciable.

---

[9] The court in *Wenker* also held that, in the specific context of Resource Advisory Committees ("RACs," which are a subset of BLM advisory committees), a § 5(b)(2) claim that an RAC is not "fairly balanced" is justiciable.  353 F.3d at 1234.  But the court's reasoning in reaching that conclusion reinforces why a § 5(b)(2) claim is not justiciable for the RPC.  The court emphasized that "BLM regulations provide a more precise standard for determining what constitutes a fair balance of interests on the RACs" because the regulations applicable *only* to RACs require "that appointees to RACs be representative of three general groups, each of which is comprised of

### III.    Counts One and Two Should Be Dismissed for Failure to State a Claim.

#### A.    Defendants Complied with the Provisions that Govern the Establishment of the RPC.

FACA requires that, before an agency head establishes an advisory committee, he or she must determine "as a matter of formal record, . . . with timely notice published in the Federal Register," that the committee "is in the public interest in connection with the performance of duties imposed on that agency by law." 5 U.S.C. App. II § 9(a)(2). That is precisely what the Secretary did in establishing the RPC. Specifically, he certified in the Federal Register that: "the Royalty Policy Committee is necessary, is in the public interest, and is established under the authority of the Secretary of the Interior, in support of greater transparency in creating royalty and leasing policy for mineral production on Federal and Tribal lands." 82 Fed. Reg. 16222. The Secretary, accordingly, complied with the statute. In fact, his 2017 certification included more detail than was provided when the 2004 RPC was established. *See* 69 Fed. Reg. 19876 ("I hereby certify that the Royalty Policy Committee is in the public interest in connection with the performance of duties imposed on the Department of the Interior[.]").

―――――――――――――――

specific subgroups[.]" *Id.* at 1233 (citing 43 C.F.R. § 1784.6-1(c)(1)-(3)). No comparable regulations govern the membership of the RPC.

Plaintiff, however, claims that FACA requires an explanation as to *why* the RPC is in in the public interest, rather than a certification that it is.  Compl. ¶ 99. But the statute is clear: it requires only that the Secretary "*determine*" that the committee to be established is "in the public interest in connection with the performance of duties imposed on that agency by law."  5 U.S.C. App. II § 9(a)(2) (emphasis added).  The Secretary plainly made that determination.

Additionally, Plaintiff posits that 41 C.F.R. § 102-3.30(a), a GSA regulation, requires two additional written findings.  Compl. ¶ 99.  This too is baseless. Plaintiff argues that the agency establishing an advisory committee must "*explain* a '[d]etermination of need in the public interest,' including a finding that the committee is 'essential to the conduct of agency business and . . . the information to be obtained is not already available through another advisory committee or source within the Federal Government."  Compl. ¶ 32 (emphasis added) (quoting 41 C.F.R. § 102-3.30(a)).  But the requirement of an explanation is nowhere in the regulation.  To the contrary, GSA requires only a "[d]etermination of need in the public interest," and unlike the determination required by FACA itself, the regulation imposes no requirement that the determination (much less any of what follows in the rest of the regulation) be published anywhere.  *Compare* 41 C.F.R. § 102-3.30(a), *with* 5 U.S.C. App. II § 9(a)(2) (requiring the relevant determination

be made "as a matter of formal record"). Count One, therefore, fails to state a claim upon which relief can be granted.

### B. The RPC Has Adhered to the Applicable Rules Governing Its Meetings and Records.

Plaintiff criticizes the RPC for "unlawfully operat[ing] outside of the public eye." Compl. ¶ 102. But the allegations in the complaint contradict that story. In fact, the allegations concerning the Committee's meetings and records—*i.e.*, the basis for Count Two of the complaint—establish that the Committee has complied with any obligations to provide notice of its meetings, make available its records, and permit public participation in Committee meetings.

At the outset, it is worth emphasizing what Plaintiff does *not* contest. First, it does not argue that the Committee has withheld any records of the full committee; it is only the records of "the RPC's subcommittees and working groups" that are at issue. Compl. ¶ 102(a). Second, Plaintiff does not suggest that the RPC has failed to provide relevant materials in advance of full committee meetings. *See id.* ¶ 102(b). Instead, it makes two claims: a) that such materials were not provided *sufficiently* in advance of full committee meetings, and b) that the RPC failed to provide materials in advance of subcommittee and working group meetings. *Id.* ¶¶ 85-86. Third, Plaintiff does not allege a violation of FACA with respect to public participation at Committee, subcommittee, and working group meetings; it

33

alleges only a violation of BLM FACA regulations.  *Id.* ¶ 102(c) (citing 43 C.F.R. § 1784.4-3(c)).  And fourth, Plaintiff's claim of inadequate notice hinges, again, on BLM FACA regulations, rather than on FACA itself.  Compl. ¶ 102(d) (citing 43 C.F.R. § 1784.4-2(a)).

Many of the allegations Plaintiff advances in support of Count Two fail to state a claim because they allege violations of regulations that do not apply to the RPC.  Specifically, the complaint relies on regulations from Subpart 1784 of Title 43, conclusorily claiming that they are applicable to the RPC.  Compl. ¶ 36.  But those regulations—which appear in only the BLM chapter of the Code of Federal Regulations ("CFR")—apply to advisory committees under the regulatory purview of the BLM, not committees like the RPC.  The RPC is administered by a different sub-component of Interior and addresses matters well outside the BLM's reach—a distinction that is apparent throughout the CFR, the Federal Register, and in Interior advisory committee charters.

First, the RPC is administered by ONRR (again, the Office of Natural Resources Revenue), not the BLM.  *Compare* 82 Fed. Reg. 16222 ("AGENCY: Office of Natural Resources Revenue, Interior"), *with* Notice of Establishment and Call for Nominations for the Bears Ears National Monument Advisory Committee, 83 Fed. Reg. 44302 (Aug. 30, 2018) ("AGENCY: Bureau of Land Management, Interior").  ONRR is not part of the BLM, but rather is a separate component within

Interior.  And as noted previously, ONRR is the component responsible for "collection and disbursement of royalty payments" from "leasing and production of natural resources and energy from Federal and Indian lands[,] onshore and on the Outer Continental Shelf," DOI, Department Manual, 112 DM 34.1, making it the most logical component to administer the RPC.

Second, the "Authority" listed in the Federal Register notice establishing the RPC is FACA, with no mention of the BLM's more specific FACA regulations. *Compare* 82 Fed. Reg. 16222 (citing "5 U.S.C. Appendix 2"), *with* 83 Fed. Reg. 44302 (identifying "43 CFR 1784.4-1," the regulation that governs calls for nominations to BLM advisory committees, as the relevant "Authority").  This is also reflected in advisory committee charters.  Committees subject to BLM regulations from Subpart 1784 say so in their charters.  *See, e.g.*, DOI, *Grand Staircase-Escalante National Monument Advisory Committee Charter* ¶ 2, Sept. 5, 2018 (pointing to "the 1995 amended BLM regulations" for the applicable regulations "regarding composition; avoidance of conflict interst;" and other matters addressed in Subpart 1784 (citations omitted)), *available at* https://www.facadatabase.gov/FACA/apex/FACAPublicCommittee?id=a10t0000 001gzpZAAQ (last visted Nov. 2, 2018).  By contrast, committees like the RPC make no mention of those regulations because the committees are not subject to them.  *See* RPC Charter ¶ 2.

35

Third, the BLM's FACA regulations are limited in scope to advisory committees created to address "matters relating to public lands and resources under the administrative jurisdiction of the Bureau of Land Management." 43 C.F.R. § 1784.0-1. But Subpart 1784 expressly defines "public lands" to exclude both "[l]ands located on the Outer Continental Shelf" and "[l]ands held for the benefit of Indians, Aleuts, and Eskimos." 43 C.F.R. § 1784.0-5(e). Both of these excluded categories of lands are central to the RPC's work. *See, e.g.*, 82 Fed. Reg. 16222 (describing the RPC's role as providing advice on royalties from "the development of energy and mineral resources on Federal *and Indian* lands" (emphasis added)).

In sum, the RPC was not established under the BLM's purview, does not invoke the BLM's regulations, and is outside the scope of what the BLM can regulate. Accordingly, the RPC is not bound by regulations that apply exclusively to BLM advisory committees. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation" (citation omitted)).

Beyond relying on BLM regulations that do not apply to the RPC, Plaintiff cites two additional inapposite authorities to claim an entitlement to all records of the RPC's subcommittees and working groups. FACA's requirements, along with the GSA's implementing regulations, "do not apply to subcommittees of advisory committees that report to a parent advisory committee and not directly to a Federal

36

officer or agency." 41 C.F.R. § 102-3.35. Plaintiff does not dispute that the RPC's subcommittees and working groups report to the parent committee, but it contends that subcommittee and working group proposals are adopted "by the parent advisory committee without further deliberations by the parent advisory committee" and therefore are still subject to GSA regulations on open meetings. Compl. ¶ 83 (quoting 41 C.F.R. § 102-3.145). Other allegations in the complaint, however, render this claim implausible. The complaint explains that subcommittee and working group proposals were discussed, and criticized, at meetings of the full committee. *Id.* ¶ 82. Plaintiff thus acknowledges that there were parent committee deliberations about subcommittee and working group proposals (what § 102-3.145 requires). What Plaintiff seems to complain about is that there was not "additional time for the [parent] Committee to discuss" comments from the public, offered at parent committee meetings, on RPC proposals. *Id.* (emphasis added). But § 102-3.145 does not require that.

The second inapposite authority Plaintiff cites is the Department of Interior Manual. *See* Compl. ¶ 84 (citing 308 DM 2.11 for the proposition that the RPC must make available the records of subcommittees and working groups). "Interior's manuals," however, "do not carry the force of law and are not binding." *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 871 n.27 (9th Cir. 2017). As such, Plaintiff cannot use the Manual to bootstrap a FACA claim.

37

Finally, Plaintiff contends that the RPC failed to release materials sufficiently in advance of its meetings. *See* Compl. ¶¶ 85, 102(b). But the one example Plaintiff provides of this alleged failure is the February 2018 meeting, where the RPC provided materials "only" two days in advance—more than enough time to allow the public to "follow the substance of the discussions." *Id.* ¶¶ 85-86 (citing *Food Chem. News v. Dep't of Health & Human Servs.*, 980 F.2d 1468 (D.C. Cir. 1992)). In fact, in the case Plaintiff cites, the court held that providing materials "on the date of the advisory committee meeting for which those materials were prepared" complies with FACA. *Id.* at 1472. Plaintiff's allegations thus demonstrate that the RPC provided the materials *earlier* than required.

Because none of Plaintiff's allegations in support of Count Two establish a violation of FACA or regulations that apply to the RPC, the count should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the complaint for lack of subject matter jurisdiction or, in the alternative, that it dismiss Counts One and Two for failure to state a claim.

Dated: November 2, 2018                 Respectfully submitted,

                                        JOSEPH H. Hunt
                                        Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Michael H. Baer*
MICHAEL H. BAER
Trial Attorney
U.S. Department of Justice,
Civil Division, Federal Programs Branch

*Counsel for Defendants*

39

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2), I certify that this brief contains 8,997 words.  I relied on the word count function in Microsoft Word, which was used to prepare this document.

_/s/ Michael H. Baer_
Michael H. Baer
