Randy J. Tanner
BOONE KARLBERG P.C.
201 West Main, Suite 300
P. O. Box 9199
Missoula, MT  59807-9199
Phone:  (406) 543-6646
Fax:      (406) 549-6804
rtanner@boonekarlberg.com

Travis Annatoyn
Democracy Forward Foundation
1333 H. St. NW
Washington, D.C. 20005
Phone:  (202) 601-2483
tannatoyn@democracyforward.org

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS,<br><br>Plaintiff,<br><br>vs.<br><br>RYAN ZINKE, in his official capacity as Secretary of the Interior, SCOTT ANGELLE, in his official capacity as Director of the Bureau of Safety & Environmental Enforcement, DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, and BRIAN STEED, in his official capacity as Deputy Director of Policy and Programs for the Bureau of Land Management,<br><br>Defendants. | Cause No. CV-18-139-M-DWM<br><br><br><br>MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |

# **TABLE OF CONTENTS**

**Page**

Table of Contents……………………………………………………………i

Table of Authorities……………………………………………....…...iv

Exhibit Index………………………………………………………ix

Introduction………………………………………………………...1

Legal Background……………………………………………..3

    I.    The Federal Advisory Committee Act…………………………………3

    II.   The Department's Implementing Regulations……………………5

    III.  The Administrative Prodecure Act…………………………………6

Factual and Procedural Background……………………………………...7

    I.    The Importance Of Federal Leasing Regimes To Public Health And Finances…………………………………………………..7

    II.   Secretary Zinke Illegally Charters And Staffs The RPC To Undervalue Leases Of Public Resources…………………………………………9

    III.  In Secret, The RPC Outsources Its Decisionmaking To Corporate Interests…………………………………………………14

Standard of Review………………………………………………..17

Argument………………………………………………………17

    I.    Plaintiff Is Likely To Succeed On The Merits Of Its Claims……………18

        A. Defendants Haved Failed To Notice And Open RPC Meetings…..…18

        B. Defendants Haved Failed To Provide RPC Documents And Disclosures……………………………………………………..19

        C. Defendants Haved Failed To Guard Against Inappropriate Influence By Special Interests……………………………….....20

        D. Defendants Haved Failed To Fairly Balance The Committee………22

II.    Plaintiff Will Suffer Irreparable Harm In The Absence Of An Injunction…………………………………………………………….25

III.    The Balance Of The Equities And Public Interest Weigh In Favor of Injuctive Relief……………………………………………………….29

Conclusion……………………………………………………………...30

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

Alabama-Tombigbee Rivers Coal. v. DOI,
   26 F.3d 1103 (11th Cir. 1994) ....................................................28, 29

All. for the Wild Rockies v. Cottrell,
   632 F.3d 1127 (9th Cir. 2011) ...........................................................18

Becerra v. DOI,
   276 F. Supp. 3d 953 (N.D. Cal. 2017).................................................10

Cal. Forestry Ass'n v. Forest Serv.,
   102 F.3d 609 (D.C. Cir. 1996)............................................................20

California v. BLM,
   3:17-cv-03804-EDL (N. D. Cal.).........................................................14

Cargill v. United States,
   173 F.3d 323 (5th Cir. 1999) ..............................................................22

Ctr. for Policy Analysis on Trade & Health v. United States Trade
   Representative,
   540 F.3d 940 (9th Cir. 2008) ..............................................................26

Colo. Envtl. Coal. v. Wenker,
   353 F.3d 1221 (10th Cir. 2004) .......................................................6, 26

Cummock v. Gore,
   180 F.3d 282 (D.C. Cir. 1999).......................................................20, 21

Davidson v. Kimberly-Clark Corp.,
   889 F.3d 956 (9th Cir. 2018) ..............................................................27

Drakes Bay Oyster Co. v. Jewell,
   747 F.3d 1073 (9th Cir. 2014) ............................................................18

Food Chem. News v. Dep't of Health & Human Servs.,
   980 F.2d 1468 (D.C. Cir. 1992)......................................................6, 20

Judicial Watch v. Dep't of Commerce,
   583 F.3d 871 (D.C. Cir. 2009)............................................................27

Law. Comm. for C.R. Under Law v. Presidential Advisory Comm'n
    on Election Integrity,
    265 F. Supp. 3d 54 (D.D.C. 2017) ....................................................... 30

Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration All.,
    304 F.3d 1076 (11th Cir. 2002) ......................................................... 19

Nat. Res. Def. Council v. Abraham,
    223 F. Supp. 2d 162 (D.D.C. 2002), 353 F.3d 40 (D.C. Cir. 2004) ................. 29

Nat'l Anti–Hunger Coal. v. Exec. Comm. of the President's Priv.
    Sector Surv.,
    711 F.2d 1071 .............................................................................. 28

Nw. Ecosystem All. v. U.S. Trade Rep.,
    No. C99-1165R, 1999 WL 33526001 (W.D. Wash. Nov. 9, 1999) ....... 25, 28, 30

Pebble Ltd. P'ship v. EPA,
    No. 3:14-cv-0171-HRH, ECF No. 90 (D. Alaska Nov. 25, 2014) .................... 29

Pub. Citizen v. DOJ,
    491 U.S. 440 (1989) .............................................................. 4, 27, 30

Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for
    Foods,
    886 F.2d 419 (D.C. Cir. 1989) ...................................................... 24, 25

Sierra Club v. Zinke,
    3:17-cv-03885-EDL (N.D. Cal.) .......................................................... 14

Sugar Cane Growers Co-op. of Fla. v. Veneman,
    289 F.3d 89 (D.C. Cir. 2002) ............................................................. 26

Winter v. Nat. Res. Def. Council,
    555 U.S. 7 (2008) .......................................................................... 18

Wyoming v. DOI,
    2:16-cv-00285-SWS (D. Wy.) ........................................................... 14

**Statutes**

5 U.S.C App. II

    § 5 ............................................................................... 5, 22

§ 8.................................................................................................6

§ 10.....................................................................................5, 19, 20

5 U.S.C.

§ 701.............................................................................................8

§§ 702-704....................................................................................7

§ 706............................................................................................7

19 U.S.C. § 2155....................................................................................26

30 U.S.C. § 191.......................................................................................8

**Other Authorities**

40 C.F.R. § 1500.1................................................................................11

41 C.F.R. § 102-3.150........................................................................5, 19

43 C.F.R.

§ 1780.0-1....................................................................................6

§ 1780.0-2....................................................................................6

§ 1784.0-5....................................................................................6

§ 1784.2–1........................................................................6, 23, 25, 26

§ 1784.2-2...........................................................................7, 22, 23

§ 1784.4-3..................................................................................19

§ 1784.5-3..................................................................................20

118 Cong. Rec. 30,276 (1972)..............................................................21

45 Fed. Reg. 8176..........................................................................6, 7

60 Fed. Reg. 43475............................................................................10

77 Fed. Reg. 22799............................................................................10

81 Fed. Reg. 83008............................................................................14

82 Fed. Reg. 16222 ...................................................................10

82 Fed. Reg. 16323 ...................................................................10

82 Fed. Reg. 36934 ..............................................................11, 28

83 Fed. Reg. 49943 ...................................................................12

Ben Lefebvre, FEC Increases Scrutiny of Zinke's Former PAC,
   Politico (Apr. 2, 2018),
   https://www.politico.com/story/2018/04/02/fec-scrutiny-of-ryan-
   zinkes-seal-pac-495228 ......................................................12

Taxpayers for Common Sense, Document Release: Agency Lists
   Subcommittee and Working Group Members (July 9, 2018)
   https://www.taxpayer.net/energy-natural-resources/document-
   release-agency-lists-subcommittee-and-working-group-members/ ..................14

Taxpayers for Common Sense, Gas Giveaways: Methane Losses Are
   a Bad Deal for Taxpayers (Apr. 2018),
   https://www.taxpayer.net/wp-content/uploads/2018/04/TCS-
   Report-Gas-Giveaways_-April-2018.pdf ............................................9

DOI, Natural Resources Revenue Data, Federal Disbursements,
   https://revenuedata.doi.gov/downloads/disbursements/ .......................8

H.R. Rep. No. 92-1017 (1972)...................................................21

Jayni F. Hein, Federal Lands and Fossil Fuels: Maximizing Social
   Welfare in Federal Energy Leasing, 42 Harv. Envtl. L. Rev. 1, 10-
   12 (2018)........................................................................8, 9

Juliet Eilperin, Interior Dept. Panel Weighs Lower Royalty Payments
   for Offshore Gas and Oil Drilling, Wash. Post (Feb. 25, 2018)....................17

Kevin Dayaratna, David Kretuzer, & Nicolas Loris, Time to Unlock
   America's Vast Oil and Gas Resources, Heritage Found. (Sept. 1,
   2016), https://www.heritage.org/environment/report/time-unlock-
   americas-vast-oil-and-gas-resources.............................................14

Letter from American Energy Alliance et al. to United States Senate
   (May 3, 2017),
   https://www.atr.org/sites/default/files/assets/Methane%20Coalition
   %20Letter.pdf ..................................................................14

Margaret Kriz Hobson, <u>ConocoPhillips Leads Charge in North Slope Oil Revival</u>, E&E News (Nov. 21, 2018). ........................................................... 16

Miranda Green, <u>Zinke's Former Energy Counselor at Interior Takes Job with Offshore Oil Company</u>, The Hill (Sept. 4, 2018) ................................. 12

Mont. Dep't of Revenue, <u>Biennial Report: July 1, 2014 – June 30, 2016</u> (2016), https://mtrevenue.gov/wp-content/uploads/2017/07/2016-Biennial-Report-Complete.pdf .......................... 8

Tyler Bridges, <u>Scott Angelle's Close Ties to Oil Helps His Campaign for Governor,</u> The Advocate (Oct. 21, 2015), https://www.theadvocate.com/baton_rouge/news/politics/elections/article_ff8d2e03-0553-59d8-bced-a63917536131.html ..................................... 12

W. Org. of Res. Councils, <u>The Flaring Boom</u> (Jan. 29, 2016) .................................. 9

W. Org. of Res. Councils, <u>No Time To Waste</u> (Nov. 24, 2015) .............................. 9

W. Org. of Res. Councils, <u>Now Is The Time To End Self Bonding</u> (Apr. 5, 2018) ............................................................................................. 9

W. Org. of Res. Councils, <u>The True Cost of Coal Exports</u> (May 4, 2016) .................................................................................................... 9

# EXHIBIT INDEX

**Exhibit**

Decl. of Sara Kendall …………………………………………………………...A-1

Decl. of Beth Kaeding...……………………………………………………….A-2

Decl. of Leland J. Turner……………………………………………………...B-1

Decl. of Ellen Pfister...………………………………………………………..B-2

Royalty Pol'y Comm. Member Directory……………………………………C

Appointment of Kathleen Sgamma as Alternate Member to Royalty Pol'y Comm.………………………………………………………………..…………D

Minutes of Royalty Pol'y Comm. Feb. 2018 meeting…………………………..E

Minutes of Royalty Pol'y Comm. June 2018 meeting…………………………F

Initial list of Royalty Pol'y Comm. Nominees………………………………....G

Dep't of Interior vetting of Daniel Rusz……………………………………....H

Sample leases held by ConocoPhillips…………………………………………..I

Sample leases held by Cloud Peak Energy……………………………………….J

Sample leases held by Shell………………………………………………….K

Sample leases held by Chevron………………………………………………….L

Sample leases held by Concho Res……………………………………………..M

Sample leases held by Incremental Oil & Gas………………………………….N

W. Org. of Res. Councils comments submitted to Royalty Pol'y Comm. prior to June, 2018 meeting……………………………………………………………...O

Comments submitted prior to Sept., 2018 meeting………………………………..P

Dep't of Interior Manual 308 DM 2.11…………………………………………..Q

Royalty Pol'y Comm. Charter (as amended)…………………………………....R

Letter from Paul LePage, et al. to Ryan Zinke………………………………..S

Royalty Pol'y Comm. inaugural meeting, summary of proceedings……………T

ix

Minutes of Royalty Pol'y Comm. Planning, Analysis, & Competitiveness
Subcomm. Mar. 30, 2018 meeting……………………………………………U

## INTRODUCTION

This case challenges Defendants' operation and maintenance of the "Royalty Policy Committee," ("RPC" or "Committee"), a federal advisory committee established by Secretary of the Interior Ryan Zinke to advise the Bureau of Land Management ("BLM") and other components of the Department of the Interior ("Department") on policies related to the leasing of federal mineral deposits. This leasing produces royalties and other revenue for the federal government, and ultimately for states and tribes, to fund schools, infrastructure, and other vital programs. But although federal law requires leasing to generate "fair market value" for the American public, Defendants have long undercharged for the rights to mine federal oil, gas, and coal, robbing taxpayers of revenue and effectively subsidizing air and water pollution that inevitably flows from overleasing. Only in recent years did the Department pass important reforms to accurately price federal mineral deposits and protect nearby communities from severe environmental degradation.

In 2017, however, the Department abruptly reversed these gains, scrapping environmental and taxpayer protections and undertaking an ambitious campaign to *lower* royalties and environmental safeguards. Key to the Department's effort was its establishment of the RPC, a committee loaded with representatives of extractive industries, to provide Secretary Zinke with a sweeping roadmap for deregulation.

The Committee, which has met for over a year in secret sessions and without meaningful public input, lacks any members who represent an interest in measured, sustainable leasing policies.  Unsurprisingly, therefore, the Committee has churned out a laundry list of loopholes and rollbacks of the nation's environmental regulations.  Defendants have not only begun to ratify these proposals, but in fact have relied upon the RPC's very existence as justification to gut crucial leasing reforms.

The Committee's operation is therefore unlawful under the Federal Advisory Committee Act ("FACA"), which requires that committees like the RPC (*i.e.*, those relied upon by the federal government to generate policy) be open, transparent, fairly balanced, and free from conflicts of interest.  Defendants have flatly violated each of these requirements and many similar provisions set forth in the Department's own regulations.  Plaintiff Western Organization of Resource Councils ("WORC") – a coalition of communities directly affected by the undercharging and environmental degradation associated with irresponsible leasing – has therefore sued to obtain an impartial and open Committee process.

Plaintiff now seeks to preliminarily enjoin the Committee's unlawful work before its forthcoming meeting on January 31, 2019.  Every day that the RPC operates in secret and without public input is an irreparably lost opportunity for the public to understand and comment on the nation's most important royalty policies.

Absent an injunction, Defendants will continue to shut out Plaintiff and others from the Committee's ongoing decisionmaking process, and will continue to rely upon the RPC's recommendations to enact policies that adversely affect Plaintiff and its membership.  Thus, Defendants should be enjoined from convening any meetings of the RPC or its subcommittees until they comply with FACA and its implementing regulations by (1) noticing and opening to the public the RPC's subcommittee and working group meetings; (2) releasing to the public mandatory ethics disclosures and materials prepared for or by the RPC's subcommittees and working groups; and (3) fairly balancing the RPC to include representation of Plaintiff's interests.

## LEGAL BACKGROUND

### I.    The Federal Advisory Committee Act

FACA "was enacted to cure specific ills[,] particularly the wasteful expenditure of public funds for worthless [advisory] committee meetings and biased proposals by special interest groups."  Pub. Citizen v. DOJ, 491 U.S. 440, 441 (1989).  Prior to FACA, special interests had used advisory committees – and the associated veneer of governmental legitimacy – to drive federal decisionmaking outside the light of public scrutiny, participation, and debate.  Id. at 445-46 & n.4.

FACA contains a number of safeguards against these abuses.  First, advisory committees must reflect a diversity of interests: "the membership of [an] advisory

committee [must] be fairly balanced in terms of points of view represented and the functions to be performed by the advisory committee," 5 U.S.C App. II § 5(b)(2), (c).  Second, committees must not be dominated by particular special interest groups.  Every committee charter must contain provisions to "assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment[.]"  Id. § 5(b)(3), (c).

Third, each advisory committee must include and facilitate public comment and participation.   The committee must provide "timely notice" of its meetings to the public, id. § 10(a)(2), and must allow interested persons to "attend, appear before, or file statements with [the] committee," id. § 10(a)(3).  All meetings must be held "in a manner or place reasonably accessible to the public" and permit "[a]ny member of the public [to] speak to or otherwise address the advisory committee if the agency's guidelines so permit."  41 C.F.R. § 102-3.150(a), (d).

Finally, and to facilitate public discussion at committee meetings, every advisory committee must also publicize "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, [and] other documents . . . made available to or prepared for" the committee, 5 U.S.C. App. II § 10(b).  All such materials must be released sufficiently in advance of the committee meeting

to enable the public to "follow the substance of the [committee's] discussions."

Food Chem. News v. Dep't of Health & Human Servs., 980 F.2d 1468, 1472 (D.C. Cir. 1992).

## II.    The Department's Implementing Regulations

FACA Section 8 requires federal agencies to "establish uniform administrative guidelines and management controls for advisory committees established by that agency[.]" 5 U.S.C. § App. II § 8(a).  To that end, the Department has published regulations at 43 C.F.R. subpart 1784, which go beyond FACA's requirements in order to guard against advisory committees falling under the sway of federal leaseholders and other parties who stand to benefit from leasing and permitting policy.[1]  See, e.g., 45 Fed. Reg. 8176 (explaining that "[t]he foremost reason" for the regulations' restrictions on membership "is to avoid seeming conflicts of interest in the eyes of the public, whether real or apparent").

Thus, the Department requires that an advisory committee's membership provide "*representative* counsel and advice about public land and resource planning, retention, management and disposal,"  43 C.F.R. § 1784.2-1(a) (emphasis added), and generally prohibits committee membership for "[p]ersons *or employees of organizations* who hold leases, licenses, permits, contracts or claims

---

[1] The regulations also apply to, at least, any advisory committee designed to advise the BLM (which controls the resources at issue here).  See 43 C.F.R. §§ 1780.0-1, 1780.0-2, 1784.0-5; Colo. Envtl. Coal. v. Wenker, 353 F.3d 1221, 1225 (10th Cir. 2004) (per curiam).

which involve lands or resources administered by the [BLM]." Id. § 1784.2-2(a)

(emphasis added).  In order to enforce the latter prohibition, "[m]embers of

advisory committees shall be required to disclose their direct or indirect interest in

leases, licenses, permits, contracts, or claims and related litigation which involve

lands or resources administered by the [BLM]," including holdings of spouses and

children.  Id. § 1784.2-2(c).

The Department has extended FACA's open meeting requirements to

subcommittee and working group meetings.  Id. § 1784.4-3.  The regulations also

require 30 days' notice of these meetings and of full Committee meetings, id. §

1784.4-2(a), "to avoid any appearance of secrecy, ensure public awareness of

committee activities, and to encourage public participation in subcommittee work."

45 Fed. Reg. at 8177.

### III.    The Administrative Procedure Act

The Administrative Procedure Act ("APA") allows a person "suffering legal

wrong because of agency action, or adversely affected or aggrieved by agency

action" to seek judicial review of that action.  5 U.S.C. §§ 702-704.  Under the

APA, a reviewing court may "compel agency action unlawfully withheld or

reasonably delayed," id. § 706(1), and "hold unlawful and set aside agency action,

findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," id. § 706(2)(A).  Because FACA does not

16

provide its own standard or scope of review, or a cause of action, this case is properly brought under the standards set forth in the APA.  See id. § 701(a).

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The Importance Of Federal Leasing Regimes To Public Health And Finances

The leasing of federal mineral deposits (many of which lie under privately-owned land) is governed by several statutes and regulations.[2]  Generally, private lessees extracting public minerals must pay royalties to the United States, along with bonus bids, rents, and other fees.  These revenues, which totaled $7 billion in 2017, flow to the United States Treasury and to tribal treasuries.  The United States Treasury, in turn, disburses royalty proceeds to states and to federal programs such as land reclamation, the Land and Water Conservation Fund, and historic preservation efforts.  See 30 U.S.C. § 191(a).  In 2017, for instance, the Department of the Interior disbursed over $24 million in leasing-related royalties to the state of Montana, 75% of which went to the state's general fund.[3]

Currently, the United States does not demand fair market value for its public resources.  A 2017 report by the Government Accountability Office determined

---

[2] See generally Jayni F. Hein, Federal Lands and Fossil Fuels: Maximizing Social Welfare in Federal Energy Leasing, 42 Harv. Envtl. L. Rev. 1, 10-12 (2018).

[3] See DOI, Natural Resources Revenue Data, Federal Disbursements, https://revenuedata.doi.gov/downloads/disbursements/ (last visited Nov. 19, 2018); Mont. Dep't of Revenue, Biennial Report: July 1, 2014 – June 30, 2016 at 129 (2016), https://mtrevenue.gov/wp-content/uploads/2017/07/2016-Biennial-Report-Complete.pdf.

that royalty rates do not maximally benefit the public fisc, and that higher rates

would lower production but increase revenues for federal, state, and tribal

treasuries.[4]  Other commenters have observed that today's royalty rates do not

merely shortchange Americans with respect to the fair market value of their

resources, but further fail to account for long-term liabilities from leasing in the

form of persistent environmental damage.  Hein, supra n.2 at 18-20.  And the

federal government forgoes tens of millions each year in lost royalty revenue from

the wasteful venting and flaring of methane and other byproducts of natural gas

extraction.[5]

Landowners and recreationalists must cope with the environmental

consequences of irresponsible leasing.  Among these communities are Plaintiff's

thousands of members, who farm, ranch, and live on lands overlying and abutting

federal, state, and privately-owned coal, oil, and gas deposits, and who daily cope

with the air, water, and noise pollution from federal leases.  See Exs. A-1, A-2.

---

[4] See Gov't Accountability Office, GAO-17-540, Oil, Gas, and Coal Royalties: Raising Federal
Rates Could Decrease Production on Federal Lands but Increase Federal Revenue (2017).

[5] See, e.g., Taxpayers for Common Sense, Gas Giveaways: Methane Losses Are a Bad Deal for
Taxpayers 4 (Apr. 2018), https://www.taxpayer.net/wp-content/uploads/2018/04/TCS-Report-
Gas-Giveaways_-April-2018.pdf.  For other summaries of shortcomings in federal leasing
regimes, see, e.g., WORC, Now Is The Time To End Self Bonding (Apr. 5, 2018); WORC, The
True Cost of Coal Exports (May 4, 2016); WORC, The Flaring Boom (Jan. 29, 2016); WORC,
No Time To Waste (Nov. 24, 2015) (all available at http://www.worc.org/our-publications/);
Hein, supra n2.

This pollution risks the health, livelihoods, and recreational interests of Plaintiff's membership, and Plaintiff thus has a long history of participating in Defendants' rulemakings and other agency actions to ensure that federal leasing is conducted responsibly and in a manner protective of local conservation interests.  See Exs. A-1, B-2.  WORC also aggressively advocates for reclamation of former mining cites. See Ex. A-1 ¶¶ 16-21.

## II.     Secretary Zinke Illegally Charters And Staffs The RPC To Undervalue Leases Of Public Resources

In 1995, the Department chartered the first iteration of the Royalty Policy Committee "to provide advice on the Department's management of Federal and Indian minerals leases, revenues, and other minerals related policies."  60 Fed. Reg. 43475.  The charter was renewed several times through 2012, ultimately lapsing in 2014.  See 77 Fed. Reg. 22799.

On March 29, 2017, Secretary Zinke chartered the Committee's most recent iteration, and the Department publicly announced the Committee on April 3, 2017. See 82 Fed. Reg. 16222.  The very next day, DOI announced the repeal of a landmark rule, less than a year old, that would have increased public revenue from leasing by over $70 million, chiefly by using index pricing rules and eliminating valuation loopholes and deductions for lessees (the "Valuation Rule").  See 82 Fed. Reg. 16323 (Apr. 4, 2017); Becerra v. DOI, 276 F. Supp. 3d 953, 955-57 (N.D. Cal. 2017).

19

From the outset, the RPC was designed to replace the repealed Valuation Rule with a set of policies extremely favorable to extractive industries, and irreparably harmful to American taxpayers, public lands, and persons residing nearby federal mineral estates.  See 82 Fed. Reg. 36934, 36943 (Aug. 7, 2017) (citing establishment of RPC as reason for repealing Valuation Rule).  Thus, the new RPC purports to embrace a much broader agenda of regulatory reform than its predecessor Committees, passing upon significant changes to federal environmental review and permitting regimes such as the National Environmental Policy Act ("NEPA"), the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).  At the Committee's first meeting, for example, Committee Chairman Vincent DeVito advertised the RPC as a vehicle to achieve "energy dominance," a goal that would require the Committee to "address a range of issues from leasing, permitting, royalty policy, product valuation regulations, revenue transparency, and other general policy improvements."  Ex. T at 3, 7.

Although the RPC's work touches on property, taxpayer, and conservation interests throughout the country, the Committee's membership was hand-picked to exclude those interests and empower just a single segment of royalty stakeholders: the extractive industry.  Secretary Zinke departed from normal advisory committee practice – in which the committee itself chooses its chair – and installed in that

position Vincent DeVito, an industry attorney and treasurer for Secretary Zinke's political action committee.[6]

Chairman DeVito promptly committed the RPC to what he described as a "business mindset," Ex. T at 3, and solicited applications for up to twenty regular members and several additional "alternate members," who were to attend meetings when primary members were unavailable. The Department denied all membership applications from public interest organizations and individuals purporting to represent conservation, landowner, public interest academic, and taxpayer interests, and instead stacked the Committee with industry advocates.[7] As relevant here, the membership breaks down as follows:

---

[6] See Ben Lefebvre, FEC Increases Scrutiny of Zinke's Former PAC, Politico (Apr. 2, 2018), https://www.politico.com/story/2018/04/02/fec-scrutiny-of-ryan-zinkes-seal-pac-495228. In September, Chairman DeVito resigned as Counselor to the Secretary (and, therefore, as RPC Chairman), see ECF No. 13 at 7 n.3, to take a position with an offshore drilling company that had benefited from the RPC's work. Miranda Green, Zinke's Former Energy Counselor at Interior Takes Job with Offshore Oil Company, The Hill (Sept. 4, 2018), https://thehill.com/policy/energy-environment/404979-interior-department-chiefs-former-energy-counselor-takes-job-at.
Mr. DeVito was replaced by Scott Angelle, who also has extensive ties to industries with a financial stake in the RPC. See Tyler Bridges, Scott Angelle's Close Ties to Oil Helps His Campaign for Governor, The Advocate (Oct. 21, 2015), https://www.theadvocate.com/baton_rouge/news/politics/elections/article_ff8d2e03-0553-59d8-bced-a63917536131.html.

[7] The RPC recently sought nominations for new Committee membership. See 83 Fed. Reg. 49943 (Oct. 3, 2018). Plaintiff has nominated one of its members to the Committee but has not yet received word of Defendants' decision on that application.

- Eleven of the twelve regular and alternate Committee members representing "various mineral and/or energy" stakeholders work or have worked for or on behalf of extractive industries.  <u>See</u> Ex. C at 40-50.

- At least three of the six alternate and regular Committee members supposedly representing "academia and public interest" have worked or consulted for extractive industries.  <u>See</u> Ex. C at 54-56 at (biographies for Daniel Rusz, Van Romero, and Kwame Awuah-Offei).  None of these members purport to represent those portions of the public's interest in conservation or in royalty prices that are fair to taxpayers or local stakeholders.  One "public interest" representative, Daniel Rusz, not only appears to lack any experience in academic or public interest work, but was initially slated to participate on the RPC as one of the "industry" representatives due to his experience in the coal mining industry.  <u>See</u> Ex. G at 2 (initial slate of nominees, listing Rusz as industry representative); Ex. H (Department vetting of Rusz, characterizing his application as "all about industry").

- At least five of six state members are representatives of governors who support increased offshore drilling, <u>see</u> Ex. S (letter from members Alabama and Alaska), or who opposed the now-repealed Valuation Rule and other Department efforts to reduce waste in energy development, such as rules to curb

the needless venting, flaring, and leaks of natural gas.  81 Fed. Reg. 83008

(Nov. 18, 2016).[8]

To further cement the Committee membership's industry orientation,

Defendants suddenly and without explanation added two "non-voting subject

matter experts."  Ex. U at 1.  These positions, which are not contemplated by the

RPC's Charter, were filled by David Kreutzer of the Heritage Foundation and Paul

Blair of Americans for Tax Reform.  Both organizations have aggressively

advocated for policies supported by extractive industries.[9]

Thus composed, the Committee has delegated the vast bulk of policy

formulation and debate to secretive subcommittees and working groups whose

membership was released only after months of inquiry by public interest

organizations.[10]  Defendants have relied on this delegation to claim that they have

released the RPC's records to the public, when in fact the most salient Committee

---

[8] See, e.g., Wyoming v. DOI, 2:16-cv-00285-SWS (D. Wy.) (challenge to Waste Prevention rule by RPC members Wyoming and Texas); California v. BLM, 3:17-cv-03804-EDL (N. D. Cal.); Sierra Club v. Zinke, 3:17-cv-03885-EDL (N.D. Cal.) (challenge to rollback of Rule, opposed by member North Dakota).

[9] See, e.g., Kevin Dayaratna, David Kreutzer, & Nicolas Loris, Time to Unlock America's Vast Oil and Gas Resources, Heritage Found. (Sept. 1, 2016), https://www.heritage.org/environment/report/time-unlock-americas-vast-oil-and-gas-resources; Letter from American Energy Alliance et al. to United States Senate (May 3, 2017), https://www.atr.org/sites/default/files/assets/Methane%20Coalition%20Letter.pdf.

[10] See Taxpayers for Common Sense, Document Release: Agency Lists Subcommittee and Working Group Members (July 9, 2018) https://www.taxpayer.net/energy-natural-resources/document-release-agency-lists-subcommittee-and-working-group-members/.

records are produced and held by subcommittees and working groups, which

Defendants evidently (and erroneously) believe fall outside governing disclosure

requirements.

Furthermore, Defendants have delegated subcommittee and working group

responsibilities to *alternate* committee members, even though the alternate

members' appointment letters provided that their primary responsibility was

merely to attend full Committee meetings in the event that primary members were

unavailable.  See, e.g., Ex. D.  At the Committee's February 2018 meeting, for

example, "alternate" member Kathleen Sgamma of Western Energy Alliance (a

lobbying group for extractive industries) presented the recommendations for

onshore oil and gas development.  See Ex. E at 10-11.  These recommendations,

most of which have been endorsed by the Committee, chiefly included the

reduction or elimination of environmental reviews for leases.  Id. at 25-27.  To

date, the Committee's subcommittee and working group meetings have not been

disclosed or opened to the public, and the Department has not released materials

prepared for or by these bodies.

## III.   In Secret, The RPC Outsources Its Decisionmaking To Corporate Interests

The full Committee has publicly met on at least four occasions, and a fifth

meeting is scheduled for January 2019.  At Committee meetings, subcommittees

and working groups summarize the conclusions they have reached out of the public

eye, and the full Committee thereafter votes on corresponding policy

recommendations, almost always rubber stamping the subcommittee reports.

Defendants have not consistently facilitated public participation during these

meetings.  At the Committee's February 2018 meeting, for example, the RPC

permitted interested members of the public to speak for only two minutes per

person, for a total of thirty minutes.  The clear majority of the speakers – some of

whom had unsuccessfully sought Committee membership – decried the RPC's lack

of balance and transparency, or spoke against specific policy proposals.  The

Committee immediately thereafter adopted many of the proposals to which the

public had objected, forgoing any discussion or consideration of the public's

concerns.  Ex. E at 13-27.  And at the Committee's June 2018 meeting, Chairman

DeVito answered calls for debate on public comments – including several

comments from interfaith leaders and tribal interests – by proclaiming "I'm not

going to go down that road," and immediately cutting off further discussion.[11]

The outcome of the RPC's lopsided and secretive decisionmaking process is

just as Secretary Zinke and Chairman DeVito intended: the Committee has issued

dozens of recommendations that benefit extractive industries at the expense of

Plaintiff's membership.  For example, the Committee has proposed widening a

---

[11] Pamela King, <u>BLM adopts NEPA change recommended by industry group</u>, E&E News, (June
7, 2018), https://www.eenews.net/energywire/2018/06/07/stories/1060083761.

loophole that permits coal companies to undervalue their royalty payments when selling coal to a subsidiary.[12]  The Committee has also issued several recommendations for scaling back or altering requirements for environmental review of leases under NEPA, and in some cases Defendants have enacted these policies only hours later.  Compare King, supra n.11 with Ex. F at 13.

Conversely, the RPC has not even attempted to pursue policies that take into account the perspective of communities adjoining leased lands (like Plaintiff's membership), the public interest, and taxpayers.  The Committee has declined to discuss, for example, policies that would compensate the public for the hundreds of millions of dollars in revenue lost through natural gas flaring, venting, and leaks; insufficient reclamation bonding for lessees; artificially low royalty rates; non-competitive bidding associated with area-wide leases or anti-competitive speculation; lack of compensation for negative externalities such as air and water pollution; the lack of comprehensive lessee data; overly-generous royalty deductions related to transportation allowances; or lost revenue from idle leases.[13]

//

//

---

[12] See Juliet Eilperin, Interior Dept. Panel Weighs Lower Royalty Payments for Offshore Gas and Oil Drilling, Wash. Post (Feb. 25, 2018).  See Ex. A-1 ¶ 11.

[13] See supra n.5.

## STANDARD OF REVIEW

To obtain a preliminary injunction, Plaintiff must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest.  Winter v. Nat. Res. Def. Council, 555 U.S. 7, 20 (2008).  The last two factors merge when the federal government is the opposing party, Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014), and are evaluated on a "sliding scale" vis-à-vis the Plaintiff's likelihood of success on the merits.  All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-32 (9th Cir. 2011).  Thus, for example, Plaintiff may obtain a preliminary injunction by demonstrating "serious questions going to the merits" if the balance of equities "tips sharply" towards Plaintiff.  Id. at 1132 (quotation omitted).

## ARGUMENT

Relevant to this motion are three of Plaintiff's claims for relief, namely Defendants' failure to (1) open RPC meetings and disclose RPC materials; (2) fairly balance the RPC, and; (3) protect the RPC from inappropriate influence by special interests.  Plaintiff is likely to prevail on all of these claims, since Defendants have in each instance simply ignored unambiguous statutory and regulatory mandates.  These violations are irreparably injuring Plaintiff and its members by depriving them of access to – and participation in – ongoing RPC

proceedings, the very types of injury Congress sought to redress when passing

FACA.  For similar reasons, the balance of equities and public interest weigh

heavily in favor of an injunction, and the Court should therefore grant Plaintiff's

motion.

I.    **Plaintiff Is Likely To Succeed On The Merits Of Its Claims**
      A. **Defendants Have Failed To Notice And Open RPC Meetings**

An advisory Committee must provide "timely notice" of its meetings to the

public, 5 U.S.C. App. II § 10(a)(2), and must allow interested persons to "attend,

appear before, or file statements with [the] committee."  Id. § 10(a)(3).  All

meetings must be held "in a manner or place reasonably accessible to the public"

and allow "[a]ny member of the public [to] speak to or otherwise address the

advisory committee if the agency's guidelines so permit."  41 C.F.R. § 102-

3.150(a), (d).  Department regulations extend this requirement to subcommittees

and working groups, 43 C.F.R. § 1784.4-3(a), (b), and require 30 days' notice of

these meetings and of full Committee meetings.  Id. § 1784.4-2(a).

Ignoring specific requests by Plaintiff, Defendants have declined to open

RPC subcommittee or working group meetings to the public, much less facilitate

public comments at those meetings.  Their failure to do so plainly violates FACA

and its implementing regulations.  See Miccosukee Tribe of Indians of Fla. v. S.

Everglades Restoration All., 304 F.3d 1076, 1080 (11th Cir. 2002) (violation of

FACA where committee failed to properly notice meetings); cf. Cal. Forestry

Ass'n v. Forest Serv., 102 F.3d 609, 611 n.2 (D.C. Cir. 1996) ("uncontested"

violation of FACA where committee closed its meetings).

### B. Defendants Have Failed To Provide RPC Documents And Disclosures

FACA and Department regulations require that the RPC and its

subcommittees maintain "[a]ll records, reports, transcripts, minutes,

recommendations, studies, working papers, and other documents prepared by or

submitted to" those bodies.  43 C.F.R. § 1784.5-3(b).  See also 5 U.S.C. App. II §

10(b); Ex. Q (Department Manual, codifying requirement).  "[T]he Government

must make such materials available for public inspection and copying, even in the

absence of a particular request," Cummock v. Gore, 180 F.3d 282, 289 (D.C. Cir.

1999), and, crucially, must provide materials undergirding committee or

subcommittee meetings *before* those meetings convene.  As the D.C. Circuit has

explained, "[o]pening the meetings to the public would be meaningless if the

public could not follow the substance of the discussions."  Food Chem. News v.

Dep't of Health & Human Servs., 980 F.2d 1468, 1472 (D.C. Cir. 1992).

With minor exceptions, Defendants simply have not provided the materials generated or relied upon by the RPC's subcommittees or working groups.[14]  These failures are particularly egregious because, as noted above, the full RPC largely does not generate leasing-related recommendations itself, but instead delegates that role to subgroups dominated by industry interests and alternate Committee members acting outside their prescribed roles.  Left to divine the Committee's work solely from opaque and incomplete materials released to the full RPC, the public has effectively been shut out of the RPC's policymaking apparatus.  See Cummock, 180 F.3d at 293.

### C. Defendants Have Failed To Guard Against Inappropriate Influence By Special Interests

Congress, in passing FACA, explained that "[o]ne of the great dangers in the unregulated use of advisory committees is that special interest groups may use their membership on such bodies to promote their private concerns," citing in particular an Industrial Waste Committee where "only representatives of industry were present[,]" and "[n]o representatives of conservation, environment, clean water, consumer, or other public interest groups were present."  H.R. Rep. No. 92-1017, at 6 (1972).  See also 118 Cong. Rec. 30,276 (1972) ("[v]iewed in its worst

---

[14] At most, Defendants have released minutes of subcommittee meetings, sometimes months after those meetings transpired.  But the Committee has not released minutes for working groups or materials relied on by subcommittees or working groups.

light, the federal advisory committee can be a convenient nesting place for special interests seeking to change and preserve a federal policy for their own ends"). Thus, FACA requires committee charters to "assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment[.]" 5 U.S.C. App. II § 5(b)(3), (c).  See Cargill v. United States, 173 F.3d 323, 339 n.30 (5th Cir. 1999) (finding justiciable claims brought under identical requirement for congressional advisory committees).  The Department's regulations are even more specific on this point, generally prohibiting participation on advisory committees for those who hold or work for those who hold "leases, licenses, permits, contracts or claims which involve lands or resources administered by the [BLM]" and requiring disclosure of any such holdings (and those of members' spouses and children).  43 C.F.R. § 1784.2-2(a), (c).

Defendants have violated these requirements.  According to public records, at least six RPC members are employed by entities falling under the prohibition set forth in 43 C.F.R. § 1784.2-2(a).  See Exs. I-N (sample leases held by employers held by Committee members).[15]  Additional members may be violating that

---

[15] See also, e.g., Margaret Kriz Hobson, ConocoPhillips Leads Charge in North Slope Oil Revival, E&E News (Nov. 21, 2018).

31

regulation, but the public has an incomplete window into the holdings of RPC

membership because Defendants have not provided the financial interest

disclosures required by 43 C.F.R. § 1784.2-2(c).  Additionally, these failures

render the RPC Charter inadequate to protect the RPC from inappropriate

influence, since the Charter merely prohibits members from participating in

matters in which they possess a personal financial interest.  See Ex. R ¶ 14.  Contra

the Department's regulations, however, the Charter does not prevent a conflict of

interest between a member's *employer* (or close family member) and the member's

obligation to render impartial advice on minerals management.  For this

independent reason, Plaintiff is likely to prevail on this fourth claim for relief.

### D. Defendants Have Failed To Fairly Balance The Committee

Defendants' illegal appointment of special interest groups to the RPC has

resulted in a Committee that is unfairly balanced towards extractive industries, and

against conservation and taxpayer interests, in violation of FACA Section 5 and

Department regulations.  Those regulations require the RPC to be fairly balanced

both with respect to viewpoints on "public land and resource planning, retention,

management and disposal," 43 C.F.R. § 1784.2–1(a), and with respect to

viewpoints on the matters set forth in the Committee's charter (*i.e.*, "the fair

market value of and on the collection of revenues derived from the development of

energy and mineral resources on Federal and Indian lands").  Ex. R at 1.

Defendants appear to have acknowledged as much by purporting to staff the Committee with representatives of the public interest.

Ultimately, however, Defendants have shut out entire core stakeholder points of view from Committee membership and deliberations. As set forth above, a decisive block of Committee membership hails from the extractive industries that are but one stakeholder in the nations' leasing and conservation regimes. See supra at 13-14; Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods, 886 F.2d 419, 437 (D.C. Cir. 1989) ("Congress . . . accepted that a person's viewpoints could be inferred from his or her background and employment status.") (Edwards, J., concurring).[16] Stakeholders *not* represented on the Committee – such as local landowners, conservationists, and taxpayer advocates – often disagree sharply with industries now controlling the RPC, and would prefer leasing regimes that prioritize environmental quality and fair return to taxpayers. See, e.g., Ex. O at (WORC comments submitted to RPC prior to June, 2018 meeting); Ex. P (comments for February, 2018 meeting). But Defendants have denied these interests even a single seat at the Committee table, robbing them of any opportunity to steer subcommittee or working group meetings, review

---

[16] In Microbiological Criteria, the panel could not agree on the correct disposition of the case, such that each judge filed an opinion and the underlying judgment in favor of the government was affirmed. 886 F.2d at 420 (per curiam).

Committee and subcommittee materials as they are produced, or opine on policy proposals before and during Committee votes. Particularly because the excluded "opinions on [Committee] matters are directly contrary" to the interests now staffing the RPC, its membership violates FACA Section 5. Nw. Ecosystem All. v. U.S. Trade Rep., No. C99-1165R, 1999 WL 33526001, at *4–8 (W.D. Wash. Nov. 9, 1999). See also Microbiological Criteria, 886 F.2d at 435–37 ("if none of the Committee members has a background in consumer issues, then the Committee is unbalanced within the meaning of FACA").

Although the Ninth Circuit has found that a fairly balanced claim is non-justiciable when the relevant statute failed to provide meaningful standards by which to adjudicate the claim, that is not the case here. See Ctr. for Policy Analysis on Trade & Health v. United States Trade Representative ("CPATH"), 540 F.3d 940, 945 (9th Cir. 2008), as amended (Oct. 8, 2008) (involving the Trade Act of 1974). Indeed, the Ninth Circuit was careful to distinguish the Trade Act from the Department regulations at issue in this case, acknowledging that the Tenth Circuit had found those regulations justiciable. Id. at 946 (citing Color. Envtl. Coal. v. Wenker, 353 F.3d 1221, 1232-34 (10th Cir. 2004) (per curiam)).

In particular, Department regulations provide explicit and judicially manageable directions for the Committee's "[c]omposition," 43 C.F.R. § 1784.2–1. The Department's regulations are more specific than the guidelines in CPATH

because they (1) categorically *require* "interest-specific" balance, whereas the

Trade Act only recommends balance "insofar as is practicable[;]" (2) specifically

tether standards for review to "functions . . . and points of view . . . prescribed by

[the committee's] charter," whereas the Trade Act does not incorporate committee

charters into its balance requirements; (3) require balance vis-à-vis particular

questions of policy ("public land and resource planning, retention, management

and disposal") whereas the Trade Act refers only to otherwise undefined categories

of "interests," and; (4) require that committee members have "demonstrated a

commitment to collaborate in seeking solutions to resource management issues."

Compare 43 C.F.R. § 1784.2–1(a), (b) with 19 U.S.C. § 2155(c)(2).  See Wenker,

353 F.3d at 1232-34.  The regulations therefore supply the "meaningful standards"

absent from CPATH, and easily lend themselves to adjudicating Plaintiff's claim.

## II.    Plaintiff Will Suffer Irreparable Harm In The Absence Of An Injunction

Plaintiff cannot wait until the conclusion of merits briefing to seek relief in

this matter, since every day in which the RPC operates outside of FACA is a

missed opportunity for Plaintiff to protect its membership in the face of ongoing

and illegal policymaking.  When, as here, an agency ignores procedural

requirements and a reviewing court denies preliminary relief, the plaintiff may well

face a scenario where "the egg has been scrambled and there is no apparent way to

restore the status quo ante."  Sugar Cane Growers Co-op. of Fla. v. Veneman, 289

F.3d 89, 97 (D.C. Cir. 2002).  In this case, Defendants' violations of FACA are irreparably injuring Plaintiff on at least three counts.

First, Plaintiff and its membership lack access to the public information that the Act promises, and that informs the Committee's ongoing work.  "In the context of a FACA claim, an agency's refusal to disclose information that the act requires be revealed constitutes [an injury in fact]." Judicial Watch v. Dep't of Commerce, 583 F.3d 871, 873 (D.C. Cir. 2009).  Cf. Davidson v. Kimberly-Clark Corp., 889 F.3d 956, 970-72 (9th Cir. 2018) (recognizing propriety of injunctive relief where plaintiff alleges an informational injury).  Plaintiff routinely relies on information like that promised by FACA to understand policymaking affecting WORC's membership, and to formulate organizational responses to those policies.  See Ex. A-1 ¶¶ 1-16.  Absent the withheld subcommittee materials and ethics disclosures, Plaintiff's day-to-day operations are hamstrung, and it forever loses opportunities to advocate and work on behalf of its membership.  See id. ¶¶ 27-30; accord Pub. Citizen v. DOJ, 491 U.S. 440, 449 (1989).

Second, Plaintiff and like-minded individuals and organizations cannot adequately participate in Committee decisionmaking, and therefore cannot recommend or advance policies that would remedy and prevent environmental injuries to its membership.  See Ex. B-1 at (documenting personal and ongoing environmental injuries from federal royalty policies); Ex. B-2 at (same, for Bull

Mountain mine in Montana).  This "inability to influence" flows foremost from

Defendants' failure to fairly balance the Committee, which deprives Plaintiff and

likeminded entities from participating directly in the RPC's policymaking.  Nw.

Ecosystem All., 1999 WL 33526001, at *4–8 (granting injunction pending

government's "good faith effort to expedite the appointment of at least one

properly qualified environmental representative" to advisory committee).

See Nat'l Anti–Hunger Coal. v. Exec. Comm. of the President's Priv. Sector

Surv., 711 F.2d 1071, 1074 n.2 ("When the [fairly balanced] requirement is

ignored . . . persons having a direct interest in the committee's purpose suffer

injury-in-fact[.]").  It also flows from Defendants' failure to notice and open

subcommittee meetings to the press and public, which robs even non-members of

their right to monitor, inform, and report on the Committee's most crucial

discussions.  This injury is irreparable, since the RPC's work is ongoing and

cumulative: "[i]f public commentary [on committee proposals] is limited to

retrospective scrutiny, the Act is rendered meaningless." Alabama-Tombigbee

Rivers Coal. v. DOI, 26 F.3d 1103, 1106 (11th Cir. 1994).

     Finally, Defendants have irreparably injured Plaintiff by generating injurious

policy recommendations – and, in some cases, acting on those recommendations –

even though the RPC has carried out its work illegally.  As Defendants promised

when they created the RPC, 82 Fed. Reg. 36934, 36943 (Aug. 7, 2017), the

Committee has driven federal policymaking by issuing dozens of industry-friendly recommendations, codifying at least one, see, e.g., King, supra n.11, and priming the remainder for additional final agency actions that threaten Plaintiff's membership.  See supra at 16-17.  But "to allow the government to use the product of a tainted procedure . . . would circumvent the very policy that serves as the foundation of [FACA]."  Alabama-Tombigbee Rivers Coal., 26 F.3d at 1107.

Conversely, an injunction would safeguard that policy and prevent irreparable injury, forestalling further policy recommendations.  This need is particularly acute for WORC's members who reside in areas of federal energy development, and who therefore suffer irreparable environmental injury from the type of loosely regulated leasing championed by the RPC.  See Exs. A-1, A-2. Those injuries, and the illegally-developed policies from which they flow, justify equitable relief at this stage of proceedings.  See Pebble Ltd. P'ship v. EPA, No. 3:14-cv-0171-HRH, ECF No. 90 at 2 (D. Alaska Nov. 25, 2014) (enjoining advisory committee from rendering recommendation because FACA plaintiffs are "unlikely to have any remedy if its . . . claims are not resolved prior to" agency action building on those recommendations); Nat. Res. Def. Council v. Abraham, 223 F. Supp. 2d 162, 182–84 (D.D.C. 2002), order set aside in part sub nom. on other grounds by Nat. Res. Def. Council v. Dep't of Energy, 353 F.3d 40 (D.C.

Cir. 2004) (same, where "plaintiffs . . . clearly demonstrated the significance" of committee work on agency policy).

## III.    The Balance Of The Equities And Public Interest Weigh In Favor Of Injunctive Relief

The balance of the equities and the public interest weigh overwhelmingly in favor of an injunction, since the RPC's worst attributes – its secrecy and indebtedness to industry interests – are precisely the ills Congress sought to address via FACA.  See Pub. Citizen, 491 U.S. at 441.  "Plainly, as an equitable and public interest matter, more disclosure, more promptly, is better than less disclosure, less promptly[,]" where FACA is concerned.  Law. Comm. for C.R. Under Law v. Presidential Advisory Comm'n on Election Integrity, 265 F. Supp. 3d 54, 71 (D.D.C. 2017).  Likewise, the public would be better served by Committee membership representing not simply the resource extraction industry, but also segments of the public advocating for a more sustainable and fiscally prudent approach to leasing.  Nw. Ecosystem All., 1999 WL 33526001, at *7-*8. Conversely, the largely procedural remedies sought by Plaintiff will scarcely burden Defendants, whose decisionmaking will *improve* with diverse representation on the Committee, more robust public participation, and a precise understanding of Committee membership's conflicts of interests.

//

//

39

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiff's motion.

DATED this 28th day of November, 2018.

Respectfully submitted,

/s/ Travis Annatoyn
Travis Annatoyn
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 601-2483
tannatoyn@democracyforward.org

/s/ Randy J. Tanner
Randy J. Tanner
BOONE KARLBERG P.C.

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), I hereby certify that the above

memorandum contains 6,499 words, excluding caption, certificates of service and

compliance, table of contents and authorities, and exhibit index.

*/s/ Travis Annatoyn*

Travis Annatoyn, Counsel for Plaintiff