# EXHIBIT A-1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS,<br><br>          Plaintiff,<br><br>  vs.<br><br>RYAN ZINKE, in his official capacity as Secretary of the Interior, SCOTT ANGELLE, in his official capacity as Director of the Bureau of Safety & Environmental Enforcement, DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, and BRIAN STEED, in his official capacity as Deputy Director of Policy and Programs for the Bureau of Land Management,<br><br>          Defendants. | Cause No. CV-18-139-M-DWM<br><br>DECLARATION OF SARA KENDALL |

I, Sara Kendall, declare as follows:

1.     I make this declaration of my own personal knowledge.  If called to testify as a witness, I could and would testify competently regarding its contents. I am of legal age to give this declaration.

2.     I am the Program Director for the Western Organization of Resource Councils ("WORC"), a nonprofit organization that works to balance economic growth with the health of people and stewardship of land, water and air resources, and ensure that the interests of westerners are represented in the decisions that

1

affect their lives.

3.      WORC has 12,200 members, many of whom live in states where significant coal, oil, and gas development occurs, including 1,495 members in Colorado, 5,455 in Montana, 884 in North Dakota, and 726 in Wyoming.  Our members farm and ranch on lands overlying and neighboring federal, tribal, state, and privately owned coal, oil, and gas deposits, and experience numerous ill effects from coal mining, oil and gas exploration and development, and associated transport and processing.  These effects include damage to water resources used for both agricultural and residential uses, deterioration of air quality and associated health effects, destruction of recreational areas by increased truck traffic, mishandled and illegally dumped radioactive oilfield waste, and spills and leaks of oil and contaminated wastewater from pipelines and other sources. WORC and its member groups, which together form a federation, have a longstanding interest in federal leasing, mining and drilling, and royalty policy as it pertains to coal, oil, and gas deposits, and for over 35 years have actively engaged in advocacy in this area.

4.      I have been employed by WORC since 1994 as Washington, DC Representative, since 2001 as Washington, DC Office Director, and since 2016 as Program Director.  In these positions, I have worked to address the damaging impacts of coal mining and drilling for oil and gas on WORC's members, their

communities, and on land, air, water and climate resources, and to ensure that our

members, as taxpayers, receive a fair return when federal coal, oil, and gas

resources are leased and mined.

5.      As a grassroots organization that is led by our members, a great deal

of our work focuses on educating and engaging our members so they can

participate in decisions that affect their lives.  I work closely with WORC's

Campaign Teams, which are made of up members and staff who decide on our

policy priorities and direct our strategies.  These Teams often include several

members from each state who are directly affected by an issue, or have related

professional expertise or interests.  My role is to follow policies of interest in

Congress and the executive branch, update our members on the status of those

policies, and discuss whether and how to engage our broader membership to

influence federal actions.  We use a variety of means to educate and update our

membership, including newsletters, email action alerts, regular email updates to

our board and Campaign Teams, and social media.  We engage our members in

actions through email action alerts, mailings and phone banking, as well as

organizing in-district meetings with members of Congress and other decision

makers and, as warranted, flying members to Washington, DC to meet with

Congressional and Administration officials.  We also conduct broader public

education and engagement through press activities (letters to the editor, opinion

editorials, press releases, press conferences, paid ads), our website, social media, and petitions. I also advocate for policies our members support in Washington, DC by scheduling and attending meetings with Congressional and Administration staff, and by representing WORC at meetings and hearings.

6.     All of these efforts depend on access to the best possible information concerning the Department of Interior's royalty policies. If we have imperfect or incomplete information, we can offer our membership only incomplete updates about federal policies that affect their lives, and cannot fully inform lawmakers and executive agencies about our membership's concerns.

7.     One of our recent priorities is the Department of Interior's Office of Natural Resource Revenue's ("ONRR") rule governing coal, oil and gas valuation. The rule, which was finalized in 2016, represented a significant improvement over the agency's previous valuation regulations, particularly with regard to non-arm's-length transactions. It is important that the mechanisms in place to assess royalties on the public's coal, oil, and gas truly reflect those resources' full value.

8.     WORC and its members worked for several years to persuade ONRR to update its valuation regulations as part of our broader effort to reform the federal coal, oil, and gas leasing programs. Hundreds of WORC members submitted comments in support of ONRR's proposed valuation rule during the 2015 public comment period. WORC also submitted written comments on the

proposed rule with other public interest organizations on May 8, 2015. On numerous separate occasions in 2014, 2015, and 2016, I represented WORC and its member groups in meetings with administration and Congressional officials in which I advocated for stronger valuation regulations. On several of these occasions, numerous of our members and staff from Colorado, Montana, and Wyoming traveled to Washington, DC to participate in the meetings.

9.    WORC has defended ONRR's new valuation rule subsequent to its adoption. WORC intervened in the legal challenge to the rule filed by coal companies and trade associations in federal district court in the District of Wyoming. Hundreds of WORC members submitted comments in opposition to ONRR's proposed repeal of the valuation rule during the 2017 public comment period. WORC submitted comments with other public interest organizations opposing the repeal on May 4, 2017, and has intervened in a legal challenge to the repeal.

10.    The updated valuation rule better protected the interests of WORC and its members. Because royalties from federal coal, oil, and gas production is the federal government's largest non-tax source of revenue, all taxpayers have an interest in ensuring that royalties are appropriately valued. Further, many of our members live in states where significant development of federal coal occurs. These members not only have an economic interest in ONRR's valuation rule as

federal taxpayers, but also as taxpayers of states that receive half of the royalties paid on federal minerals produced in those states.  Federal mineral royalty payments to states are variously allocated among, for example, public education, highways and roads, and other public works and infrastructure projects.  With the rescission of the valuation rule, these benefits to WORC members are lost.

11.    Further, WORC and its members have long argued that payment of an appropriate royalty is a standard cost of doing business, and failure to assess appropriate royalties on federally owned coal, oil, and gas is a subsidy to fossil fuel companies at the expense of state and federal taxpayers, renewable energy producers, and the owners of private and state minerals and the companies that lease and produce those minerals.  In particular, the loophole that failed to appropriately value federal coal sold through non-arm's length transactions prior to 2016 is a giveaway to coal companies that export coal to Asian markets, where it is generally sold for a substantially higher price than when sold domestically. This subsidy promotes the export of federal coal, and creates significant impacts to our members who live near coal mines and along railroad routes.

12.    The day after Secretary Zinke chartered the most recent Royalty Policy Committee ("RPC"), the Department of Interior announced the repeal of the royalty valuation rule, less than a year after it had been finalized.  The RPC is developing a replacement for the repealed valuation rule that is favorable to

extractive industries, in a subcommittee that is populated with multiple industry representatives.

13.     The RPC has also considered and/or endorsed a series of policies that have been proposed by extractive industries in Congress for years, but have not been passed.  These include numerous proposals to streamline the processes to review environmental impacts of fossil fuel leasing and development under the National Environmental Policy Act, and to review and issue permits.  WORC has opposed these policies in Congress because they would reduce or eliminate comment opportunities for split estate landowners who own the private land above federally owned minerals and other neighboring landowners and interested members of the public.  Some of the proposals would grant these families just a few weeks to analyze proposals and prepare substantive comments on agency actions that would have major impacts on their property, livelihoods and quality of life.  We have written and signed several letters, and raised the issues in meetings with Congressional staff, and succeeded in defeating the most extreme proposals.

14.     These proposals represent the narrow interest of the most dominant RPC members – fossil fuel companies and industry associations that represent them – and fail to take into account the value of robust public comment to identify unnecessary or unacceptable negative impacts.  For example, under the

Notification of Permit to Drill ("NPD") proposal recommended by the RPC's

Planning, Analysis and Competitiveness Subcommittee and considered at the

Committee's most recent meeting, drilling permit applications would be

automatically approved if BLM did not act on the proposal within 45 days. Not

only would the NPD proposal limit public participation requirements under NEPA

at an important juncture (i.e., when site-specific environmental impacts are known

for the first time) and severely restrict the opportunity for onsite visits with

surface owners, it could lead to permits being automatically approved without

sufficient review by BLM staff itself. The result for WORC's membership would

be more drilling with insufficient environmental review, a combination that has

spelled disaster for WORC's membership in the past.

15.    Many of WORC's members have long relationships with the land,

allowing them to offer comments, with rich specifics, that can inform BLM's

analysis and decision-making, limit interference with farm and ranch activities,

and better protect wildlife and other natural resources. Those resources include,

for example, the presence of habitats of species such as bald and golden eagles,

locations of floodplains and wetlands, locations of drinking water wells, sharp

topography, concerns related to public access, and visual resources worthy of

consideration for protection.

16.    In 2004, WORC worked to oppose and defeat proposals similar to

those proposed by the RPC.  When Congress considered legislation that would

become the Energy Policy Act of 2005, then-Senator Conrad Burns proposed a

provision that would automatically approve drilling permits after 30 days if BLM

had not taken action.  Armed with data provided by our member groups, WORC

was able to document that drilling permits were most commonly delayed because

oil and gas companies submitted incomplete permits, and successfully argued that

BLM must continue to affirmatively approve permit applications.  The final bill

passed by Congress and signed by President Bush included language establishing

a 30-day timeline for action on permits, but did not provide for automatic

approval.

17.    In WORC's view, the policies that are not being considered by the

RPC are as important as those that are.  One long-standing WORC priority is the

importance of ensuring that federal coal mines, and oil and gas sites are fully

reclaimed by lessees and operators, so that taxpayers are not forced to pay for

cleanup, and split estate landowners are not left with unreclaimed sites that can

hinder farming and ranching, and that pose threats to health and safety. WORC

and others have documented the weak reclamation track records of coal mines.

18.    Although some incremental reclamation has occurred, after decades of

mining, more than 130,000 acres of coal mine facilities and pits, or 40% of all

land strip mined for coal since 1977, still require cleanup and decommissioning in

the states where our members live.  Although state and federal laws require

reclamation of this mined land, reclamation may not be guaranteed if mining

companies collapse in the middle of mining or reclamation operations, or if

reclamation bonds are not sufficient.

19.    DOI's track record on reclamation of federal oil and gas sites is even

worse.  The Government Accountability Office (GAO) has criticized BLM for not

accurately accounting for idle and orphaned onshore oil and gas wells, and the risk

that taxpayers will have to shoulder cleanup costs.  According to the GAO, the

public cost of cleaning up wells that are currently idle and orphaned has grown to

at least $46 million.  However, this estimate does not include thousands of idle

and orphaned wells that BLM is not appropriately tracking in its outdated

recordkeeping system.

20.    Despite this oversight, BLM has not implemented recommendations

from GAO, the Interior Office of Inspector General, WORC, and others that

would increase reclamation bond amounts to ensure that the cost to reclaim oil

and gas sites are borne by lessees and operators, and not taxpayers and

landowners.  Numerous WORC members have idle and orphaned federal wells on

or near their private property.

21.    The RPC should more actively consider failure of the BLM and

Office of Surface Mining to update their policies to ensure that mine and well sites

are reclaimed as contemporaneously as possible, and that reclamation bonds are sufficient to pay for reclamation should companies go bankrupt.

22.    Another example of an issue that the RPC has failed to consider is the issue of natural gas waste,  which is an important component of ensuring the public receive the full value of natural resources produced from federal and tribal lands that WORC and 28 allied organizations asked the RPC to address.

23.    In 2016, the BLM finalized common-sense standards to reign in the excessive waste of natural gas occurring on public lands, a much-needed improvement to rules that had not been updated in 36 years despite significant changes in oil and gas industry development practices and technologies.  By curbing unnecessary venting, flaring and leaks at oil and gas operations and facilities, the Waste Prevention Rule would have reduced natural gas venting by 35% and flaring by 49%, resulting in the capture and use of 41 billion cubic feet of gas each year and significant reductions in emissions of climate-destabilizing methane, smog-forming volatile organic compounds, and air toxics, thereby limiting local residents' exposure to these pollutants.

24.    The rule would have also generated an estimated $800 million over 10 years.  WORC members have an economic interest in the new rules as taxpayers of states that receive a share of oil and gas royalties.  Also, some of our Native American members are mineral owners who stand to receive increased royalty

payments as a direct result of the new rules.  This is an area where BLM must set policy and cannot rely on states, because states have no authority to impose royalties on federal minerals, or those held in trust by the federal government for tribal governments or individual Native American allottees.

25.     The Department of Interior proposed a repeal of the BLM's Methane Waste Prevention Rule on September 19, 2018.  In lieu of a comprehensive federal requirement, the BLM would be abdicating its responsibilities and relying almost exclusively on existing state regulations to limit waste.  Many impacted states have inadequate or nonexistent natural gas waste and methane reduction regulations.  Relying on this patchwork approach would lead to inconsistent standards across our public lands and, more importantly, will result in pollution and the continued waste of taxpayer owned resources.  Since the abdication rule was finalized, there are almost no protections to ensure that the public receives the full value of the vented, leaked, flared, or otherwise wasted natural gas, resulting in taxpayers losing hundreds of millions of dollars a year on royalty-free natural gas that could otherwise be captured and sold by companies.  We believe that BLM's recent actions with respect to reducing methane waste demonstrate a gross dereliction of its duty and should be resolved as quickly as possible.

26.     Our letter making this proposal was submitted in advance of the RPC's September 13, 2018 meeting, but the RPC did not acknowledge that this

proposal had been made, discuss its merits, or in any way consider our recommendation at its meeting, nor give any indication that the proposal would be referred to or discussed in a Subcommittee.

27.    This oversight is emblematic of the RPC's general failure to include diverse points of view among its membership.  There is not one full or alternate RPC member representing the WORC's members, who have no voice on the Committee: there is no RPC member that can influence Committee deliberations on particular policy proposals, vote on the policy proposals that WORC finds harmful to its members, or propose and proactively advance (through development at the RPC's subcommittee or working group meetings) proposals that would protect WORC's membership.

28.    Making matters worse, WORC has limited access to information that the RPC should provide to the public.  The RPC has not noticed or opened its subcommittee or working group meetings, even after WORC specifically requested as much.  If the RPC were to take these steps, WORC and its membership would have up-to-date insight about policies that the full RPC may consider, and could therefore attempt to bring WORC's concerns to the RPC's subcommittees and working groups.

29.    Likewise, the RPC has not released materials prepared by or for its

subcommittees and working groups, nor has released the ethics disclosures required of its members.

30.     If WORC had this information, it could better inform its membership (and its advocacy campaigns) by describing precisely how the RPC was formulating policy, and by understanding who among of the RPC's membership was foreclosed by law from participating in RPC deliberations: with better and more complete information, WORC can more accurately address its concerns to Congress and federal agencies.  As described above, real-time access to such information has previously proved crucial in WORC's efforts to shape federal mineral policy and protect its membership.

I declare, under penalty of perjury, that the foregoing information is true, accurate, and correct.  Executed on November 26, 2018 in Washington, DC.

*Sara Kendall*

Sara Kendall

EXHIBIT A-2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS, | |
| Plaintiff, | |
| vs. | Cause No. CV-18-139-M-DWM |
| RYAN ZINKE, in his official capacity as Secretary of the Interior, SCOTT ANGELLE, in his official capacity as Director of the Bureau of Safety & Environmental Enforcement, DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, and BRIAN STEED, in his official capacity as Deputy Director of Policy and Programs for the Bureau of Land Management, | DECLARATION OF BETH KAEDING |
| Defendants. | |

I, Beth Kaeding, declare as follows:

1.     I make this declaration of my own personal knowledge.  If called to testify as a witness, I could and would testify competently regarding its contents.  I am of legal age to give this declaration.

2.      I live in Bozeman, Montana.  I have Bachelor of Science and Masters of Science degrees in Fish and Wildlife Management from Montana State University in Bozeman.

1

3.      I worked for the National Park Service as a planner and National

Environmental Policy Act ("NEPA") compliance officer between 1991 and 1997,

preparing numerous NEPA documents for that agency.

4.      Under NEPA, federal agencies must analyze the environmental

consequences of their actions through formal documents such as Environmental

Assessments or Environmental Impact Statements.

5.      When I prepared Environmental Assessments and Environmental

Impact Statements for the National Park Service, I placed a high priority on public

participation.  I conducted targeted and general public meetings and solicited

written public comments on proposed federal projects.  Analyzing and addressing

substantive comments submitted by the public was a significant part of my job.

6.      I have been a member of Northern Plains Resource Council

("Northern Plains") since 1991.

7.       I have held every Board position, including Chair, in that time period.

I remain on the Board.

8.      Northern Plains is a grassroots conservation and family agriculture

non-profit organization based in Billings, Montana.  Northern Plains organizes

Montana citizens to protect our water quality, family farms and ranches, and

unique quality of life.  Northern Plains is dedicated to providing the information

and tools necessary to give citizens an effective voice in decisions that affect their

lives.  Northern Plains has 3,365 members across Montana, many in local affiliate (chapter) organizations.

9.    I have been a member of the Western Organization of Resource Councils ("WORC") since 1991.  I am currently on WORC's Board and am Chair of the organization.

10.    WORC is a federation of eight statewide grassroots community organizations that includes 15,190 members and 39 local chapters in seven western states.  WORC is headquartered in Billings, Montana.  WORC's mission is to advance the vision of a democratic, sustainable, and just society through community action.  WORC is committed to building sustainable environmental and economic communities that balance economic growth with the health of people and stewardship of their land, water, and air resources.  Since its creation in the 1970s, WORC has focused on issues of coal mining and other mineral resource extraction and on assisting its members and communities address the adverse impacts of mining. Northern Plains Resource Council is an organizational member of WORC.

11.    While a member of Northern Plains and WORC, I have testified numerous times for the organizations at public hearings.  I have also written or edited many sets of NEPA comments that our organizations have submitted for various projects in Montana and the Powder River Basin.  These projects include

coal bed methane development, proposed coal development projects, proposed oil-and-gas development projects, federal methane rules, and major Bureau of Land Management ("BLM") resource management plan updates.

12.     I have personally composed and edited numerous sets of comments for Northern Plains and WORC on various coal development projects, including the Department of the Interior's 2016 programmatic environmental impact statement on the federal coal leasing program.  I testified for WORC on that proposal at the public scoping hearing in Grand Junction, Colorado, in July of that year.  More recently, I have participated in the preparation of scoping and draft environmental impact statement comments on federal coal lease applications, federal coal lease modifications, and amendments to federal land use permits at the Spring Creek Mine in southeastern Montana, which is operated by Cloud Peak Energy, a company with representation on the Royalty Policy Committee ("RPC" or "Committee").  Our organization also regularly submits comments on oil and gas development, including lease sales of federal oil-and-gas parcels.

13.     The catalyst for Northern Plains' formation in 1972 was coal strip mining and its impacts on private surface owners who own the land over federal and state mineral reserves.  Many of our members' livelihoods as ranchers and farmers depend entirely on clean air and water, native soils and vegetation, and lands that remain intact.  The strip mining of coal and the drilling of oil and gas

wells directly affects our members.  Many more of our members live along and near railroad lines that are the conduits for the transportation of millions of tons of coal and millions of barrels of oil and gas.

14.    Mining, drilling, and fossil fuels transportation have far ranging environmental and social impacts and costs.  Our members care deeply about Montana, its future, and  issues of the state's development of coal, oil, and gas resources.

15.     Northern Plains and WORC frequently submit comments in response to comment periods opened by agencies under federal laws, including NEPA. Providing substantive, thorough, and specific comments on proposed actions is a key tool for our organizations to advocate for the interests of our members.  By participating in the NEPA process, our members obtain a voice in decisions that affect their lives.

16.    When a project is announced, Northern Plains and WORC determine if it affects our members and communities within our area of interest and concern. I and others then read the project proposal and gather the information necessary to provide substantive comments for the federal agency to consider and address in their environmental analysis.  In many cases, after we develop our comment themes, our organizations prepare e-mail "action alerts" to our members notifying

them of the project, briefly explaining it and the issues of concern, and then providing the members a link to personally comment on the project.

17.     Our comments on numerous coal development and oil and gas development projects have led to revisions, restrictions, and better mitigations for those projects.  For example, in February 2002 BLM published a draft Environmental Impact Statement and Amendment to the Powder River and Billings Resource Management Plan, which the agency had prepared to address coal bed methane development.  After receiving substantive comments from Northern Plains, WORC, our members, and many others, BLM restarted the process and prepared a more thorough, complete, and accurate NEPA document. Northern Plains, WORC, our members, and others participated fully in this supplemental EIS process.  Our substantive comments on both NEPA documents guided the project's development and identified the many adverse environmental and social effects requiring better mitigation by BLM.

18.     I am aware that the RPC has been working for more than a year to change many regulations and policies related to the Department's management of public lands.  I am also aware that the Committee does not contain any members who advocate for WORC's interests in sustainable and fair leasing.

19.     Some of the policies considered and recommended by the Committee are related to NEPA.  In June 2018, the Committee recommended that BLM should

issue a new document exempting five categories of mining projects from NEPA analysis.

20.    The Committee also recommended that BLM issue a document restricting NEPA analysis of non-federal surface off-lease and horizontal wells that develop a minority of federal minerals.

21.    Finally, the Committee recommended that BLM issue a "catch-all" document generally narrowing NEPA analysis for all leasing projects.

22.    Limiting the scope of public comments will not result in better decisions but will instead jeopardize the ability of affected stakeholders to effectively participate in agency decision-making.  Individual permits and projects are unique, highly variable, and pose environmental problems that can take a very long time to properly analyze.  Narrowing the scope of the NEPA process compromises the ability of our organizations to advocate on behalf of our members who are affected by the land and resource management decisions subject to NEPA. Our organization and I regularly invest significant time and resources into the analysis of such projects and the development of comments specific to the project at hand.

23.    We note that projects routinely of concern to Northern Plains and WORC are the subject of the Royalty Policy Committee's NEPA recommendations issued in June, 2018.  The minutes for that meeting discuss

limiting timeframes for approving applications for permits to drill and "redundant NEPA analysis" by using categorical exclusions from NEPA to hurry along the permit process.

24.    Further, the RPC recommends that BLM limit NEPA analyses for projects that extract non-federal minerals in the area.  But such projects are frequently cumulative and possibly connected actions that often do have significant additive impacts to a project.  We adamantly object to these recommendations, which will almost certainly result in significant and possibly detrimental impacts to landowners, wildlife, vegetation, water, archeological resources, and other environmental and social issues from any proposed project, and will hinder WORC's efforts to protect its membership through the NEPA process.  All pertinent issues should be thoroughly considered before any permit approval.

25.    If WORC had access to the RPC's subcommittee and working group meetings, or had representation on the Committee, we would use those opportunities to better protect our membership's interests with respect to NEPA by providing input as policies were being developed.  As it stands, we have no such opportunities because the RPC has shrouded its subgroups in secrecy, has not released documents from the subcommittee and working groups, and contains no representation of WORC's interests.

I declare, under penalty of perjury, that the foregoing information is true, accurate, and correct. Executed on November 21, 2018, in Bozeman, Montana.

_____
Beth Kaeding