IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

WESTERN ORGANIZATION OF
RESOURCE COUNCILS,

Plaintiff,

vs.

DAVID BERNHARDT,[1] et al.,

Defendants.

CV 18–139–M–DWM

OPINION
and ORDER

In August 2018, Plaintiff Western Organization of Resource Councils

("Western") sued various officials within the Department of the Interior

("Defendants"), challenging the establishment and operation of the Royalty Policy

Committee ("Royalty Committee" or "Committee") under the Federal Advisory

Committee Act ("FACA"). The Secretary of the Interior established the Royalty

Committee to provide advice on issues related to the leasing of energy and mineral

resources on Federal and Indian lands. (Doc. 25 at 15.) According to Western,

"Rather than pursue its task with the full and transparent participation of [the

public], the Committee operates in secret and works to advance the goals of only

one interest: the extractive industries that profit from the development of public

---

[1] *See* Fed. R. Civ. P. 25(d).

1

gas, oil, and coal." (First Amend. Compl., Doc. 14 at ¶ 2.) Defendants seek to dismiss Western's complaint pursuant to Rule 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure. (Doc. 24.) Western seeks to preliminarily enjoin Committee operations, including activities conducted by its subcommittees and working groups. (Doc. 17.) Argument was heard on the pending motions on January 16, 2019.

As explained further below, Defendants' motion to dismiss is granted as to Counts 3 and 4 but denied as to Counts 1 and 2. Western's request for a preliminary injunction is denied.

## BACKGROUND

## I. FACA

"Congress passed FACA in 1972 to address whether and to what extent committees, boards, and councils should be maintained to advise Executive Branch officers and agencies." *Cummock v. Gore*, 180 F.3d 282, 284 (D.C. Cir. 1999) (internal citation omitted). "Congress recognized that advisory committees are frequently a useful and beneficial means of furnishing expert advice, ideas and diverse opinions to the Federal Government. However, Congress also feared the proliferation of costly committees, which were often dominated by representatives of industry and other special interests seeking to advance their own agendas." *Id.* (internal quotation marks and citation omitted). Enacting FACA,

2

Congress struck a balance between these concerns, by preserving the advisory committee mechanism for informing policy decisions, while ensuring "that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature."

*Id.* at 285 (quoting *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 446 (1989)).

FACA outlines a number of requirements governing the creation and operation of such "advisory committees." *See* 5 U.S.C. App. II § 3(2). For instance, membership must be "fairly balanced in terms of the points of view represented and the functions to be performed" and a committee's advice must reflect its "independent judgment" without inappropriate influences from the appointing authority or special interests. *Id.* at § 5(b)(2), (3). Additionally, once established, an advisory committee must open its meetings to the public, *id.* at § 10(a)(1), publish advance notice of its meetings, *id.* at § 10(a)(2), and make publicly available records, drafts, studies, and other documents that were made available to or prepared by or for the committee, *id.* at § 10(b). Additionally, FACA requires federal agencies to "establish uniform administrative guidelines and management controls for advisory committees established by the agency." *Id.* at § 8(a).

## II. Royalty Committee

The Royalty Committee was first established in 2004, with a mandate to

3

"review and comment on revenue management and other mineral-related policies"
stemming from Federal and Indian mineral leases. 69 Fed. Reg. 19876-02 (Apr.
14, 2004). The Committee's charter lapsed in 2014. It was reestablished in its
current form in 2017 with a similar mandate to "advise on current and emerging
issues related to the determination of fair market value, and the collection of
revenue from energy and mineral resources on Federal and Indian lands," as well
as "on the potential impacts of proposed policies and regulations related to revenue
collection from such development, including whether a need exists for regulatory
reform." 82 Fed. Reg. 16222-01 (Apr. 3, 2017). The Committee is comprised of:

- Seven officials from the Department of the Interior;
- Up to six representatives of governors of states that receive at least
  $10,000,000 annually in royalty revenues from federal leases;
- Up to four representatives of Indian Tribes that are subject to laws
  relating to mineral development;
- Up to six representatives of various mineral and/or energy
  stakeholders; and
- Up to four members representing academic and public interest
  groups.

(Royalty Committee Charter, Ex. R, Doc. 18-18 at ¶ 12.) It is administered by the

Office of Natural Resources Revenue. (*Id.* at ¶ 6.)

To date, the Committee has held four meetings, *see* 82 Fed. Reg. 41646

(Sept. 1, 2017) (announcing Oct. 4, 2017 meeting); 83 Fed. Reg. 6613 (Feb. 14,

2018) (announcing Feb. 28, 2018 meeting); 83 Fed. Reg. 22989 (May 17, 2018)

(announcing June 6, 2018 meeting); 83 Fed. Reg. 40081 (Aug. 13, 2018)

4

(announcing Sept. 13, 2018 meeting), and maintains its materials at its website: https://www.doi.gov/rpc.

The next Committee meeting was scheduled for January 31, 2019, but that meeting has since been cancelled due to the lapse in appropriations. (*See* Schindler Decl., Doc. 35-1 at ¶ 5.) Additionally, all members of the Committee were told that no "[Committee]-related work should occur during the shutdown, including any informal collaboration among non-federal members of the Committee." (*Id.*) All subcommittee meetings were also cancelled for the duration of the shutdown. (*Id.* at ¶ 3.) However, Western has pointed to news articles indicating certain leasing work was to continue despite the shutdown, (*see* Doc. 36 at 4 (citing "Trump Administration Working on Arctic Oil Leases Despite Shutdown," *Reuters* (Jan. 9, 2019))), raising some question as to continued operations.

## III.   The Present Case

Western is a Montana-based organization self-described as "a regional network of grassroots community organizations," that seeks "to build sustainable environmental and economic communities that balance economic growth with public health and stewardship of land, water, and air resources." (Doc. 14 at ¶ 17.) In its original complaint, Western named as defendants the Department of the Interior; the Bureau of Land Management; Ryan Zinke, Secretary of the Interior; Vincent DeVito, Counselor for Energy Policy to the Secretary of the Interior; and

5

Brian Steed, Deputy Director of Policy and Programs for the Bureau of Land Management. (Doc. 1.) Western alleges that the Royalty Commission was established in violation of FACA (Count 1) and that its operation violates FACA's requirement that it: (1) provide public notice of its meetings and publicly disseminate its materials (Count 2); (2) ensure that its membership be "fairly balanced" (Count 3); and (3) exercise independent judgment without inappropriate influences from special interests (Count 4).

On November 2, 2018, Defendants moved to dismiss Western's original complaint, arguing that (1) Western lacked standing, (2) Counts 3 and 4 are non-justiciable, and (3) Counts 1 and 2 fail to state a claim. (Doc. 12.) On November 23, 2018, Western filed its First Amended Complaint, replacing Defendant DeVito with Scott Angelle, Director of the Bureau of Safety & Environmental Enforcement. (Doc. 14); *see also* Fed. R. Civ. P. 25(d). Although Western added factual information, the First Amended Complaint contains the same four claims as the original complaint. In light of Western's amended pleading, Defendants' motion to dismiss, (Doc. 12), was denied subject to renewal, (Doc. 15).

On November 28, 2018, Western filed a motion for preliminary injunction, asking the Court to enjoin any further Committee and subcommittee meetings and operations—specifically the one scheduled for January 31, 2019—until Defendants comply with FACA's implementing regulations. (Doc. 17.) On December 17,

6

2018, Defendants filed a renewed motion to dismiss combined with their response to Western's motion. (Doc. 24.) The grounds for dismissal were substantially the same as those argued in Defendants' previous motion. (*Compare* Doc. 13 *with* Doc. 25.) On January 10, Defendants unsuccessfully sought to stay proceedings in light of the lapse in appropriations. (Doc. 34.) In that filing, Defendants indicated that the January 31 Committee meeting was cancelled, and other Committee operations were suspended during the lapse. (Doc. 35.) Western argues, however, that certain subcommittee and working group work is slated to continue. (*See* Doc. 36.)

## SUMMARY CONCLUSION

The parties take a fundamentally different view of the nature of FACA. Western's allegations, and the basis for its pending motion, rest on the principle purpose behind its enactment: the requirement that advisory committee work be both efficient and transparent. Defendants, on the other hand, base their arguments on the minimum required to comply with the text of the Act. While the dichotomy of these approaches is not dispositive, it highlights a troubling trend within the current administration's view of governing and the rule of law.

The survival of the majority of Western's claims depends on whether or not the Bureau of Land Management's ("BLM") implementing regulations under 43 C.F.R. subpart 1784 apply to the Royalty Committee. Because they do not, and

FACA alone does not provide an adequate basis for judicial review, all but two of Western's claims are dismissed as non-justiciable under the Administrative Procedure Act ("APA").

ANALYSIS

Because a court must assess its subject-matter jurisdiction with respect to a claim before ruling on the merits, *see Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999), Defendants' motion to dismiss is addressed first below.

## I.    Dismissal

### A.    Legal Standards

#### 1.    Rule 12(b)(1)

A Rule 12(b)(1) motion challenges a federal court's jurisdiction over the subject matter of the complaint. The motion may be brought on either facial or factual grounds. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.* Western, as the party invoking the court's jurisdiction, bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested. *Kokken v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

8

### 2.    Rule 12(b)(6)

A motion under Rule 12(b)(6) challenges the sufficiency of the plaintiff's pleadings. To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, a plaintiff's complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 8(a). The "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). In reviewing such a motion, a court must accept as true all well-pleaded facts in the complaint but is not required to accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sci. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

### B.    Standing (Counts 1, 3, and 4)

Defendants first argue that Western has not met its burden of establishing Article III standing with respect to three of its claims.[2] To have standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

---

[2] Defendants' original motion challenged Western's standing to bring all four claims. (*See* Docs. 12, 13.) It is now undisputed that Western has standing for its informational challenge (Count 2). *See Pub. Citizen*, 491 U.S. at 449 (holding that two advocacy organizations' failure to obtain information subject to disclosure under FACA "constitutes sufficiently distinct injury to provide standing to sue").

favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). The plaintiff must establish these elements for each claim, *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017), and "clearly allege facts demonstrating each element," *Spokeo*, 136 S. Ct. at 1547 (alteration and internal quotation marks omitted).

Western brings this action "on its own behalf," (Doc. 14 at ¶ 19), and "on behalf of its members," (*id.* at ¶ 23). Accordingly, it must establish standing "as a representative of its members" (associational standing) or "in its own right" (organizational standing). *Smith v. Pac. Properties & Dev't Corp.*, 358 F.3d 1097, 1101 (9th Cir. 2004). Defendants argue that Counts 1, 3, and 4 all hinge on procedural provisions of FACA and Western fails to show "some concrete interest that is affected by the [alleged] deprivation" under either theory. (Doc. 25 at 22 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).) Western has organizational standing to bring its claims.[3]

---

[3] Because Western has standing under this theory, associational standing is not addressed. However, Defendants likely have the better argument that Western's allegation that "its members are injured by policies encouraging the irresponsible leasing of public minerals nearby their properties, *and* by the [Committee]'s failure to consider policies that would ameliorate localized environmental destruction," (Doc. 31 at 21–22), is too speculative given the nature of the Committee and its work. Western does not show the harms identified can be linked to the unlawful creation of the Committee (Count 1) or biased, unbalanced membership (Counts 3, 4). Absent a more specific proposal in a more specific area, it seems that the

10

To establish organizational standing, a plaintiff must satisfy the same test used to assess "standing in the context of an individual plaintiff." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest (Lake Forest)*, 624 F.3d 1083, 1088 (9th Cir. 2010). An organization can establish such "standing by showing that the challenged practices have perceptibly impaired their ability to provide the services they were formed to provide." *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1241 (9th Cir. 2018) (internal quotation marks and alterations omitted). "[A] diversion-of-resources injury is sufficient to establish organizational standing for the purposes of Article III if the organization shows that, independent of the litigation, the challenged policy frustrates the organization's goals and requires the organization to expend resources in representing clients they otherwise would spend in other ways." *Id.* (internal quotation marks and citations omitted). Western argues that it has suffered three injuries sufficient to establish organizational standing: (1) procedural injuries under FACA, (2) informational injuries under FACA's implementing regulations, and (3) injuries to its ability to function as an organization. (Doc. 31 at 14.) Its argument for procedural injury is sufficient to confer standing.

In evaluating Western's claims under a "procedural injury" framework, the Court must determine "(1) whether [FACA] was established to protect [Western's]

members do not have standing to sue in their own right.

11

concrete interests (as opposed to purely procedural rights), and if so, (2) whether the specific procedural violations alleged in the case actually harm, or present a material risk of harm to, such interests." *Robins v. Spokeo, Inc. (Spokeo II)*, 867 F.3d 1108, 1113 (9th Cir. 2017); *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 918 (9th Cir. 2018).

"In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Spokeo*, 136 S. Ct. at 1549 ("Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before.") (internal quotation marks omitted). In enacting FACA, "Congress aimed . . . to control the advisory committee process and to open to public scrutiny the manner in which government agencies obtain information from private individuals," specifically, "special interest groups." *Cummock*, 180 F.3d at 285. FACA was therefore created to protect the public's participation and concrete interest in unbiased, useful, and productive advisory committees. *See id.* To achieve this end, FACA places numerous regulatory burdens on the creation and administration of such committees. *Id.*

Guided by Congress's judgment and prior judicial decisions under FACA, it is reasonable to conclude that the FACA procedures at issue in this case were crafted to protect the public's concrete interest in the unbiased and productive

establishment and operation of advisory committees. *See Pub. Citizen*, 491 U.S. at

449 (holding that allegations regarding the denial of participation in committee

meetings "constitutes a sufficiently distinct injury to provide standing" under

FACA). And, this interest goes beyond that of public access to records and

committee materials. For example, "legislative history makes clear[] the 'fairly

balanced' requirement [as alleged in Count 3] was designed to ensure that persons

or groups directly affected by the work of particular advisory committee would

have some representation on the committee." *Nat'l Anti-Hunger Coal. v. Exec.

Comm. of President's Private Sector Survey on Cost Control*, 711 F.2d 1071, 1074

n.2 (D.C. Cir. 1983).

Thus, the next question is whether Western has alleged FACA violations

"that actually harm, or at least that actually create a material risk of harm to, this

concrete interest." *Spokeo II*, 867 F.3d at 1115 (internal quotation marks omitted).

It seems that it does. If the concrete interest at stake is participation in and

oversight for advisory committees, creating unnecessary committees that cut the

public out of the process or having an allegedly one-sided committee are direct

threats to that interest. Specifically, when an advisory committee is unnecessarily

established or § 5's "fairly balanced" or "inappropriately influenced" requirements

are ignored and groups directly affected by the work of the committee lack

representation, "persons having a direct interest in the committee's purpose suffer

13

injury-in-fact sufficient to confer standing to sue." *See Nat'l Anti-Hunger Coal.*, 711 F.2d at 1074 n.2. And, Western has alleged that the actions of the Committee have interfered with Western's ability to provide services to its members, frustrating it goals. (Doc. 14 at ¶ 20); *see E. Bay*, 909 F.3d at 1241. Thus, Western has alleged procedural injury sufficient to confer organizational standing as to Counts 1, 3, and 4.

That said, Western's informational and functional injury arguments do not contribute to a finding of standing. Western argues injury exists because it has been denied information about the Committee's composition and membership. In doing so, Western relies on BLM regulation 43 C.F.R. § 1784.2-2(a), (c), which requires members of advisory committees to disclose direct or indirect interest(s) (including of spouses) involving land administered by the BLM. However, as discussed below, the Royalty Committee is not governed by the BLM regulations. Thus, this alleged injury does not provide a basis for standing. Additionally, Western alleges injury related to Counts 3 and 4 insofar as the Committee's actions impair Western's ability to function as an organization. Western argues that "Defendants have disrupted [Western]'s operations by denying [it] and likeminded representatives even a single seat on the Committee." (Doc. 31 at 18.) While Western may have a good argument under *National Anti-Hunger Coalition*, *see* 711 F.2d at 1074 n.2 (finding that organizations that sought but were denied

14

membership on committee in which they had a direct interest suffered an injury in fact), as of the writing of this Order, Western's application for membership is pending. *See* 83 Fed. Reg. 49943 (Oct. 3, 2018) (announcement for nominations for new Committee membership); (Doc. 18 at 21 n.7). Contrary to Western's argument, the Court cannot make a prediction about whether or not the Committee will deny it. This type of speculative injury does not provide a basis for standing. But, as discussed above, Western alleges procedural injury sufficient to confer Article III standing for Counts 1, 3, and 4.

## C.    Justiciability (Counts 3 and 4)

Defendants argue that Counts 3 and 4 are non-justiciable because they cover matters that have been "committed to agency discretion" under the APA. Judicial review is unavailable under the APA where "statutes preclude judicial review" or "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1)–(2). An action is committed to agency discretion when "the statute is drawn so a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Where that is so, the court lacks jurisdiction. *See Spencer Enters., Inc. v. United States*, 345 F.3d 683, 691 (9th Cir. 2003) (characterizing § 706(a)(2) as "the APA's jurisdictional bar").

Count 3 of the First Amended Complaint alleges that the Committee is not

15

"fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." (Doc. 14 at ¶ 110 (quoting 5 U.S.C. App. II § 5(b)(2)).) Count 4 claims that the Committee lacks "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or any special interest." (*Id.* at ¶ 113 (quoting 5 U.S.C. App. II § 5(b)(3)).) Defendants argue that "[b]ecause FACA provides no meaningful standards for assessing whether [they] have complied with these provisions, the Court lacks jurisdiction over these two claims." (Doc. 25 at 31.) The question is whether the "particular statutes contain sufficiently definite standards for [courts] to apply to allow for judicial review." *Ctr. for Policy Analysis on Trade & Health (CPATH) v. Office of U.S. Trade Representative*, 540 F.3d 940, 946 (9th Cir. 2008), as amended (Oct. 8, 2008).

### 1.    Count Three: Section 5(b)(2) – Fair Membership Balance

In *CPATH*, the Ninth Circuit examined the composition of the Industry Trade Committees, which were required under the Trade Act to "be representative of all industry, labor, agricultural, or service interests (including small business interests) in the sector or functional areas concerned." *Id.* at 945 (quoting 19 U.S.C. § 2155(c)(2)). The court concluded that neither FACA nor the Trade Act supplied a standard against which the court could judge whether the viewpoints represented on the advisory committee were "fairly balanced." *Id.* The court

16

further stated that FACA does not "articulate what perspective must be considered when determining if an advisory committee is fairly balanced." *Id.* Thus, whether the committee was "fairly balanced" was a "hopelessly manipulable" "political question that [was] best left to the other branches of government." *Id.* (citing *Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*, 886 F.2d 419, 426–30 (D.C. Cir. 1989) (Silberman, J., concurring)). However, the court clarified that the justiciability of "fairly balanced" in other circumstances "remains an open question" depending on the applicable statutes and implementing regulations. *Id.* at 947.

Following *CPATH*, Western can only succeed if it shows that some authority other than FACA provides a sufficient standard for review. To do so, Western relies on the BLM regulations under Title 43, subpart 1784 of the Code of Federal Regulations. The Tenth Circuit has held that the Department's implementing regulations for resource advisory committees, 43 C.F.R. §§ 1784.2-1, 1784.6-1, are sufficient to create a reviewable controversy on the "fairly balanced" question under the APA. *See Col. Env'tl Coal. v. Wenker*, 353 F.3d 1221, 1223–24 (10th Cir. 2004) (per curiam). However, *Wenker* relies heavily on standards outlined in 43 C.F.R. §§ 1784.6-1(c), 1784.6-2, which govern appointments to BLM resource advisory committees. These regulations specifically outline "categories of interests [that] are entitled to representation on [resource advisory committees]"

17

and provides three specific "models" for organization. *Id.* at 1233–34. Thus, the threshold question is whether the Royalty Committee is governed by these regulations. Defendants make a compelling argument that it is not.

As argued by Western, there are a number of potentially applicable regulations that govern BLM advisory committees. *See* 43 C.F.R. §§ 1784.0-1 to 1785.6-2. Relevant here, the Department requires an advisory committee's membership to provide "representative counsel and advice about public land and resource planning, retention, management, and disposal," 43 C.F.R. § 1784.2-1(a), and generally prohibits committee membership for "[p]ersons or employees of organizations who hold leases, licenses, permits, contracts or claims which involve lands or resources administered by the [BLM]," 43 C.F.R. § 1784.2-2(a). Accordingly, "[m]embers of advisory committees shall be required to disclose their direct or indirect interest in leases, licenses, permits, contracts, or claims and related litigation which involve lands or resources administered by the [BLM]," including holdings of spouses and children. 43 C.F.R. § 1784.2-2(c). The Department has also extended FACA's open meetings requirements to subcommittee and working group meetings. 43 C.F.R. § 1784.4-3. The regulations also require 30 days' notice of these meetings and full committee meetings. 43 C.F.R. § 1784.4-2(a).

While these regulations could potentially provide sufficient standards for

18

assessing the "fairly balanced" requirement under § 5(b)(2), they only apply to advisory committees created to address "matters relating to public lands and resources under the administrative jurisdiction of the [BLM]." 43 C.F.R. § 1784.0-1. "Public lands" as defined in this subpart excludes the Outer Continental Shelf and Indian trust land, 43 C.F.R. § 1784.0-5(e), both of which play a large role in the Royalty Committee's work. Additionally, neither the Committee's Charter nor its Notice of Establishment reference Subpart 1784, unlike those that generally fall under BLM's purview. (*See* Charter of the Grand Staircase-Escalante National Monument Advisory Committee, Ex. 6, Doc. 25-6 at ¶ 2.) Rather, the Committee is administered by the Office of Natural Resources Revenue, which is independent from the BLM. *Compare* 82 Fed. Reg. 16222 (Apr. 3, 2017) ("AGENCY: Office of Natural Resources Revenue") *with, e.g.*, 83 Fed. Reg. 44302 (Aug. 30, 2018) ("AGENCY: Bureau of Land Management, Interior"). While it is concerning that the Department can structure an advisory committee whose work overwhelmingly involves the administration of BLM lands as to avoid the more stringent BLM advisory committee regulations, it has succeeded in doing so here. As a result, Western cannot rely on the BLM's advisory committee regulations to provide sufficient standards to assess whether the Royalty Committee is "fairly balanced."

### 2. Count Four: Section 5(b)(3) – Inappropriate Influence

Defendants further argue that the reasoning under § 5(b)(2) compels the

same non-justiciable result for "inappropriately influenced" claims under § 5(b)(3), citing *Physicians Comm. for Responsible Medicine v. Vilsack*, 2016 WL 5930585, at *1 (N.D. Cal. Oct. 12, 2016). Defendants are correct. Moreover, Western's argument for the justiciability of this claim is even weaker than its claim under § 5(b)(2). Even if Western's dependence on the BLM regulations was warranted, its § 5(b)(3) claim would still be non-justiciable because neither those regulations nor FACA provide a meaningful standard for what amounts to "inappropriate" influence. *Wenker*, 353 F.3d at 1230–32 (concluding that while § 5(b)(2) ("fairly balanced") was justiciable in context of resource advisory committees under BLM, § 5(b)(3) ("inappropriate influence") was not).

Accordingly, Counts 3 and 4 are dismissed as nonjusticiable.

## D.    Failure to State a Claim

Finally, Defendants unsuccessfully argue that Counts 1 and 2 should be dismissed for failure to state a claim under Rule 12(b)(6).

### 1.    Count One: Establishment of the Committee

FACA requires that, before an agency head establishes an advisory committee, he or she must determine "as a matter of formal record, . . . with timely notice published in the Federal Register," that the committee "is in the public interest in connection with the performance of duties imposed on that agency by law."  5 U.S.C. App. II § 9(a)(2). Additionally, FACA's implementing regulations

require that an advisory committee "may be established only when it is essential to the conduct of agency business and when the information to be obtained is not already available through another advisory committee or source within the Federal Government." 41 C.F.R. § 102-3.30(a).

Defendants insist Western fails to state a claim because the Secretary is merely required to *certify* the necessity of the committee, not *justify* it. In 2004, then-Secretary Gale Norton certified "that the Royalty Policy Committee is in the public interest in connection with the performance of duties imposed on the Department of the Interior." 69 Fed. Reg. 19876-02 (Apr. 14, 2004). Similarly, in 2017, then-Secretary Zinke certified "that the Royalty Policy Committee is necessary, is in the public interest, and is established under the authority of the Secretary of the Interior, in support of greater transparency in creating royalty and leasing policy for mineral production on Federal and Tribal lands." 82 Fed. Reg. 16222-01 (Apr. 3, 2017).

Western argues that a conclusory certification sentence does not meet the agency's duty under the APA to "examine the relevant data and articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Defenders of Wildlife v. Zinke*, 856 F.3d 1248, 1262 (9th Cir. 2017) (internal quotation marks omitted). Western has the better argument. While Defendants may be correct that the Secretary's decision is

21

unreviewable once an assessment of the public interest is made, the failure to provide a factual basis for that decision is reviewable under the APA. Defendants' motion to dismiss is denied as to Count 1.

## 2. Count Two: Public Meetings and Records

Pursuant to FACA, advisory committees have an obligation to provide notice of meetings, make available records and materials, and permit public participation in meetings. 5 U.S.C. App. II § 10. Defendants challenge Western's application of this "openness" standard to subcommittees and working groups. Generally, there is no open meeting requirement for subcommittees or working groups. *See* 41 C.F.R. § 102-3.35(a). However, that general rule is subject to exception if an agency's regulations require such openness, *id.*, or "[i]f a subcommittee makes recommendations directly to a Federal officer or agency, or if its recommendations will be adopted by the parent advisory committee without further deliberations by the parent advisory committee," 41 C.F.R. § 102-3.145.

Western first alleges that the Committee is required to open subcommittee and working group meetings and disclose their materials in light of the BLM's advisory committee regulations, subpart 1784. But, as discussed above, the Committee does not fall under the BLM's regulations.

Western further argues that subcommittee and working group records are subject to public review because the Royalty Committee adopts their proposals

22

without further deliberation. 41 C.F.R. § 102-1.145. If correct, Western's allegation is sufficient under Rule 12(b)(6). While Defendants argue the factual record shows certain subcommittee and working group recommendations have been debated by the Committee itself, that does not foreclose Western's broader claim. Thus, while Defendants may be able to show 41 C.F.R. § 102-1.145 does not apply at summary judgment or trial, Western states a claim under Count 2 as it relates to subcommittees and working groups. Further, Western's allegations also extend to the Committee itself, which undisputedly must provide the access and materials outlined in FACA. (*See* Doc. 14 at ¶¶ 107, 108.) To the extent Defendants argue all Committee information and materials have been provided, that assertion remains disputed.

Western further cites the Department's Manual, which extends the provisions of FACA "to subcommittees and subgroups of advisory committees established or utilized by the Department." (308 DM 2.11, Ex. Q, Doc. 18-17 at 8.) In response, Defendants argue that the Department's "manuals do not carry the force of law and are not binding." *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 871 n.27 (9th Cir. 2017). Western disagrees, noting the express statement of mandatory compliance in the Department Manual, (*see* 11 DM 1.2(B), Doc. 31-2 at 1), and arguing the Manual consists of agency regulations. Ultimately, Defendants' cursory dismissal of the Department Manual is unpersuasive given the

explicit language of FACA, which states that agencies are to "establish uniform administrative guidelines and management controls for advisory committees established by the agency." 5 U.S.C. App. II § 8(a).

## E. Conclusion

Based on the foregoing, Counts 3 and 4 are dismissed as non-justiciable under the APA; however, Counts 1 and 2 survive. As a result, consideration of Western's motion for preliminary injunctive relief is limited to the success, harms, and equities related to the surviving counts.

## II. Preliminary Injunction

"Preliminary injunctions are an 'extreme remedy never awarded as of right.'" *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008)). A plaintiff seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in its favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "When the government is a party, these last two factors merge." *Drake Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). In the Ninth Circuit, a plaintiff may also obtain injunctive relief if there are serious questions going to the merits, the balance of hardships tips sharply in its favor, and the remaining two *Winter* factors are satisfied. *Id.* at 1085. Assuming

24

the *Winter* factors are met, a district court has the power to grant injunctive relief for an alleged FACA violation. *Alabama-Tombigbee Rivers Coal. v. Dep't of Interior*, 26 F.3d 1103, 1107 (11th Cir. 1994).

Here, Western asks that Defendants be enjoined from convening any meetings of the Committee or its subcommittees "until they comply with FACA and its implementing regulations by (1) noticing and opening to the public the [Committee]'s subcommittee and working group meetings; (2) releasing to the public mandatory ethics disclosures and material prepared for or by the [Committee]'s subcommittees and working groups; and (3) fairly balancing the [Committee] to include representation of [Western]'s interests." (Doc. 18 at 13.) Based on the analysis above, the only claims that could provide a basis for relief involve the establishment of the Committee and the provision of all Committee (and subcommittee and working group) materials as well as open access to and notice of all meetings. The January 31 Committee meeting has been cancelled, (Doc. 35), and the status of other Committee or subcommittee operations is unclear, (Doc. 36). Ultimately, Western fails to meet its burden of showing irreparable harm in the absence of an injunction.

## A.    Success on the Merits

"The first factor under *Winter* is the most important—likely success on the merits." *Garcia*, 786 F.3d at 740. Judicial review of Western's FACA claims falls

25

under the APA, 5 U.S.C. § 701(a), which allows a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to seek judicial review of that action, 5 U.S.C. §§ 702–704. Under the APA, a reviewing court may "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

An advisory committee must provide "timely notice" of its meetings to the public, 5 U.S.C. App. II § 10(a)(2), and must allow interested persons to "attend, appear before, or file statements with the committee," *id.* at § 10(a)(3). All meetings must be held "in a manner or place reasonably accessible to the public" and allow "[a]ny member of the public [to] speak to or otherwise address the advisory committee if the agency's guidelines so permit." 41 C.F.R. § 102-3.140(a), (d). FACA also requires that the Committee maintain "[a]ll records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were prepared for or by each advisory committee." 5 U.S.C. App. II § 10(b). "[T]he Government must make such materials available for public inspection and copying, even in the absence of a particular request," *Cummock*, 180 F.3d at 289, and do so before or at the meetings convened, *Food Chem. News v. Dep't of Health & Human Servs.*, 980 F.2d 1468, 1472 (D.C. Cir.

1992).

Western's motion is based on the argument that "the Committee's subcommittee and working group meetings have not been disclosed or open to the public, and the Department has not released materials prepared for or by these bodies." (Doc. 18 at 24.) However, most of Western's brief, (Doc. 18 at 28–30), is based on the application of the regulations outlined in subpart 1784, which do not apply here. Rather, Western's only potential path to success is to show either "a subcommittee makes recommendations directly to a Federal officer or agency, or . . . its recommendations will be adopted by the parent advisory committee without further deliberations by the parent advisory committee." 41 C.F.R. § 102-3.145. Because Western's own brief indicates Committee debate and public comment on certain subcommittee and working group recommendations, (*see* Doc. 18 at 25), Western faces an uphill battle in proving its claims. Thus, the first and most important *Winter* factor does not weigh heavily, if at all, in favor of Western. But, even concluding Western has raised a serious question as to this issue, Western fails to show irreparable harm.

## B.    Irreparable Harm

A plaintiff is required to show "that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. However, "[i]rreparable harm may be caused by activities broader than those that plaintiffs seek to enjoin." *Nat'l*

27

*Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018).

"There must be a sufficient causal connection between the alleged irreparable harm and the activity to be enjoined, and showing that the requested injunction would forestall the irreparable harm qualifies as such a connection." *Id.* (internal quotation marks omitted). Western alleges irreparable harm on three fronts: (1) lost opportunity to influence Committee policymaking; (2) lost opportunity to understand and disseminate information related to Committee proceedings; and (3) environmental harm to Western's members. According to Western, "[e]very day that the [Committee] operates in secret and without public input is an irreparably lost opportunity for the public to understand and comment on the nation's most important royalty policies." (Doc. 18 at 12.)

Given that the only remaining claims are Counts 1 and 2, the only harm at issue is participation in and access to materials from the Committee as well as its subcommittees and working groups. Because it is unclear that these groups will continue to operate during the lapse, it is difficult to ascertain harm. That absence of information also makes it difficult to say that Western has not been provided with the relevant documentation for a specific meeting. *Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, 265 F. Supp. 3d 54, 69 (D.D.C. 2017) (assessment of harm limited to what materials must be made available *prior* to meeting at issue). Further, Defendants indicate that the

Committee posts all the materials that will be considered at each meeting on its website, "including any recommendation from one of [its] subcommittees." (Doc. 25 at 17.) Thus, while

> [t]here may be other documents that could, in theory, further facilitate this public debate, . . . based on the information presently available, it appears that the principal documents have or will be disclosed, and the public and Plaintiff will have a substantial opportunity to debate and provide input with respect to the work of the Commission. Accordingly, the harm that would flow from the failure to disclose *additional* materials, *prior* to the [relevant] meeting, is at this time too speculative to warrant injunctive relief.

*Lawyers' Comm. for Civil Rights Under Law*, 265 F. Supp. 3d at 70–71.

Western conceded at oral argument that it has been able to participate in Committee meetings and provide feedback on proposals made by subcommittees and working groups to the larger Committee. While there may be a question as to whether Western should have access to more materials related to the operation of subcommittees and working groups, its current ability to participate in the process indicates it will not be irreparably harmed by continued operations.

## C.    Balance of Equities and Public Interest

In the absence of irreparable harm and in light of Western's undisputed ability to presently participate in Committee work, neither the equities nor the public interest favors an injunction.

### CONCLUSION

Based on the foregoing, IT IS ORDERED that Defendants' motion to

dismiss (Doc. 24) is GRANTED as to Counts 3 and 4 and DENIED as to Counts 1 and 2. Western's motion for preliminary injunctive relief (Doc. 17) is DENIED.

DATED this 24th day of January, 2019.

14:03 P.M.

Donald W. Molloy, District Judge
United States District Court