
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS, | CV 18–139–M–DWM |
| Plaintiff, | OPINION and ORDER |
| vs. | |
| DAVID BERNHARDT, et al., | |
| Defendants. | |

In August 2018, Plaintiff Western Organization of Resource Councils

("Western") sued various officials within the Department of the Interior

("Defendants"), challenging the reestablishment and operation of the Royalty

Policy Committee ("Royalty Committee" or "Committee") under the Federal

Advisory Committee Act ("FACA"). The Secretary of the Interior ("Secretary")

established the Committee to provide advice on issues related to the leasing of

energy and mineral resources on federal and Indian lands. *See* 60 Fed. Reg.

43,347, 43,475 (Aug. 21, 1995). According to Western, "Rather than pursue its

task with the full and transparent participation of . . . [the public], the Committee

operates in secret and works to advance the goals of only one interest: the

extractive industries that profit from the development of public gas, oil, and coal."

(First Amend. Compl., Doc. 14 at ¶ 2.) Ultimately, because the Committee was

improperly established, reliance on or use of its recommendations is enjoined.

## BACKGROUND

## I.    FACA

"Congress passed FACA in 1972 to address whether and to what extent committees, boards, and councils should be maintained to advise Executive Branch officers and agencies." *Cummock v. Gore*, 180 F.3d 282, 284 (D.C. Cir. 1999) (internal citation omitted). "Congress recognized that advisory committees are frequently a useful and beneficial means of furnishing expert advice, ideas and diverse opinions to the Federal Government. However, Congress also feared the proliferation of costly committees, which were often dominated by representatives of industry and other special interests seeking to advance their own agendas." *Id.* (internal quotation marks and citation omitted). Enacting FACA,

> Congress struck a balance between these concerns, by preserving the advisory committee mechanism for informing policy decisions, while ensuring "that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature."

*Id.* at 285 (quoting *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 446 (1989)).

FACA outlines a number of requirements governing an agency's creation and operation of "advisory committees." *See* 5 U.S.C. app. 2 §§ 3(2), 9(a). For instance, FACA mandates that membership be "fairly balanced in terms of the

2

points of view represented and the functions to be performed" and that a committee's advice reflect its "independent judgment" without inappropriate influences from the appointing authority or special interests. *Id.* at § 5(b)(2), (3). Additionally, once established, an advisory committee must open its meetings to the public, *id.* at § 10(a)(1), publish advance notice of its meetings, *id.* at § 10(a)(2), and make publicly available records, drafts, studies, and other documents that were made available to or prepared by or for the committee, *id.* at § 10(b). Additionally, FACA requires federal agencies to "establish uniform administrative guidelines and management controls for advisory committees established by the agency." *Id.* at § 8(a).

## II.    Royalty Committee

The first iteration of the Royalty Policy Committee was chartered by the Department of the Interior ("Department") in 1995. 60 Fed. Reg. 43,347, 43,475 (Aug. 21, 1995). Its charter was regularly renewed, and the Committee was imbued with a mandate to "review and comment on revenue management and other mineral-related policies" stemming from federal and Indian mineral leases. 69 Fed. Reg. 19,876-02 (Apr. 14, 2004). The Committee was reestablished in its current form in 2017 to "advise on current and emerging issues related to the determination of fair market value, and the collection of revenue from energy and mineral resources on Federal and Indian lands," as well as "on the potential

3

impacts of proposed policies and regulations related to revenue collection from

such development, including whether a need exists for regulatory reform."[1] 82

Fed. Reg. 16,222-01 (Apr. 3, 2017); AR_0004.

The Secretary signed the Committee's charter on March 29, 2017, AR_0016,

and published a notice in the Federal Register on April 3, 2017, AR_0004. The

Committee is comprised of:

- Seven officials from the Department of the Interior;
- Up to six representatives of governors of states that receive at least $10,000,000 annually in royalty revenues from federal leases;
- Up to four representatives of Indian Tribes that are subject to laws relating to mineral development;
- Up to six representatives of various mineral and/or energy stakeholders; and
- Up to four members representing academic and public interest groups.

AR_0015. It is administered by the Office of Natural Resources Revenue.

AR_0014. The Committee has three subcommittees: the Fair Return and Revenue

Subcommittee (the Fair Return in Value Subcommittee); the Planning, Analysis &

Competitiveness Subcommittee; and the Tribal Affairs Subcommittee (the Tribal

Energy Subcommittee). *See* AR_0063–64. These subcommittees, in turn, formed

various working groups to address specific issues. *See, e.g.*, AR_0243 (describing

---

[1] Western focuses heavily on the repeal of the Valuation Rule. (*See, e.g.*, Brief, Doc. 49 at 17–18; SUF, Doc. 50 at ¶¶ 11–18.) While relevant to the narrative of the Committee's formation, neither the Rule nor the Committee's actions regarding the Rule are directly at issue here.

4

Marketable Condition Working Group).

To date, the Committee has held four meetings, *see* 82 Fed. Reg. 41,646 (Sept. 1, 2017), AR_0052 (announcing Oct. 4, 2017 meeting); 83 Fed. Reg. 6,613 (Feb. 14, 2018), AR_0232 (announcing Feb. 28, 2018 meeting); 83 Fed. Reg. 22,989 (May 17, 2018), AR_0646–47 (announcing June 6, 2018 meeting); 83 Fed. Reg. 40,081 (Aug. 13, 2018), AR_1263–64 (announcing Sept. 13, 2018 meeting), and maintained its materials at its website: https://www.doi.gov/rpc. However, the Committee's Charter lapsed in April 2019, two years after it was chartered. *See* AR_0016 (dated April 21, 2017); 41 C.F.R. § 102-3.30(b)(4) (providing for automatic expiration after two years unless renewed).

## III. The Present Case

Western is a Montana-based organization self-described as "a regional network of grassroots community organizations," that seeks "to build sustainable environmental and economic communities that balance economic growth with public health and stewardship of land, water, and air resources." (Doc. 14 at ¶ 17.) Western filed this action in August 2018, alleging that the Royalty Committee was established in violation of FACA (Count 1) and that its operation violates FACA's requirements that it: (1) provide public notice of its meetings and publicly disseminate its materials (Count 2); (2) ensure that its membership be "fairly balanced" (Count 3); and (3) exercise independent judgment without inappropriate

5

influences from special interests (Count 4). (*Id.*) Following a January 16, 2019

hearing, Counts 3 and 4 were dismissed on Defendants' motion, leaving Counts 1

and 2. (Doc. 42); *W. Org. Resource Councils v. Bernhardt (W. Org.)*, 362 F. Supp.

3d 900 (D. Mont. 2019).

Despite the lapse of the Committee's charter, Western argues that its

"injuries persist in the form of (1) unlawfully withheld Committee materials;

(2) the Committee's pending recommendations to the Department, and;

(3) ongoing Committee work absent a valid charter." (Doc. 49 at 9.)  While

Defendants insist all Committee work has ceased, (*see* Docs. 52-1, 52-2

(summaries of April 10 and 12, 2019 meetings, indicating expiration of charter on

April 21)), they concede that subcommittee and working group records have not

been released, (Doc. 52 at 17), and maintain that potential future reliance by the

Department on existing Committee recommendations is appropriate, (*id.* at 40–42).

On May 2, 2019, Western filed its motion for summary judgment, (Docs. 48,

49), and on June 3, 2019, Defendants filed their cross-motion, (Docs. 51, 52).

### SUMMARY CONCLUSION

The establishment and operation of the Royalty Committee presents a

concerning case study in the regulation of advisory committees and their role in

government.  Through the passage of FACA, Congress sought to make advisory

committees transparent and accountable. *Cummock*, 180 F.3d at 284–85.

Defendants, ignoring that mandate, seek to render FACA impotent while essentially conceding violations of the spirit, if not the letter, of the law. While Western should not succeed on all of its claims, it has identified a gaping hole in government accountability.

## LEGAL STANDARD

Actions under FACA are evaluated under the standards set forth in the Administrative Procedure Act ("APA"), which authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and to "hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). An agency action is unlawfully withheld if the agency fails to take a "discrete agency action that it is required to take," i.e., an action that is "demanded by law," including "agency regulations that have the force of law." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64–65 (2004) (emphasis omitted). Agency action is arbitrary and capricious if the administrative record demonstrates that the "agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Where an agency's

administrative record is complete and constitutes the whole and undisputed facts underlying agency decisionmaking, summary judgment is the appropriate vehicle to address claims under both § 706(1) and (2). *City & Cty. of S.F. v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) ("[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.").

## ANALYSIS

Two FACA considerations remain: (1) reestablishment of the Committee and (2) public access to subcommittee and working group meetings and materials.

## I.    Reestablishment – Section 9 (Count 1)

Pursuant to FACA, "new advisory committees should be established only when they are determined to be essential and their number should be kept to the minimum necessary." 5 U.S.C. app. 2 § 2(b)(2). An agency must also "determine[] as a matter of formal record . . . , with timely notice published in the Federal Register," that the new committee is "in the public interest in connection with the performance of duties imposed on that agency by law." *Id.* at § 9(a)(2). Western argues that the Royalty Committee's reestablishment was infirm because the Department failed to follow the necessary consultation process or explain and justify its existence. In response, Defendants contend that Western's arguments exceed the scope of its pleadings, the Department followed the necessary

8

consultation process, and its discretionary decisions are nonjusticiable. Ultimately, Western raises persuasive concerns regarding the consultation process and the underlying basis for the agency's actions.

### A.  Scope of Argument

Defendants first argue that Western's contentions regarding the Department's failure to consult with the GSA, failure to file the charter with necessary entities, and the challenge to the sufficiency of the Committee's Membership Balance Plan exceed the scope of the Amended Complaint, (Doc. 14), and should therefore not be considered. However, as argued by Western, a complaint is only required to contain a factual basis for its claim, Fed. R. Civ. P. 8(a)(2), not outline a complete legal theory, *see Johnson v. City of Shelby*, 135 S. Ct. 346, 346–47 (2014) (distinguishing between pleading factual allegations and legal theories). Western's Amended Complaint challenges the reestablishment of the Royalty Committee. (*See* Doc. 14 at ¶¶ 103–05; *id.* at 40.) Its arguments to that point are properly before the Court.

### B.  Charter

Western argues the Royalty Committee lacks a legal charter because it did not: (1) consult with the GSA, (2) follow the procedure outlined in the Department Manual, or (3) properly file the charter. Its consultation argument has merit.

#### 1.  Consultation with GSA

An agency "must consult" with the GSA "[b]efore establishing, renewing, or reestablishing a discretionary advisory committee," so that the GSA can "suggest alternate methods of attaining its purpose that the agency may wish to consider, or inform the agency of a pre-existing committee performing similar functions." 41 C.F.R § 102-3.60(a). These consultations

> must at a minimum contain the following information:
>
> (1) Explanation of need. An explanation stating why the advisory committee is essential to the conduct of agency business and in the public interest;
>
> (2) Lack of duplication of resources. An explanation stating why the advisory committee's functions cannot be performed by the agency, another existing committee, or other means such as a public hearing; and
>
> (3) Fairly balanced membership. A description of the agency's plan to attain fairly balanced membership. The plan will ensure that, in the selection of members for the advisory committee, the agency will consider a cross-section of those directly affected, interested, and qualified, as appropriate to the nature and functions of the advisory committee.

*Id.* at § 102-3.60(b).

Defendants insist that the Department consulted with the GSA prior to reestablishing the Committee in April 2017, pointing to an email exchange in March 2017. (*See* Doc. 53-1.) But that email chain raises more questions than it answers. On March 8, 2017, the Department sent the GSA an email with a draft committee charter attached. AR_1712. While that email further states that a

10

"Membership Balance Plan" will be sent "under separate cover in a few minutes,"
*see id.,* the only "Membership Balance Plan" in the record is dated March 29,
2017, *see* AR_0005–08. And, based on a later Department email in the same
chain, it appears that document was not provided to the GSA until March 29. *See*
AR_1713–14; (Doc. 52 at 31 n.6). Additionally, while the Committee's
Justification Statement generally covers those matters outlined in 41 C.F.R. § 102-
3.60(b), *see* AR_0009, it is not clear if or when this statement was provided to the
GSA as it is generically dated "March 2017." There is a "Correspondence Brief"
dated March 8, 2017, that indicates a package containing the "Charter, the
Justification Statement, the proposed Membership Balance Plan, and the Federal
Register Notice" were all provided to the Secretary, *see* AR_0013, but it does not
appear these documents were provided to the GSA prior to the charter being
signed. Accordingly, the record does not support a conclusion that the Department
properly consulted with the GSA before reestablishing the Committee, and
Defendants fail to show the agency took the "discrete agency action that it [wa]s
required to take," in violation of the APA. *Norton*, 542 U.S. at 64.

But Defendants argue that because some consultation occurred—citing the
GSA's March 8, 2017 responsive email criticizing the proposed Committee's use
of federal employees as committee chairs, AR_1713—any procedural error is
harmless. That position is unpersuasive. "[H]armless error requires a

11

determination that the error had no bearing on the procedure used or the substance of the decision reached." *Cali. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1092 (9th Cir. 2011) (internal quotation marks and alteration omitted). The current record indicates the Department ignored the only feedback it got from the GSA. But it also shows that the GSA had feedback and that further consultation may have forced Defendants to confront a number of the concerns raised in this lawsuit. *See* 41 C.F.R. § 102-3.60(a). By failing to consult, the Department's "decisionmaking process . . . was contrary to that mandated by Congress." *Cali. Wilderness Coal.*, 631 F.3d at 1095.

## 2. Department Manual § 2.6

Next, Western claims that the Department failed to provide the Secretary of the Interior with a memorandum setting forth the information prescribed in § 2.6 of the Department's Manual. Defendants concede that they did not comply with § 2.6 but maintain that the Manual does not carry the force and effect of law and therefore provides only "procedural guidance," not substantive rights. (Doc. 52 at 33.) Defendants are correct.

For the Manual

> to have the force and effect of law, it must: (1) Prescribe substantive rules—not interpretive rules, general statements of policy or rules of agency organization, procedure or practice—and, (2) conform to certain procedural requirements. To satisfy the first requirement the rule must be legislative in nature, affecting individual rights and obligations; to satisfy the second, it must have been promulgated

12

pursuant to a specific statutory grant of authority and in conformance
with the procedural requirements imposed by Congress.

*Moore v. Apfel*, 216 F.3d 864, 868 (9th Cir. 2000). Here, § 2.6 fails the first test.

The purpose of Chapter 2 of the Manual is to "provide[] policy and procedural

information regarding the establishment, use, revision, and operating criteria for

advisory committees utilized by the Department." (§ 2.1 (Purpose), Doc. 49-1 at

2.) Thus, Chapter 2 operates "strictly [as] an internal guidance tool," *Moore*, 216

F.3d at 868, and § 2.6 cannot provide a basis for Western's claim.

Of concern, this Court declined to dismiss Count 2 of Western's Amended

Complaint in part based on Manual § 2.11 (addressing subcommittees and working

groups) earlier in this litigation on the ground that Defendants had not addressed

FACA's mandate that agencies "'establish uniform administrative guidelines and

management controls for advisory committees established by that agency.' 5

U.S.C. app. 2 § 8(a)." *See W. Org.*, 362 F. Supp. 3d at 913–14. Defendants have

since provided a thorough legal analysis of their position, (*see* Doc. 52 at 24–26;

Doc. 58 at 6–11), explaining how FACA's very mandate is procedural in nature.

(*See* Doc. 52 at 25.) Additionally, the fact that Chapter 2 of the Manual has since

been unilaterally rescinded by the Department without notice and comment,[2] (*see*

---

[2] While not at issue in this case, it is unclear whether the Department is in
compliance with 5 U.S.C. app. 2 § 8(a) given its rescission of Chapter 2.

Doc. 50-3), distinguishes it from a binding regulation, *see Moore*, 216 F.3d at 869 (emphasizing publication in either the Federal Register or the Code of Federal Regulations as the touchstone for binding regulations).

Because the Department Manual does not have the force and effect of law, it was not binding on the agency and cannot form the basis of Western's argument.

### 3.    Filing of Charter

Finally, Western claims in its opening brief that the Department failed to file the Committee charter with the relevant entities. (Doc. 49 at 29–30.) However, Western waived this argument by not addressing it in its responsive briefing. *C.f. Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1249 (N.D. Cal. 2015) (finding that plaintiff's failure to brief a claim on summary judgment constituted waiver). Even so, it appears that the charter was properly filed based on the evidence presented by Defendants. *See* AR_1721–35 (April 21, 2017 letters).

### B.    Formation Decision

Western further argues that the Department's decision to reestablish the Committee was arbitrary because the record does not show that the agency considered relevant factors or made a rational connection between the facts found and the choices made. *See Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1173 (9th Cir. 2016). Defendants, on the other hand, maintain that because these are non-

14

justiciable, discretionary conclusions vested with the agency and the agency's ultimate decisions are not reviewable, "there is no need for explanations." *Lalani v. Perryman*, 105 F.3d 334, 338 (7th Cir. 1997) (finding APA does not apply to decision committed to the Attorney General's discretion).

Defendants' position is frustrating because both FACA and the GSA regulations show that the agency is required to consider certain factors in makings its discretionary determinations. Therefore, as this Court previously concluded, the basis for the Department's decision to charter the Committee may be reviewed under the APA. *See W. Org.*, 362 F. Supp. 3d at 913; *see also Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1134 (D.C. 1995) ("The APA's procedural requirements are enforceable apart from the reviewability of the underlying action, and, indeed, support several important functions wholly distinct from judicial review."). While the standard of review in this circumstance is deferential, the agency must show "a reasonable basis exists for its decision." *Pac. Dawn LLC*, 831 F.3d at 1173 (internal quotation marks omitted).

### 1. Membership Balance Plan

Pursuant to § 102-3.60(b)(3), an agency is required to propose a membership balance plan that "will ensure that, in the selection of members for the advisory committee, the agency will consider a cross-section of those directly affected, interested, and qualified, as appropriate to the nature and functions of the advisory

15

committee." Here, the agency completed a form titled "Membership Balance Plan." *See* AR_0005–08. Defendants insist that the Committee's combination of federal members and four categories of non-federal members with connections to royalty revenues as outlined in that form, *see* AR_0005–06, satisfy its obligations. In response, Western argues that any such justification is an impermissible post-hoc rationalization. *See Cal. Pub. Utilities Comm'n v. Fed. Energy Reg. Comm'n,* 879 F.3d 966, 975 (9th Cir. 2018) (explaining that evidence of post hoc rationalization undercuts deference).

Thus, the question is whether Defendants' tautological argument (that the very nature of the members proves that they are balanced) is sufficient to show the agency engaged in reasoned decisionmaking. It is not. While the agency can point to a group of members with diverse interests, it does not explain why certain groups were omitted or included. For example, the agency does not explain why its original memorandum to the Secretary included "organizations with interest in *environmental,* mineral, and energy resource governance," AR_0013 (emphasis added), but the final membership did not, *see* AR_0006. Though the agency's final decision as to membership falls within the realm of agency discretion, it must provide a rational basis for its decision. *Pac. Dawn LLC,* 831 F.3d at 1173. The failure to do so was arbitrary in capricious in violation of the APA.

16

## 2.    Justification Statement

Western further criticizes the Justification Statement's assertion that the

Committee's functions cannot be performed by other means.  The Department was

required to provide "[a]n explanation stating why the advisory committee's

functions cannot be performed by the agency, another existing committee, or other

means such as public hearing."[3]  41 C.F.R. § 102-3.60(b)(2).  Defendants rest their

argument on the plain text of the Statement:

> **Why the Committee's functions cannot be performed by other means**
> The advice the [Committee] provides to the Department is critical in
> determining the performance of discretionary functions in the
> Department's management of Federal and Indian mineral leases and
> revenues.    The [Committee] reviews and comments on royalty
> management and other mineral-related policies and provides a forum to
> convey the views of mineral lessees, operators, revenue payors,
> recipients, governmental agencies, Tribes and the interested public.
> The [Committee] also provides opportunities for collaboration between
> multi-stakeholders, and due to the experience, knowledge, expertise,
> and motivation of all participants, there is also the intent to discuss and
> resolve highly-technical issues that are meaningful to all the parties.

AR_0009.  Defendants argue that the type of highly technical collaboration

outlined could not be performed elsewhere.  But, contrary to Defendants'

argument, that is not clear from the Statement itself.  There is no part of the

---

[3]  The Department Manual also requires the agency to explain "alternative actions .
. . that were considered and reasons why each alternative was not acceptable."
(§ 2.6(B)(1)(b), Doc. 49-1 at 4.)  As discussed above, however, the Manual is not
binding on the agency.

Statement—except for its conclusory title—that implies the work performed by the Committee could not be or is not presently performed elsewhere. Thus, the Department failed to comply with §102-3.60(b)(2).

### 3. Public Interest

Finally, Western argues that "Defendants' public interest determination is hopelessly bereft of any supporting analysis." (Doc. 56 at 27.) According to Western, because both the balanced membership and justification statements are insufficient, a finding of public interest necessarily fails to consider "important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Western further points out that Defendants present no other record support explaining how the agency exercised its discretion in this manner. In response, Defendants merely rely on the non-justiciability of the Secretary's conclusion. (*See* Doc. 52 at 38.) However, as discussed above, while the Secretary's final conclusion is unreviewable, the Court can review whether there was a reasoned basis for that conclusion. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Defendants present none. The agency's failure to provide "a rational connection between the facts found the choice made," in declaring the Committee in the public interest, *id.* (internal quotation marks omitted), is arbitrary and capricious in violation of the APA.

Accordingly, summary judgment is granted in favor of Western as to Count 1 of its Amended Complaint.

18

## II.    Public Access – Section 10 (Count 2)

Western further argues that it was entitled to access to the Royalty Committee's subcommittee and working group meetings and materials.[4]   While Defendants concede that the Committee's subcommittee and working group meeting were not open to the public and the Committee has not released their records, (Doc. 52 at 17; Doc. 54 at ¶ 31); AR_1645-46 (Dec. 12, 2018 letter to Western), Defendants maintain such disclosure is not required by FACA. Defendants are correct.

Pursuant to FACA, a committee must provide "timely notice" of its meetings and allow interested persons to "attend, appear before, or file statements with [the] committee."  5 U.S.C. app. 2 § 10(a)(2), (3).  The committee must hold meetings "in a manner or place reasonably accessible to the public" and permit "[a]ny member of the public [to] speak to or otherwise address the advisory committee if the agency's guidelines so permit."  41 C.F.R. § 102-3.140(a), (d). Committees must also publicize "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents . . . made

---

[4]  Western did not brief the public access and disclosure claims related to the Committee itself that were identified in its Amended Complaint. (*See* Doc. 14 at ¶¶ 106–08.) Those claims are therefore waived. *See Klamath-Siskiyou Wildlands Ctr.*, 109 F. Supp. 3d at 1249 (finding that plaintiff's failure to brief a claim on summary judgment constituted waiver); *cf. Ghahremani v. Gonzales*, 498 F.3d 993, 997 (9th Cir. 2007) ("Issues raised in a brief that are not supported by argument are deemed abandoned.").

available to or prepared for" the committee. 5 U.S.C. app. 2 § 10(b). These access

and disclosure rules are subject to exception, however. For example, preparatory

and administrative work are excluded. *See* 41 C.F.R. § 102-3.160.[5] And, relevant

here, these access and disclosure rules do not generally apply to subcommittees or

working groups unless "a subcommittee makes recommendations directly to a

Federal officer or agency, or if its recommendations will be adopted by the parent

advisory committee without further deliberations by the parent advisory

committee." 41 C.F.R. § 102-3.145.

Western argues that public access and disclosure of subcommittee and

working group meetings and materials is required for two reasons: first, the

Department Manual requires disclosure, and second, the Committee merely acts as

a rubber stamp for its subcommittees and working groups, triggering the exception

under § 102-3.145. Western's argument fails on both accounts.

## A. Department Manual

Western claims that the Department Manual gives it a right to access the

records and meetings of the Committee's subcommittee and working groups.

According to the Manual, "The provisions of [FACA] and this chapter are

---

[5] In their reply, Defendants attempt to argue that the work of the subcommittees
and working groups qualifies as "preparatory work" and is therefore excluded from
disclosure under § 102-3.160. (*See* Doc. 58 at 13.) But that argument was not
developed in Defendants' initial brief, (*see* Doc. 52 at 22 (merely mentioning the
exclusion of such work under the regulations)), so was not considered here.

applicable to subcommittees and subgroups of advisory committees established or utilized by the Department."[6] (§ 2.11 ("Subcommittees and Subgroups"), Doc. 49-1 at 8). As discussed above, however, the Manual does not carry the force and effect of law. *Moore*, 216 F.3d at 868–69. Thus, § 2.11 cannot provide a basis for Western's claim.

## B.    Committee Deliberation

Western further argues that the full Royalty Committee adopted subcommittee and working group recommendations "without further deliberations," triggering the exception to the nondisclosure rule. *See* 41 C.F.R. § 102-3.145. Western bases its argument primarily on the Committee's failure to respond to public comment following the presentation of certain recommendations. (*See* Doc. 50 at ¶¶ 40, 44, 48, 51, 57, 64, 67 (outlining numerous recommendations and commentary, concluding: "The [Royalty Committee] did not discuss these concerns.").) Defendants argue that Western's position is contradicted by the administrative record, which shows that every subcommittee recommendation was "1) circulated in advance of committee meetings, 2) presented to the full committee at those meetings, 3) subject to public comment before and at committee meetings, and 4) open to discussion among the [Royalty Committee]'s

---

[6] As mentioned above, Chapter 2 has since been rescinded. Other than to note that it is no longer in effect, Defendants do not rely on rescission to defend the Committee's noncompliance.

members prior to any committee vote." (Doc. 58 at 12.)

The parties' dispute boils down to the meaning of "further deliberations." Western takes the position that deliberation requires a perceptible consideration of feedback and public commentary. Defendants, on the other hand, view the presentation of a recommendation and the opportunity for contemporaneous public commentary and questions during the Committee meeting as sufficient. Western's view is likely consistent with the spirit of the regulation, while Defendants once again hang their hats on minimum compliance with the regulatory text. But, as argued by Defendants, it would be difficult, and inappropriate, for courts to engage in judicial review of all the recommendations made by the different subcommittees and working groups to determine on a case-by-case basis whether a nebulous level of "deliberation" occurred. And, the record as cited by Western shows that each recommendation was presented to the Committee and subjected to public comment. (*See* Doc. 50 at ¶¶ 38–73.) Such "contemporaneous[]" participation is what the GSA envisioned when it established its "without further deliberations" exception. *See* 66 Fed. Reg. 37,729 (July 19, 2001) (discussing GSA final rule with respect to Federal Advisory Committee Management). It is not enough that Western disagreed with the recommendations or the ultimate actions taken by the Committee. Because the Committee subjected subcommittee and working group recommendations to "further deliberations," 41 C.F.R. § 102-3.145, the public

22

access requirements of FACA do not apply to subcommittee and working group materials or meetings.

Accordingly, summary judgment is granted in favor of Defendants as to Count 2 of Western's Amended Complaint.

## III. Remedies

Based on the foregoing, Western has shown that the Committee was established in violation of the APA, raising the question of the appropriate remedy. Western asks the Court to: (1) vacate the charter and secretarial order; (2) order Defendants to open subcommittee and working group records for inspection; (3) enjoin Defendants from relying on Committee recommendations or work product; and (4) enjoin further meetings. Defendants argue these requests are moot, unnecessary, or disfavored.

### A. Charter

Given the unlawful establishment of the Committee, Western insists that its charter should be vacated. Defendants, on the other hand, argue that such relief is not warranted because the charter automatically lapsed in April 2019 and is no longer valid. Given the status of the charter, Western's requested relief is moot. But while the Court declines to vacate the now-lapsed charter, a use injunction—as discussed further below—is warranted.

23

**B.     Subcommittee and Working Group Records**

Because subcommittee and working group meetings and materials are not

subject to FACA's public disclosure rules, the release of these materials is not

required. This request for relief—and Western's attendant request for further

discovery and production, (*see* Doc. 56 at 20 n.7)—is denied.

**C.     Committee Recommendations and Work Product**

Western also seeks a use injunction, which would prevent the Department

from relying on Committee recommendations or work product going forward.

Defendants argue that such an injunction is an extraordinary remedy that should

not be employed in this situation. Given the foundational nature of the FACA

violation at issue here, a use injunction is warranted.

The Ninth Circuit has not addressed use injunctions in the FACA context.

Other circuits have taken differing approaches. The Eleventh Circuit has adopted

what could be characterized as a per se rule that the use of work product by a

committee that violates FACA must be enjoined. *See Alabama-Tombigbee Rivers

Coal. v. Dep't of Interior*, 26 F.3d 1103, 1107 (11th Cir. 1994) ("We find

injunctive relief as the only vehicle that carries the sufficient remedial effect to

ensure future compliance with FACA's clear requirements. Anything less would

be tantamount to nothing."). However, the Fifth and D.C. Circuits have rejected a

"per se rule," holding that use injunctions "should be the remedy of last resort" but

"might be appropriate in some cases . . . if the unavailability of an injunctive remedy would effectively render FACA a nullity." *Cargill, Inc. v. United States*, 173 F.3d 323, 342 (5th Cir. 1999) (quoting *Cal. Forestry Ass'n v. U.S. Forest Serv.*, 102 F.3d 609, 614 (D.C. Cir. 1996)). In both *Cargill* and *California Forestry*, the circuit courts ultimately remanded the remedy question to the district court to "inquire whether under the circumstances an injunction would promote FACA's purposes," *Cal. Forestry*, 102 F.3d at 614, and "fashion an injunctive remedy that will encourage compliance with FACA's strictures," *Cargill*, 173 F.3d at 342. Similarly, the Second Circuit has held that the agency's subsequent rulemaking process can cleanse tainted recommendations: "Applicable rulemaking procedures afford ample opportunity to correct infirmities resulting from improper advisory committee action prior to the proposal." *Nat'l Nutritional Foods Ass'n v. Califano*, 603 F.2d 327, 336 (2d Cir. 1979). The DC Circuit has also favorably referenced this cleansing process. *See Natural Resources Def. Council v. Pena*, 147 F.3d 1012, 1026 (D.C. 1998) (citing *Nat'l Nutritional Foods Ass'n*). All these cases recognize, however, a district court's broad discretion in this area.

Because the FACA violation at issue here goes to the very creation and existence of the advisory committee, a use injunction is appropriate under either approach discussed above. The very existence of the violation would be sufficient to support a use injunction in the Eleventh Circuit. Additionally, consistent with

the Second, Fifth, and DC Circuits, consideration of "FACA's principal purposes" reaches the same result. Those purposes include: "(1) avoidance of wasteful expenditures and (2) public accountability." *Natural Resources Def. Council*, 147 F.3d at 1026. Relevant considerations therefore include the "magnitude of the waste[d]" committee efforts, "the value of the committee's work to the sponsoring federal agency and the effect of the FACA violation on the committee's findings." *Id.*

This case is unique because while the operation of the Committee and its individual recommendations are FACA compliant (to the extent they are judicially reviewable), its creation was not. Thus, while public participation and accountability were present in the Committee's meetings, the Committee's very existence was tainted, undercutting both the Committee's devotion to the government fisc and its accountability to the public. Moreover, because the Committee's charter has lapsed, it is unclear how anything but an injunction could compel future FACA compliance. This conclusion is only reinforced by Defendants' concerning litigation position that compliance with FACA, its implementing regulations, and Departmental guidance is not entirely necessary.

On the other hand, it is unclear how and when these recommendations would or could be used in the future. It is also unclear how much money and resources went into the Committee's analysis and recommendations, which would have to be

duplicated if the recommendations were deemed null and void. *But see* AR_0010

(estimating annual operating cost of $495,000.00). This uncertainty complicates

fashioning an appropriate injunction. And, as argued by Defendants, to the extent

the Committee's recommendations influence agency policy or rulemaking in the

future, they will be subject to further public notice and comment. Thus, any

perceived harm arising from a specific recommendation could be addressed.

But ultimately, the harms under FACA would remain outstanding. A use

injunction is the only way to achieve FACA's purposes of enhancing public

accountability and avoiding wasteful expenditures going forward.[7] The agency

had the obligation and opportunity to comply with FACA from the start. It did not

do so. Under the circumstances of this case, it cannot now rely on

---

[7] While use injunctions do not explicitly rest on the four-factor test used for
permanent injunctions, it appears that those requirements are met as well:

> A plaintiff seeking a permanent injunction must show: (1) that it has
> suffered an irreparable injury; (2) that remedies available at law, such
> as monetary damages, are inadequate to compensate for that injury;
> (3) that, considering the balance of hardships between the plaintiff and
> defendant, a remedy in equity is warranted; and (4) that the public
> interest would not be disserved by a permanent injunction.

*Nat'l Wildlife Fedn. v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 817 (9th Cir.
2018) (internal quotation marks omitted). Western has suffered an irreparable
injury through the illegal creation of an advisory committee that cannot be
remedied by monetary damages. Both Western and the public as a whole were
harmed when the necessary process was not followed resulting in
recommendations that would not otherwise have been brought forth.

recommendations from an advisory committee whose very existence flies in the face of FACA. Accordingly, an injunction preventing the further use of or reliance on Committee recommendations is the only way to "promote FACA's purposes," *Cal. Forestry*, 102 F.3d at 614, and "encourage compliance with FACA's strictures," *Cargill*, 173 F.3d at 342.

## D. Further Committee Meetings

Because the Committee was established in violation FACA it should not be permitted to meet further. However, this issue has been mooted by the expiration of the Committee's charter in April 2019. (*See* Doc. 50-2 at 2.) Thus, there is no reason to enjoin further meetings.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that Western's motion (Doc. 48) is GRANTED as to Count 1. Further use of or reliance on the Royalty Committee's recommendations is ENJOINED. Defendants' cross-motion (Doc. 51) is GRANTED as to Count 2. The Clerk of Court is directed to enter judgment consistent with the above and close the case.

DATED this 13th day of August, 2019.

11:56 A.M.

Donald W. Molloy, District Judge
United States District Court

28